**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
      apersinger@bursor.com
      jluster@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT FRENZEL, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>   v.<br><br>ALIPHCOM d/b/a JAWBONE,<br><br>                Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT

Plaintiff Robert Frenzel ("Plaintiff") brings this class action on behalf of himself and all others similarly situated against AliphCom d/b/a Jawbone ("Jawbone" or "Defendant"). Plaintiff makes the following allegations based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge, including investigation conducted by his attorneys.

## I.  NATURE OF THE ACTION

1.    Defendant markets and sells a "fitness tracker" called Jawbone UP. But Jawbone UP does not function as advertised. As consumer complaints and Defendant's own admissions show, the product suffers from a fatal defect that causes it to stop functioning shortly after purchase. The defect that renders the product useless is caused by components that provide power to the product.

2.    In 2011, Defendant launched Jawbone UP (pictured below), that Defendant markets as a "system, wristband + mobile app, that tracks how you sleep, move and eat so you can know yourself better, make smarter choices and feel your best." Jawbone UP is a wristband with a built-in accelerometer that is supposed to track the user's movements, measure how long the user has been active, and keep track of how long a user has been sitting. Before going to sleep, the user is instructed to press a button at the end of the band to change the tracker from "awake mode" to "sleep mode." While in nighttime mode, the wristband is also supposed to track the user's sleep movements. Defendant also claims the product will sync to a mobile application ("app") that supposedly allows users to set their activity and diet goals, track their progress, and work in tandem with other Jawbone UP users. However, Jawbone UP has none of these uses because Jawbone UP's power defects render it useless: it does not turn on, does not charge, does not maintain a charge for the advertised number of days, and does not sync.



3.      Consumers purchase fitness trackers like Jawbone UP with the expectation that the product will work as marketed and advertised, and it will continue to function following normal usage.  This expectation is created in part because Jawbone represents that after fully charging the product, Jawbone UP will maintain the charge for an extended period of time before recharging is required.  Specifically, according to Defendant, a fully charged First or Second Generation Jawbone UP should retain its charge for 10 days, and a fully charged Jawbone UP 24 should retain its charge for 7 days.

4.      Jawbone UP purchasers pay an exorbitant price for the convenience of a device with a long battery life that combines lifestyle tracking tasks, such as a pedometer, sleep monitor, or calorie counter.  Significantly less expensive devices and free apps exist to achieve comparable results, but they are not wrapped up in one small device with a long-lasting battery.  Accordingly, the advertised battery life of the product motivates purchasers to pay approximately $80-$150 for the Jawbone UP.

5.      A legion of consumer complaints demonstrate that Jawbone UP's battery suffers from fatal defects that include the following symptoms: failure to turn on, failure or significant delay in charging, failure to maintain a charge for the advertised number of days, flashing lights indicating low charge following a complete charge or "lost clock," sync problems, shorter battery life than advertised, and other similar problems.  Not only does the product fail to maintain a charge for the advertised days, it "dies" and fails to retain any charge at all.  *See, e.g.*, Den Howlett, "The unhealthy Jawbone Up has a 60 day life," DIGINOMICA.COM, http://diginomica.com/2013/09/06/unhealthy-jawbone-60-day-life/ (September 6, 2013).

6.      Defendant is well aware of this problem.  Just months after launching Jawbone UP in 2011, the company issued a letter acknowledging a problem with "two specific capacitors in the power system that affects the ability to hold a charge."  *See* Letter from the CEO, JAWBONE.COM, https://jawbone.com/up/guarantee (last visited 7/17/2014).  In 2012, Defendant launched a Second Generation Jawbone UP that purportedly fixed the battery problems with the First Generation device.  It did not.  In fact, the problem has plagued all three generations of Jawbone UP.  Both

1  Defendant's own admissions and ample customer complaints demonstrate that the subsequent

2  versions of Jawbone UP are also inherently flawed and suffer from a fatal defect that results in

3  syncing errors and battery failure.  Because the power defect prevents Jawbone UP from working

4  at all, Jawbone UP users are left with a worthless device that fails and does not function as

5  advertised.

6  ## II.  THE PARTIES

7  7.      Plaintiff Robert Frenzel is a citizen of Missouri residing in Kansas City.

8  8.      Defendant AliphCom d/b/a Jawbone is a California corporation with its

9  headquarters and principal place of business located at 99 Rhode Island Street, San Francisco,

10  California 94304.

11  9.      Defendant markets and sells Jawbone UP widely throughout California and

12  nationwide.  Defendant has manufactured, marketed, and sold Jawbone UP using the express and

13  implied warranties, and deceptive, false, and misleading claims described herein since at least

14  2011.

15  ## III.  JURISDICTION AND VENUE

16  10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

17  because this case is a class action where the aggregate claims of all members of the proposed class

18  are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiff, as well as most

19  members of the proposed Class, are citizens of states different from the states of Defendants.

20  11.      This Court has general jurisdiction over Defendant because Defendant is

21  headquartered in San Francisco, California.  Defendant also has significant, continuous, and

22  pervasive contacts with the State of California.

23  12.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because

24  the acts and occurrences that are the subject matter of Plaintiff's and of many Class Members'

25  claims, including the challenged mislabeling and marketing practices, have occurred in whole or in

26  substantial part in this District.  Further, Defendant is headquartered in this District.

27

28

## IV.  FACTUAL BACKGROUND

**A.      An Overview of Jawbone UP**

13.      Since 2006, Jawbone has designed, manufactured, and sold consumer electronics.  It specializes in wearable technology (like the fitness tracker Jawbone UP) and portable audio devices, including portable wireless speakers like Jambox and Big Jambox, and noise-cancelling Bluetooth headsets like Jawbone Era and Jawbone Icon.

14.      Since Jawbone entered the fitness tracker market in 2011, it has distributed three generations of the Jawbone UP: First Generation Jawbone UP (2011), Second Generation Jawbone UP (2012), and Jawbone UP24 (2013) ("collectively, Jawbone UP").  Each Jawbone UP is accompanied by a one year warranty that provides for a replacement Jawbone UP, and each replacement issued under the original warranty has a three month warranty.  Although the Jawbone UP24 has features not available in the previous model, including the ability to sync to computers and smart devices wirelessly, all three Jawbone UP generations suffer from identical power defects.

15.      Jawbone UP is marketed as a lifestyle device that helps consumers monitor their movements, lifestyle choices, and sleeping patterns.  The Jawbone UP box states: "**KNOW YOURSELF**; LIVE BETTER."



16. The packaging sums up the product's utility with three words: "**SLEEP, MOVE, EAT.**" Jawbone UP is purportedly designed to track sleep patterns and help purchasers "wake up refreshed," measure the purchaser's activity and exercise while tracking the total calories burned, and assist the purchaser in making food choices that help her "feel [her] best."



17. To achieve these ends, the Jawbone UP user must "**WEAR, SYNC, AND ACT**." In other words, the device must be worn continually for best results, and the device must sync with the purchaser's computer or smart device to track the user's progress.

1
2
3
4
5
6
7
8
9
10
11



12    18.    Additionally, Jawbone UP incorporates an app for phones and compatible smart

13  devises to help users "ACT" by monitoring their movement, exercise, sleep, track progress on

14  personal goals, and record calorie intake.  Users may also "act" by joining with other Jawbone UP

15  users to create teams allowing users to monitor each other's progress.

16
17
18
19
20
21
22
23
24
25
26
27
28

1    19.    In fact, Jawbone UP suffers from defects that prevent it from syncing with the

2    user's device. Thus, contrary to Defendant's representations the user's progress is not recorded by

3    the Jawbone app. It goes without saying that when the product simply dies, it can neither record

4    data or be synced with the Jawbone app. Unfortunately, the device defects render the product

5    useless.

6    **B.    The Design of Jawbone UP**

7    20.    Jawbone UP is made of several components. *See* Jonathan Strickland, "How

8    Jawbone UP Works," HOWSTUFFWORKS.COM, "http://gizmodo.com/5965750/jawbone-up-2012-

9    review-still-not-fit-to-buy (last visited July 28, 2014). The product is coated in water-resistant

10   rubber, and beneath this coating is a strip of steel spring that keeps the wristband's shape. Jawbone

11   UP's electronic components, including the flash memory chip, are mounted on a strip within this

12   framework. Jawbone UP also contains an audio plug for syncing and charging, a motion sensor,

13   and a vibration motor.

14
15
16
17
18
19
20
21
22
23
24
25
26
27



28

21.     The Jawbone UP status lights indicate what mode the device is currently in.  When in daytime mode, the status light looks like a green sun.  When in nighttime mode, the status light looks like a blue or green crescent moon depending on the model.  The band also has a "stopwatch" mode and a "power nap" mode.  To enter the various modes, the user presses a button on the end of the band to cycle through them.



22.     As the battery starts to lose its charge, the lights change from green to a flashing red/yellow.  *See* "Understanding UP's Status Lights," JAWBONE.COM, https://jawbone.com/kb/articles/UPstatuslights.html (last visited July 25, 2014).



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23.     When the Jawbone UP is plugged into a device to charge, the status light flashes green to indicate it is charging.  Once the band is fully charged, the light is a solid green color. According to Defendant, a fully charged First or Second Generation Jawbone UP should retain its charge for 10 days, and a fully charged Jawbone UP24 should retain its charge for 7 days. Unfortunately for consumers, the product fails to live up to this claim.  The defective battery completely fails to maintain a charge or only maintains a charge for a significantly shorter period than the advertised time.



**C.      The Fatal Jawbone UP Power Defect**

24.     Unfortunately, despite its promises to deliver a veritable "lifestyle" device with a long-lasting battery, the Jawbone UP power source is defective.  Since its launch, each generation of Jawbone UP has been plagued with gadget failure stemming from power problems.  Symptoms include: significant delay in charging, syncing problems, flashing lights indicating low charge following full charge or "lost clock," extremely short battery life of a few hours or days rather than the advertised 7 or 10 days, failure to charge at all, and other similar problems.

25.     Each of these battery problems renders the device effectively useless.  The defect also results in complete device failure when the wristband fails to charge.  For example, "Lost clock" occurs when the power in the Jawbone UP band is interrupted very briefly.  The faulty power connection changes a green status light (indicating full charge) into a red/yellow color very suddenly (indicating the band needs to be charged or needs to be synced to the smart device).  As a result of this problem, the band stops tracking any data, and the user data gathered by the device is inaccurate and, in some cases, fails to continue recording.  *See generally* http://forums.jawbone.com/t5/TROUBLESHOOTING-UP/Lost-Clock/td-p/52662/page/2.  The device also simply refuses to turn on, a phenomenon known as "bricking" in the technology field. *See* Thomas Ricker, "Jawbone UP fitness bands are 'bricking,' say owners," THE VERGE.COM, http://www.theverge.com/2011/11/15/2563955/some-jawbone-up-fitness-bands-are-bricking-say-owners (Nov. 25, 2011).  All of these symptoms are a result of the defective battery and power problems in the Jawbone UP band.

26.     Instead of fixing the defect prior to sale, Defendant recommends two troubleshooting procedures to address the above-described battery problems.  Neither procedure addresses the underlying power defect.  First, Jawbone recommends a "Soft Reset," which re-boots the Jawbone UP without disrupting the user's accrued information contained on the device:



**Soft Reset**

Follow these steps:

• Plug your USB charging cable into a powered USB port.

• Press and hold the button on your band

• Continue pressing the button while you plug the band into the USB cable

• When the band's lights flash rainbow, release the button.

• Sync your band to complete the reset process.

1   *See* "UP Soft Reset," JAWBONE.COM, https://jawbone.com/kb/articles/425.html (last visited July 28,

2   2014).

3          27.     If a soft reset does not fix the problem, Defendant recommends a second procedure

4   called a "Hard Reset: to address the above-mentioned power problems.  Unlike a Soft Reset, the

5   Hard Reset returns the band to factory settings, thereby wiping out the individual user's settings

6   and accrued data.  Generally, Jawbone only recommends a hard reset after the customer contacts

7   customer relations complaining about the problem.  Numerous online resources also describe the

8   process as Jawbone UP users try to resolve power issues.  To complete a hard reset, the customer

9   must:

10   - Check whether there is some battery left in the Jawbone UP.

11   - Press the button on the band 10 times.

12   - On the 10th press, hold the button for 10 seconds until there is a red light flashed on the

13       band.

14   - To complete the reset, users have to sync the Jawbone UP with the device app, as is done

15       when using the band for the first time.

16   *See, e.g.*, Chetan Bhawani, "How to Reset Your Jawbone UP Band," THEWEARABLESTUFF.COM,

17   http://www.thewearablestuff.com/reset-jawbone-up-band-soft-hard-reset/ (last visited July 28,

18   2014).

19          28.     As stated, neither of these "fixes" actually resolves Jawbone UP's underlying power

20   defect.  After a purchaser complains enough, Defendant will replace the band if it is under

21   warranty.  Because the replacement band suffers from the same defect, a replacement band does

22   nothing to stave of the inevitable device failure.

23          29.     Defendant has engineered a clever solution to this infinite loop of product failure

24   and replacement.  While a user's first Jawbone UP device comes with a one year warranty, any

25   subsequent replacement bands issued to the user enjoy a ***three month*** guarantee.[1]  Although the

26    

---

[1]     There are some apparent inconsistencies regarding Jawbone's replacement policy, however.
At least one user reported in her review on Amazon.com that after her initial Jawbone UP24
purchase, she went through three additional replacement bands.  After the initial one-year warranty
expired, even though each subsequent warranty lasted less than three months, she was told her one-

product is extremely likely to fail within the first year of use, the failure often occurs after three months pass.  According to one report, the Jawbone UP "issue of complete battery drain commonly crops up around the three-month mark."  "The Fixya Fitness Bands Report," BLOG.FIXYA.COM, http://blog.fixya.com/pr/aug2013/fitness-band-report.html (Aug. 14, 2013).  By shortening the timeframe in which the warranty applies to replacement bands, Defendant attempts to escape its responsibility for a product that it knows contains fatal defects.  It is also Defendant's policy not to issue refunds to purchasers of Jawbone UP.

**D.     Defendant Knows About Jawbone UP's Defects**

**1.     First Generation Jawbone UP**

30.     As their sneaky replacement policy implies, Jawbone is well aware of the power defects that plague Jawbone UP.  In fact, in December 2011, Jawbone CEO Hosain Rahman published a letter acknowledging the problem and offering a limited-time, no questions asked, money back guarantee or replacement band.  *See* "Letter from the CEO: THE UP NO QUESTIONS ASKED GUARANTEE," JAWBONE.COM, https://jawbone.com/up/guarantee (last visited July 28, 2014).

31.     In the letter, Mr. Rahman admitted,
[W]e know that some of you have experienced issues with your UP band.  Given our commitment to delivering the highest quality products, this is unacceptable and you have our deepest apologies.  We've been working around the clock to identify the root causes and we'd like to thank everyone who has provided us with information and returned their bands for troubleshooting.  With your help, we've found an issue with two specific capacitors in the power system that affects the ability to hold a charge in some of our bands.

32.     Mr. Rahman continued to admit, "We recognize that this product has not yet lived up to everyone's expectations – including our own – so we're taking action."  *Id.*  From December 9, 2011 through December 31, 2012, Jawbone offered purchasers a refund for the First Generation Jawbone Up bands.  *See id.*; *see also* "THE UP NO QUESTIONS ASKED GUARANTEE," JAWBONE.COM, https://jawbone.com/up/refund (last visited July 28, 2014).  Alternately, purchasers

year warranty was up and she was out of luck.  Accordingly, it appears that Jawbone does not always honor the three month guarantee or that the one year warrantee supersedes it.  *See infra* § D.

could opt for a replacement Second Generation Jawbone UP band that would supposedly fix the power problem.

2.      Second Generation Jawbone UP

33.     When the Second Generation Jawbone UP rolled off the assembly line in 2012, Defendant represented that the power defects were fixed.  Unfortunately, the same fatal problem persisted.  *See, e.g.*, Zach Epstein, "Giving Up on Jawbone UP," NEWS.YAHOO.COM, http://news.yahoo.com/giving-jawbone-160517614.html (Aug. 15 2013).  Once again, hundreds if not thousands of consumers complained to Jawbone UP about intrinsic battery problems that plague the Jawbone UP.

34.     An incredible number of purchasers have complained about the Second Generation's failure, including on Jawbone's own website.  *See* http://forums.jawbone.com/t5/forums/searchpage/tab/message?filter=labels&q=dead (using the simple search word "dead" as a search inquiry on Jawbone's own webpage).  On one Amazon.com listing, a striking 862 reviews rated Jawbone UP with only one star.  *See* Jawbone UP Customer Reviews, AMAZON.COM, http://www.amazon.com/UP-Jawbone-Medium-Retail-Packaging/dp/B00A17IAO0/ref=sr_1_1?ie=UTF8&qid=1406681777&sr=8-1&keywords=jawbone+up (last visited July 29, 2014).  There are also regular posts from disgruntled Jawbone UP customers on the Jawbone Facebook page.  *See* Jawbone Electronics, FACEBOOK.COM, https://www.facebook.com/jawbone?fref=ts (last visited July 30, 2014).

35.     Defendant is also aware of the reported power defects because Customer Service makes it a point to ***respond directly*** to dissatisfied customers in the comments section of customer reviews both on websites within their control and the websites of their distributers.  Accordingly, Defendant is (or should be) aware that Second Generation Jawbone UP suffers from an identical problem to the defect that plagued the First Generation of Jawbone UP

36.     Furthermore, the Second Generation failure received significant press that put Defendant on notice that the same power problems persisted in the newly re-issued device.  *See id.* Den Howlett of Diginomica.com opined, "Scanning through the customer stories it seems that the

typical or average elapsed time between new/working and dead [Jawbone UPs] is around 60 days." Den Howlett, "The Unhealthy Jawbone UP has a 50 day Life," http://diginomica.com/2013/09/06/unhealthy-jawbone-60-day-life/ (Sept. 6, 2013). In another article, Simon Jones said, "The honeymoon period [with Jawbone UP] was over after a short period, when I noticed that the claimed 'Up to 10 days of use between charges' was spectacularly wide of the mark." Simon Jones, "Thumbs down for the Jawbone UP," ONPR.COM, http://onpr.com/thumbs-down-for-the-jawbone-up/ (last visited July 28, 2014).

37.     In his article entitled "Report on tracker woes shows Jawbone plagued by old demons," Jonah Comstock from MobiHealthNews noted that Jawbone "may not have entirely addressed all of the battery life issues that caused the company to offer a refund for the first generation of the device." *See* Jonah Comstock, "Report on tracker woes shows Jawbone plagued by old demons," MOBIHEALTHNEWS.COM, http://mobihealthnews.com/24751/report-on-tracker-woes-shows-jawbone-plagued-by-old-demons/ (Aug. 16, 2013). There is even a website devoted exclusively to the failures of Jawbone UP entitled "Jawbone UP: Design Failure from Product to Support." "Jawbone UP: Design Failure from Product to Support," http://jawboneup.wordpress.com/2013/02/14/jawbone-up-support-review-terrible-2/ (Feb. 14, 2013). The entire purpose of the website is to chronical the devices failure and the user's attempt to obtain replacement bands from Defendant.



*Image from http://jawboneup.wordpress.com/2013/02/14/jawbone-up-support-review-terrible-2/*

### 3.     Jawbone UP24

38.     Since its release in 2013, the Jawbone UP24 has not fared any better. It, too, suffers from the power defect that renders the device useless. *See, e.g.*, Troubleshooting UP24, FORUMS.JAWBONE.COM, http://forums.jawbone.com/t5/TROUBLESHOOTING-UP24/UP24-

1   died/td-p/81461 (last visited July 30, 2014).  Like the previous versions of Jawbone UP, the device

2   has power problems that disrupt syncing, result in charging issues, and end in downright failure.

3   *See generally* "Jawbone UP24: Ratings & Reviews," STORE.APPLE.COM,

4   http://store.apple.com/us/product/HE549LL/A/up24-by-jawbone-wristband-small (last visited July

5   30, 2014).  Plentiful consumer complaints about battery life, which are sampled in part below,

6   corroborate the continuing power defect with Jawbone UP24.

7            **E.       Customers Complaints About the Jawbone UP Defect**

8            39.      An incredible number of Jawbone UP customers have reported power problems

9   with their wristbands, including syncing problems or "lost clock," charging issues, failure to

10  maintain a charge for the marketed number of days, and complete product failure.  The following

11  are just a few examples of customers reporting power and battery problems with the currently

12  available models of Jawbone UP:

13      635 of 690 people found the following review helpful
        1.0 out of 5 stars **Two (now FOUR!) Ups down, no refund**, May 21, 2013
14      **D. McGrath "Suffering Athlete"** (Cincinnati) - See all my reviews (REAL NAME)
        **This review is from: UP by Jawbone - Medium - Retail Packaging - Onyx (Wireless
15      Phone Accessory)**

16      What a cool premise! Everything the Up was supposed to do appealed to me.

17
18      I got my first one a bit over 2 months ago. It was awesome. Until it stopped working. Well
        electronics aren't foolproof. So I informed them of my experience and they said they'd send
19      a replacement. While I was waiting for it to arrive I mentioned that I expected the 60 day
        return policy would reset with my new band, but I was told it did not. I thought that was
20      odd. I would expect to get two months of uninterrupted service to decide if I wanted to keep
        it, but that clearly is not their policy.
21
22      Now as of yesterday my second band is also dead. No lights, no vibration, no charge or
        sync, and resets don't work. Frustrating!
23
24      I asked for a refund and was told I'm outside my 60 days - which according to them start
        from the day you order the product! Mine took well over a week to arrive, and I waited for
25      another week for the replacement. I have had a functioning band for less than 60 days but
        they refuse to bend. I am stunned by the poor consumer experience.
26
27      Bottom line, the band fails way too easily and often for me, and you have no recourse if
        you're out of the 60 day window. I would avoid this product, and I would avoid this
28      company.

CLASS ACTION COMPLAINT                                                                    15

***** Update after 6 months ******

I have now made my way through 4 up bands, and each one has failed on me in about the same time frame. I think I am still under warranty, but honestly I no longer have the energy to go and get another band only to have it fail on me in another couple weeks. I still love the idea of activity and sleep tracking, but this product clearly isn't engineered to be robust enough to provide a solution for more than a couple months at best. Very disappointing.

912 of 1,082 people found the following review helpful
1.0 out of 5 stars **Avoid the Jawbone Up.**, February 4, 2013
By
**Larry** - See all my reviews
**Verified Purchase**(What's this?)
**This review is from: UP by Jawbone - Large - Retail Packaging - Onyx (Wireless Phone Accessory)**
After almost exactly two months to the day my Up died. First the charge I gave it yesterday was gone so I tried recharging it. Now it refuses to charge, and won't soft boot. I can't [d]o a hard boot because it won't charge. It worked just great until it didn't.

Support messages to Up aren't answered because they say they have higher than normal request volume - in email. And the "chat with support" that they offer doesn't work at all. They'll get back to me within two days.

Seems nice but once it stops working there is no recourse apparently. Avoid this product.

>> Update (Feb 11, 2012):

Jawbone customer service did contact me the day after I wrote this review. They determined that the UP was indeed dead, and said that they would send a replacement to me. They said their fulfillment department was several days behind, but they said they would bend their policy and send me the replacement and allow me to return mine when I received it. They needed my original receipt which I provided as a PDF by email. I twice confirmed that I had a Black Onyx size Large UP, which was noted on the receipt as well.

I received my replacement UP today. They sent the WRONG SIZE.

I have demanded an immediate correct replacement or a refund, and explained that I was an extremely unsatisfied customer, who still can't use the UP band that was purchased a mere two months ago.

So for now I suggest that you continue to avoid this product.

>> Update (Feb 12, 2012)

Jawbone customer support got back to me and said they would - AGAIN - send another UP.

And as you can see below this review Jawbone has asked me to contact them at socialsupport@jawbone.com. However, in Amazon reviews and Jawbone forums the UP seems to be failing quite often. I intend to tell them that I would appreciate a refund because as far as I can see, getting a replacement UP will just push the problem two months further until I'm eventually dealing with my UP is out of warranty.

As far as I'm concerned this was a waste of $129.99.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

>> Update (Feb 14, 2013)

Jawbone Support asked me to contact them. I did so a day and a half ago, explaining my problem and asking for a refund. I have had no response of any kind.

Amazon allows manufacturer comments which make it appear as though the manufacturer cares. They do not allow me to comment further on the manufacturer's comment to state what they actually did, and in this case it seems to be window dressing for appearances only.

95 of 110 people found the following review helpful
1.0 out of 5 stars **2 bands, 2 dead batteries**, May 7, 2013
By
**merritte** - See all my reviews
**This review is from: UP by Jawbone - Medium - Retail Packaging - Onyx (Wireless Phone Accessory)**
Bought this originally straight from jawbone in December, even paid an extra $20 have it expedited because I was so excited for it. Also owned and used the Fitbit One and Nike Fuelband. But the UP was my favorite. I much prefer the design of the band, and the app interface was really awesome and the sleep and activity tracking was a more accurate that fitbit. Also a major benefit Jawbone lets you download your information in spreadsheet form from the website, awesome

30 days later the band was dead. dead dead dead. tired all the reseting stuff, then had to pay the $10 to mail back for exchange. Received the replacement a few weeks later. It worked for 2 months this time and then one day it's battery stopped holding a charge, instead of lasting for 10 days, it lasts for about 10 hours. So know I have a band that I have to plug in and charge twice daily, which is a joke. I had originally reccomended this over the UP to some friends and their's all became non-funcitoning at some point. It's a disaster.

Please improve the product, I was happy to pay $130 and singing the praises of this product until it failed me. It's hard for me to love something that doesn't actually work most of the time.

83 of 95 people found the following review helpful
1.0 out of 5 stars **On 3rd Replacement Band**, March 12, 2013
By
**Marlena** (Philadelphia, PA United States) - See all my reviews
**This review is from: UP by Jawbone - Medium - Retail Packaging - Onyx (Wireless Phone Accessory)**
This band is simply flawed. My first band stopped working. Jawbone agreed that the band needed to be replaced. They used pony express to send me a new band a week or 2 later. 2nd band worked great for a month. 2nd band just stopped working too. Jawbone agreed that this band needed to be replaced too. They said it was crazy odds that I would get a second dud. Pony express is currently on it's way to me with my 3rd replacement band. Should be here next week. My advice to the consumer- wait for the fitbit band and hope that they figured out the technology. My advice to Jawbone - call it. Your second attempt didn't work - give people their money back. (I asked that before my second replacement, figuring if it broke within the first 2 weeks I should just get a refund) but Jawbone refused my refund because I bought it from Best Buy.

62 of 72 people found the following review helpful
1.0 out of 5 stars **We've renamed it "junk-bone" at work because it fails so often**, April 14, 2014

By
**Suburban Dad** (MA United States) - <u>See all my reviews</u>
**This review is from:** <u>UP 24 by Jawbone - Bluetooth Enabled - Large - Retail
Packaging - Onyx (Wireless Phone Accessory)</u>
Despite almost 50% of the reviews reporting failure and horrible customer service, a group
of us bought these as part of a weight loss competition at work. What a mistake. During the
first few weeks, it worked well and we all raved about it. Then they started failing. For
some of us, it stopped syncing. For others, it wouldn't start. I personally had huge gaps of
time during the day where no data at all was recorded. We all spent hours on the Jawbone
community boards trying to troubleshoot our issues without success. We also reached out to
Jawbone customer care through email and they kept telling all of us to "calibrate" the band
by timing ourselves walking around a track. Seriously?!? What kind of company includes
taking a mile walk as a troubleshooting technique?!? So we finally decided to call customer
care. None of us actually got through. Ever. We all left messages and as of this post, I'm
still waiting to get a call back. It got so bad that we permanently renamed the thing to
"Junk-bone" or "GiveUp".

But don't take my word for it. If you read all of these negative reviews and, like me, still
decide to buy one, I would really suggest one small step before you press the purchase
button. Do yourself a favor and (1) read the messages posted in the forums on Jawbone's
own community site and (2) try to call Jawbone customer service. That should give you a
better feel for the quality of this product and the company behind it.

22 of 24 people found the following review helpful
1.0 out of 5 stars **Do NOT Buy. Stopped working after two days.**, February 3, 2014
By
**J. Moores "jaimie"** (Lubec, Maine) - <u>See all my reviews</u>
<u>(REAL NAME)</u>
**Verified Purchase**(<u>What's this?</u>)
**This review is from: UP 24 by Jawbone - Bluetooth Enabled - Medium - Retail
Packaging - Onyx (Wireless Phone Accessory)**
This would be wonderful if it worked. I loved it for the two days that it did. It had battery
and sync issues and judging from the reviews here AND the support forums on the Jawbone
site, I'm far from the only one. In short, it worked perfectly for two days. I charged it on the
second night, then the following morning the silent vibration alarm didn't go off when it
was supposed to. My phone could not longer "see" it with bluetooth, nor my iPad mini, and
it wouldn't charge when I plugged it in.

The following is a description of the exact issues I had with it and what I did to try and
remedy it:

I got the UP24 band on Monday, January 27th. On January 29th, it had less than 20%
charge, so I charged it. It synced with my iPhone and it said it was fully charged with a life
of about eight days. Not long after, I went to bed and put it in sleep mode. I noticed
something was wrong in the morning when the vibration alarm didn't wake me up. It seems
that about an hour after charging, my UP24 stopped syncing.

When pressing the mode button, there were two sun flashes and two vibrations. When
holding down the mode button, the sun flashes 13 times with no vibration. There are no
lights when I plug it in to charge it.

I did a soft reset four times. I powered off my iPhone twice. I turned my iPhone Bluetooth
off and on several times. My iPhone bluetooth settings didn't see the band. I tried to add a
band using the app, which unpaired the band at first, but then the phone couldn't find a band

to pair with. I also downloaded the app on a separate device, an iPad mini, but it couldn't find a band either.

I still got the two flashes and two vibrations when I pressed the mode button, and I got no lights when I plugged it in to charge it.

I did a hard reset and then the phone did recognize it. However, the battery had gone down to 1% in less than a few hours, so I had to recharge it. After it was fully charged I put it on again. Everything seemed OK. Then a few hours later, I was working out when I felt the band vibrate. I pressed the button and it did the same thing as before: two sun flashes and two vibrations; no longer synced with the phone and it would not charge.

I was not going to keep messing around with it. I sent it back. I'm going to get a Polar Loop instead.

23 of 27 people found the following review helpful
1.0 out of 5 stars **On my 5th band ... A great concept, but still wracked by kinks and glitches**, March 20, 2014
By
**T. Dinneen** - See all my reviews
**This review is from: UP 24 by Jawbone - Bluetooth Enabled - Medium - Retail Packaging - Onyx (Wireless Phone Accessory)**
In 14 months of owning the UP and UP24 (which, in vain, I bought thinking it'd be a better product) they've worked about 1/4 of the time. Jawbone Support is friendly-seeming but actually pretty horrible (now that I've interacted with just about everyone there) and will only go so far to help you out. There are so many alternatives out there, better off going with a company that's gotten it right, this still feels like it's in development.

I used to be a huge advocate of the company and UP, but my experience with this product that purports to improve your well-being has, ironically, only made for stress, frustration, and inconvenience.

16 of 20 people found the following review helpful
1.0 out of 5 stars **Not ready for prime time**, February 4, 2014
By
**R. Morand "R Morand"** (Maine) - See all my reviews
(REAL NAME)
**This review is from: UP 24 by Jawbone - Bluetooth Enabled - Medium - Retail Packaging - Onyx (Wireless Phone Accessory)**
Well it does look and feel cool but the build is just not quality. First one stopped with dead battery after 34 hours use although it still registered as having 7 days charge...bunk!! I called and they sent another which lasted 1 week and now won't hold a charge more Han 1 day or less. I GIVE UP24!! Don't buy it!!

9 of 11 people found the following review helpful
1.0 out of 5 stars **One star is too generous!!**, March 6, 2014
By
**BWC** (HUTTO, TX, United States) - See all my reviews
**This review is from: UP 24 by Jawbone - Bluetooth Enabled - Large - Retail Packaging - Onyx (Wireless Phone Accessory)**
I gave this to my husband as a gift and it worked for a little over a month (5 days past the return window expired). We contacted Jawbone directly and they told us it was a battery issue and they would send him a "new" one...it was refurbished. This one worked for about 60 days and the same issue is happening again. We can't return it to Amazon (past the window) and Jawbone, just wants to send another refurbished one, but what it the point of

getting one that is just going to break in a month.

DO NOT WASTE YOUR MONEY!! This is a horrible product by a company with lazy & apathetic customer service department. I will never buy another Jawbone product again!!

1.0 out of 5 stars **Another One-Star review: your UP band will not last a year**, June 27, 2014
By
**C.S. Wesselkamper** (Avon Lake, OH USA) - See all my reviews
**Verified Purchase**(What's this?)
**This review is from: UP 24 by Jawbone - Bluetooth Enabled - Large - Retail Packaging - Onyx (Wireless Phone Accessory)**
I bought the UP24 band (with Bluetooth connectivity) in February 2014. I had an earlier model without Bluetooth connectivity, but that first UP band broke in mid-2013. It occurs to me now that I should have pursued the company for a replacement. But I didn't. While this is a review of the UP24 band, that earlier experience is a factor in my consideration, as I'll make clear.

I found both the 5-star review by RST10 on December 7, 2013 and the 3-star review by kolimit from January 9, 2014 both excellent at describing the features of UP24. I'll not expand on their comments. Each of those reviews is silent on my hot button issue: quality and workmanship.

Jawbone has recently replaced my UP24 when it suddenly stopped synching early this month. I am aware of four other users whose UP band experience is identical to mine: band failure within a year. I'm alarmed by that rate, and at a minimum question the QC at the manufacturer if not the basic engineering and development of the product. I will continue to use my replacement UP24 band - until it fails - but I won't purchase a replacement when that day comes. And I expect it within 6 months.

Beyond this fundamental disappointment, I have two additional adverse concerns about the UP band. I very much like the concept of tracking movement as the band purports to do. At about $150, the solution seems extravagant compared to a low tech pedometer or a phone app that can achieve the same result. Nike and MapMyFitness offer phone apps that can achieve activity tracking just as the UP band does at a tiny fraction of the cost. Admittedly, this may not be an effective alternative for women who carry their phones in purses.

Additionally, I found sleep tracking an interesting element of the UP band data collection. It's my presumption that this feature of the UP band is accomplished via the MotionX sensor in the band. Presumably, the MotionX sensor allows the UP band to infer the level of deep sleep vs. light sleep activity according to the wearer's restfulness/restlessness. Following very little internet research on my part, I concluded there is little compelling evidence of a strong correlation between deep sleep and restfulness. Full disclosure: that's my opinion only based on a few minutes of browsing the internet. Do your own research. I can understand why it is reasonable to believe so, but I suspect there's more marketing puff than peer reviewed science.

Beyond that fundamental question about the legitimacy of sleep data - and here we go again - there's an app for that. MotionX offers an eponymous 24/7 Sleep Cycle Alarm. Other vendors have competing phone apps, too. There are arguments against the use of these phone apps in favor of the UP band to measure sleep patterns, but be aware of the low cost phone app alternative. Particularly, given, what I believe is the junk science nature for the data.

5 of 6 people found the following review helpful
1.0 out of 5 stars **Do Not Purchase--Product does not last**, June 18, 2014
By
**Book lover** (San Ramon, ca) - See all my reviews
**This review is from: UP 24 by Jawbone - Bluetooth Enabled - Medium - Retail Packaging - Onyx (Wireless Phone Accessory)**
I will start off saying that the band itself is nice and the app is easy to use. However, the product is just not built to last. I have gone through 4 bands...yes FOUR! each lasting no longer than 3 months. during those replacements, support was decent in that they sent a replacement. However, after the fourth band broke, I got an email reply saying, "Sorry, your one year warranty has expired based on the original bands purchase date of 4/4/13". And I replied saying 'REALLY'? The warranty should start over after each new band you send me since they only last 3 months. They replied with sorry you are disappointed, read the warranty. I could never recommend this product and highly disappointed in their service now.

40.      Online reviews at other retailers also show customers complaining about the same power problems with Jawbone UP.  *See, e.g.*, "Jawbone UP24: Ratings & Reviews," STORE.APPLE.COM, http://store.apple.com/us/product/HE549LL/A/up24-by-jawbone-wristband-small (last visited July 30, 2014).  The comments and feedback highlight the prevalence of the Jawbone UP power problem, and customers describe the symptoms in enough detail to demonstrate that the Second Generation Jawbone UP and Jawbone UP24 have substantively identical problems as the First Generation Jawbone UP.

**F.      Plaintiff Robert Frenzel's Experience with Jawbone UP**

41.      In November 2012, Plaintiff purchased a Second Generation Jawbone UP from an Apple store for approximately $129.99 before tax.  Prior to purchasing his Jawbone UP, Mr. Frenzel reviewed Defendant's marketing materials and representations.  The representations included that Jawbone UP is a fitness and lifestyle tracker that monitors the purchaser's physical activity, sleep patterns, and eating habits, and the battery is expected to last for 10 days when fully charged.  Based on those representations, Mr. Frenzel purchased his Jawbone UP.  Plaintiff read and relied on Defendant's instructions to set up his Jawbone UP as used the wristband as directed.  Within a few months, Mr. Frenzel began experiences problems with his Jawbone UP when the battery stopped maintaining its charge.  Symptoms of the problem included the band "losing its clock," sync problems, and failure to maintain the indicated charge on the battery after fully

charging the device.  When Mr. Frenzel contacted Jawbone's Customer Care, he went through standard troubleshooting procedure but was ultimately issued a replacement band.

42.     The problems did not stop there.  Because of the device's inherent design defects, Mr. Frenzel's second band also failed to perform as advertised when, once again, the band experienced power problems.  Again, the band could not retain a charge.  The band ultimately died when it failed to turn on entirely.  Although Mr. Frenzel alerted Jawbone of the recurring problems with his device, he was informed that they would be unable to assist him and would not issue any refund or replacement.  Instead, customer support advised him that he should *purchase* a new Jawbone UP.

43.     Mr. Frenzel would not have purchased Jawbone UP if he had known that the product was so defective that it would be worthless and, would not operate as advertised.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff seeks to represent a class defined as all persons who purchased Jawbone UP for personal use, excluding those who purchased Jawbone UP for resale (hereafter, the "Class").

45.     Defendant has sold hundreds of thousands of Jawbone UP bracelets.  According to the NPD Group, the overall digital fitness device market was worth approximately $330 million in 2013 alone.  *See* "Fitbit, Jawbone, Nike had 97 percent of fitness tracker retail sales in 2013," MOBIHEALTHNEWS.COM, http://mobihealthnews.com/28825/fitbit-jawbone-nike-had-97-percent-of-fitness-tracker-retail-sales-in-2013/ (last visited July 24, 2014).  According to the report, ninety-seven percent of those sales were comprised of FitBit, Jawbone UP, and Nike Fuel Band.  *Id.* Jawbone UP accounts for approximately nineteen percent of the $330 million in sales for 2013, making Defendant's total sales of Jawbone UP in 2013 alone approximately $62.7 million.  *Id.*

46.     Jawbone UP is available in major retail stores nationwide and online.  Defendant distributes the product to leading retailers across the nation and throughout the world, including Amazon, Apple, Target, WalMart, Best Buy, AT&T, Verizon, Sprint, T-Mobile, and Radio Shack.

Jawbone UP sells for a retail price of approximately $80-$150.00 through Defendant's various distributors.

47.     Accordingly, members of the Class are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendant and third party retailers and vendors.

48.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

     a.  Whether Defendant breached an express warranty made to Plaintiff and the Class;

     b.  Whether Defendant breached an implied warranty made to Plaintiff and the Class;

     c.  Whether Defendant advertised or marketed Jawbone UP in a way that was false or misleading;

     d.  Whether Defendant's conduct was false, misleading, or reasonably likely to deceive ordinary consumers;

     e.  Whether Class Members have been injured by Defendant's conduct;

     f.  Whether Class Members suffered an ascertainable loss as a result of Defendant's misrepresentations; and

     g.  Whether Class members are entitled to damages, restitution, injunctive relief, and/or monetary relief and, if so, the amount and nature of such relief;

     h.  Whether Defendant violated California Civil Code §§ 1750, *et seq.*;

     i.  Whether Defendant violated California Business & Professions Code §§ 17200, *et seq.*; and

     j.  Whether Defendant violated California Business & Professions Code §§ 17500, *et seq.*

49.     The claims of the named Plaintiff are typical of the claims of the Class in that Plaintiff (a) was exposed to Defendant's false and misleading packaging, marketing, and promotion of Jawbone UP; (b) relied on Defendant's misrepresentations; and (c) suffered a loss as a result of his purchase.  Each Class Member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

50.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class Members will be fairly and adequately protected by Plaintiff and his counsel.

51.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**<u>COUNT I</u>**
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq.***

50.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

51.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

52.      Plaintiff and the Class Members are consumers who purchased Jawbone UP for personal purposes.  Plaintiff and the Class Members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).  Plaintiff and the Class members are not sophisticated experts with independent knowledge of pedometer and fitness tracker design, battery life, or other characteristics of fitness trackers like Jawbone UP.

53.      Jawbone UP, purchased by Plaintiff and other Class Members from Defendant, is a "good" within the meaning of Cal. Civ. Code § 1761(a).

54.      Defendant's actions, representations, and conduct have violated and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

55.      Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have …."  Cal. Civ. Code § 1770(a)(9) further prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

56.      Defendant violated Cal. Civ. Code § 1770(a)(5) and (a)(9) by misrepresenting that the First and Second Generation Jawbone UP batteries would retain its charge for 10 days when fully charged, and Jawbone UP24 would retain its charge for 7 days after being fully charged. Further, Defendant also violated Cal. Civ. Code § 1770(a)(5) and (a)(9) by representing that the device would accurately record movement and sleep patterns when the power defect prevents Jawbone UP from working at all.  Defendant knew, or should have known, based on pre-market testing that Jawbone UP contains a fatal defect that reduces the battery life of the product, impacts the product's ability to record the user's data as advertised, and results in a product that will not turn on.

57.      Plaintiff and the Class suffered injuries caused by Defendant because: (a) they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and/or the impact battery defect has the product's performance and function, and the falsity of the battery life claims; (b) they paid for a product that

1   is so defective that it is worthless; (c) they did not receive the promised benefits of Jawbone UP,

2   including the advertised battery life of the product and the functions the device can perform when

3   properly powered, as described herein; and (d) Jawbone UP did not have the characteristics, uses,

4   or benefits as promised.

5           58.     On or about July 1, 2014, prior to filing this action, Mr. Frenzel, by and through his

6   counsel, served a CLRA notice letter on Defendant Jawbone which complies in all respects with

7   California Civil Code § 1782(a).  Plaintiff sent Defendant a letter via certified mail, return receipt

8   requested, advising Defendant that it is in violation of the CLRA and demanding that it cease and

9   desist from such violations and make full restitution by refunding the monies received therefrom.

10  The letter provided Defendants with notice that Jawbone UP is defective, and the defect causes the

11  product to stop working.  He also informed Defendant that he acted on behalf of himself and a

12  putative class, and demanded relief for the class.  A true and correct copy of Plaintiff's letter is

13  attached hereto as Exhibit A.

14          59.     Wherefore, Plaintiff seeks damages, restitution, and injunctive relief for this

15  violation of the CLRA.

16                          **COUNT II**
                **Violation of California's Unfair Competition Law ("UCL"),**
17              **California Business & Professions Code §§ 17200,** *et seq.*

18          60.     Plaintiff hereby incorporates by reference the allegations contained in all preceding

19  paragraphs of this complaint.

20          61.     Plaintiff brings this claim individually and on behalf of the members of the

21  proposed Class against Defendant.

22          62.     Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof.

23  Code §§ 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and

24  include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or

25  misleading advertising …."

26          63.     Defendant violated the "unlawful" prong of the UCL by violating the CLRA, the

27  FAL, and by breaching its express and implied warranties as described herein.

28

64.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.  Defendant's practice of promising a lifestyle device that will track movement, exercise, sleep, calorie intake and calorie burn, and other benefits and then delivering an expensive and defective bracelet is of no benefit to consumers.  Defendant's conduct of selling Jawbone UP despite pre-market tests showing the defects with Jawbone UP's power supply and battery, or, alternatively, Defendant's failure to test Jawbone UP before releasing it on the market offends public policy.  Further, Defendant's refusal to remedy the defect or its representations even after numerous customers have requested that Defendant do so is unscrupulous.

65.     Defendant violated the "fraudulent" prong of the UCL by making misrepresentations about Jawbone UP, as described herein.

66.     Plaintiff and the Class members are not sophisticated experts with independent knowledge of fitness trackers and personal electronics like Jawbone UP, or how fitness trackers like Jawbone UP retain power in their batteries or record users' data.  Thus, Plaintiff and the Class members acted reasonably when they purchased Defendant's products based on their belief that Defendant's representations were true.

67.     Plaintiff and the Class lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and/or the impact battery defect has the product's performance and function, and the falsity of the battery life claims; (b) they paid for a product that is so defective that it is worthless; (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and the functions the device can perform when properly powered, as described herein; and (d) Jawbone UP did not have the characteristics, uses, or benefits as promised.

## COUNT III
### Violation of California's False Advertising Law ("FAL"),
### California Business & Professions Code §§ 17500, *et seq.*

68.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

69.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

70.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

71.     Defendant committed acts of false advertising, as defined by §§17500, *et seq.,* by making misrepresentations about Jawbone UP's battery life and performance as a lifestyle and fitness tracker as described herein.

72.     Defendant knew or should have known through the exercise of reasonable care (i.e. pre-market testing) that their representations about Jawbone UP were untrue and misleading.

73.     Defendant's actions in violation of §§ 17500, *et seq.* were false and misleading such that the general public is and was likely to be deceived.

74.     Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because:  (a) they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and/or the impact battery defect has the product's performance and function, and the falsity of the battery life claims; (b) they paid for a product that is so defective that it is worthless; (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and the functions the device can

perform when properly powered as described herein; and (d) Jawbone UP did not have the characteristics, uses, or benefits as promised.

## COUNT IV
### Breach of Express Warranty

75.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

76.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

77.     Plaintiff, and each Class member, formed a contract with Defendant at the time Plaintiff and each Class member purchased a Jawbone UP.  The terms of the contract include the promises and affirmations of fact relating to the function and longitivity of the product's battery, the performance and accuracy of the device's ability to record movement, exercise, and sleep and its other advertised fitness and lifestyle tracking functions, on Defendant's product packaging, online, and through its marketing campaign, as described above.  Defendant's online and packaging representations became part of the basis of the bargain and are part of a contract between Plaintiff and the members of the Class on the one hand, and Defendant on the other, and thus constituted express warranties.

78.     Defendant, as the designer, manufacturer, marketer, distributor, or seller expressly warranted, among other things, the following material terms about Jawbone UP:

    a.     First and Second Generation Jawbone UP devices have "[b]attery life up to 10 days."

    b.    Jawbone UP24 has "[b]attery life up to 7 days."

    c.    Jawbone UP will "track how you sleep, move, and eat.  Understand more about yourself to make smarter choices and feel your best."

    d.    Jawbone Up "measure[s] your daily activity details including steps, distance, speed, intensity, and calories burned.  Learn how active you are throughout the day top help you reach your goals."

e.  Jawbone Up helps you "see your sleep details including when you went to bed, when you fell asleep, total hours slept, and time spent in deep versus light sleep."

f.  Jawbone UP "also vibrates to wake you up at the ideal moment in your natural sleep cycle so you feel refreshed."

g.  Jawbone UP helps you "make smarter daily decisions when you understand your actions. UP helps you learn how sleep, movement, food and drink impact how you feel. In turn, as UP gets to know you, it delivers personal insights based on your daily activities, guiding you to take action, understand your choices, and know yourself better."

79.  Defendant sold the goods to Plaintiff and the other Class members, who bought the goods from Defendant. Plaintiff and the Class Members are ordinary consumers who are not experts with independent knowledge of fitness trackers and personal electronics like Jawbone UP, or how fitness trackers like Jawbone UP retain power in their batteries or record users' data. Plaintiff and the Class acted reasonably based on Defendant's representations regarding battery life and the purported benefits the product could provide to users, assuming the device is properly powered.

80.  Defendant breached the terms of this contract, including the express warranties described in this Count IV as well as above, because Jawbone (a) does not contain a battery that retains its charge for 10 because the device is defective (First and Second Generation Jawbone UP) (b) does not contain a battery that retains a charge for 7 days (Jawbone UP24) because the device is defective; (c) does not help users "understand" themselves and "make smarter choices," measure "daily activity details," measure sleep patterns, wake users at the "ideal moment," or help users "make smarter daily decisions when [they] understand [their] actions" because the defective battery and power render the product worthless and thus make delivering these promises impossible. Therefore, Defendant has breached its express warranties. As a result of this breach, Plaintiff and the Class did not receive the goods as warranted by Defendant.

81.     Plaintiff and Class members were injured and harmed as a direct and proximate result of Defendant's breach because: (a) they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and/or the impact battery defect has the product's performance and function, and the falsity of the battery life claims; (b) they paid for a product that is so defective that it is worthless; and (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and the functions the device can perform when properly powered as described herein.

**COUNT V**
**Breach of the Implied Warranty of Merchantability**

82.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

83.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

84.     Defendant is and was at all relevant times a "merchant" within the meaning of the Uniform Commercial Code ("UCC").  Defendant manufactured, distributed, and marketed Jawbone UP, which is a "good" within the meaning of the UCC.  Consequently, Defendant impliedly warranted that Jawbone UP were merchantable, including that they could pass without objection in the trade under the contract description, that they were fit for the ordinary purposes for which such goods are used, that they were of fair average quality within the description, that they were adequately labeled, and that they would conform to the promises or affirmations of fact made on their container or labels.  However, each of these implied warranties was false with respect to the goods of the kind sold to Plaintiff and members of the Class.  Indeed, Jawbone UP is not fit for the ordinary purpose for which fitness trackers and lifestyle devices are used, which includes measuring and tracking the user's activity, movement, exercise, and sleep.

85.     Plaintiff and Class members purchased Jawbone UP for the purpose of accurately recording their activity, sleep, and calorie intake.

86.     Plaintiff and the Class Members did not alter their Jawbone UP devices.

87.     The Jawbone UP devices were defective when they left the exclusive control of Defendant.

88.     Defendant knew the Jawbone UP devices would be purchased and used by Plaintiff and Class Members without additional testing. The Jawbone UP devices were unfit for their ordinary purpose, and Plaintiff and Class members did not receive the goods as warranted.

89.     More specifically, Defendant breached its implied warranty of merchantability to Plaintiff and the Class because the Jawbone UP devices would not pass without objection in the trade because they were incapable of performing the functions that fitness and lifestyle trackers are intended to perform. They are not capable of maintaining power or a charged battery, thereby rendering the device useless and unable to deliver their promised functions, including recording users' activities, movement, exercise, calorie intake, and sleep patterns.

90.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class members were injured because they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and/or the impact battery defect has the product's performance and function, and the falsity of the battery life claims; (b) they paid for a product that is so defective that it is worthless; (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and the functions the device can perform when properly powered as described herein; and (d) Jawbone UP did not have the characteristics, uses, or benefits as promised.

## COUNT VI
### Breach of Implied Warranty of Fitness for a Particular Purpose

91.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

92.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

93.     Defendant marketed, distributed, and/or sold Jawbone UP with implied warranties that it was fit for its particular purpose of acting as a fitness and lifestyle tracker with a 7 or 10 day battery life.

94.     At the time of purchasing their wristbands, Plaintiff and the Class members intended to use Jawbone UP to realize its particular purpose of acting as a fitness and lifestyle tracker with a 7 or 10 day battery life.

95.     Because Defendant extensively marketed Jawbone as a fitness and lifestyle tracker with a 7 or 10 day battery life, Defendant knew at the time it sold Jawbone UP to Plaintiff and the Class that the Plaintiff and the Class intended to use Jawbone UP for that particular purpose.

96.     Plaintiff and the Class members relied on Defendant's skill and judgment to furnish goods suitable for use as a fitness and lifestyle tracker with a 7 or 10 day battery life.  Plaintiff and Class members purchased Jawbone UP in reliance upon Defendant's implied warranties.

97.     At the time that the Jawbone UP devices were sold, Defendant knew or had reason to know that Plaintiff and Class members were relying on Defendant's skill and judgment to select or furnish a product capable of operating as a fitness and lifestyle tracker with a 7 or 10 day battery life.

98.     Plaintiff and the Class Members did not alter their Jawbone UP devices.

99.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class members have been injured and harmed because: they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and/or the impact battery defect has the product's performance and function, and the falsity of the battery life claims; (b) they paid for a product that is so defective that it is worthless; and (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and the functions the device can perform when properly powered as described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant as follows:

    a.   For an order certifying a nationwide Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

    b.   For an order declaring that Defendant's conduct violates the statutes referenced herein;

    c.   For an order finding in favor of Plaintiff, and the nationwide Class on all counts asserted herein;

    d.   For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

    e.   For prejudgment interest on all amounts awarded;

    f.   For an order of restitution and all other forms of equitable monetary relief;

    g.   For injunctive relief as pleaded or as the Court may deem proper;

    h.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees, and expenses;

    i.   Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

    j.   For such other and further relief as the Court may deem proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

1    Dated:  August 7, 2014                         Respectfully submitted,

2                                                    **BURSOR & FISHER, P.A.**

3

4                                                    By:_____*/s/ Julia A. Luster*_____
                                                          Julia A. Luster

5                                                    L. Timothy Fisher (State Bar No. 191626)
                                                     Annick M. Persinger (State Bar No. 272996)
6                                                    Julia A. Luster (State Bar No. 295031)
                                                     1990 North California Boulevard, Suite 940
7                                                    Walnut Creek, CA  94596
                                                     Telephone: (925) 300-4455
8                                                    Facsimile:  (925) 407-2700
                                                     E-Mail: ltfisher@bursor.com
9                                                               apersinger@bursor.com
                                                               jluster@bursor.com
10

11                                                   *Attorneys for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Robert Frenzel, declare as follows:

1.      I am a plaintiff in this action and a citizen of the State of Missouri.  I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently thereto.

2.      The complaint filed in this action is filed in the proper place for trial under California Civil Code Section 1780(d) in that Defendant conducts a substantial amount of business in this District and maintains its headquarters here.

3.      After reviewing the label and representations made by Defendants regarding Jawbone UP, I purchased a Jawbone UP for my personal use.  The marketing of the product and the representations on the label were substantial factors influencing my decision to purchase Jawbone UP.  I would not have purchased Jawbone UP had I known that the product was defective and would not function as advertised.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, executed on August  7 , 2014 at Kansas City, Missouri.

Robert Frenzel

**EXHIBIT A**

# BURSOR & FISHER
P.A.

1990 N. California Blvd.
SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

JULIA A. LUSTER
Tel: 925.300.4455
Fax: 925.407.2700
jluster@bursor.com

July 1, 2014

*Via Certified Mail - Return Receipt Requested*

JAWBONE Headquarters
99 Rhode Island Street
San Francisco, CA 94103

Re:     *Demand Letter Pursuant to California Civil Code § 1782,*
        *Violation of Magnuson-Moss Act, 15 U.S.C. §§ 2301, et seq., and other applicable laws.*

To Whom It May Concern:

This letter serves as a notice and demand for corrective action on behalf of my client, Robert Frenzel, and all other persons similarly situated, arising from violations of numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsection (a). This letter also serves as notice pursuant to Cal. Com. Code § 2607(3)(a) concerning the breaches of express and implied warranties described herein.

You have participated in the manufacture, marketing, and sale of Jawbone UP. Your conduct with respect to the promotion and marketing of Jawbone UP is false and misleading. Because the product suffers from recurring dysfunction and failure rendering the product useless, your conduct violates California consumer protection laws designed to protect consumers from defectively designed and manufactured products, and products that do not perform as advertised. Although Jawbone UP is marketed as "[a]n integrated system" built around the customer that "helps you understand how you sleep, move and eat so you can make smart choices," the product defects render it unable to track the consumers sleep habits, calorie and nutrition intake, and exercise. As a result of the Jawbone UP's defects, Jawbone UP purchasers received an ineffective product that does not perform as advertised.

Mr. Frenzel purchased Jawbone UP based on representations on the label and in other marketing and advertising material stating that the product would track his exercise, his sleep patterns, and his eating habits to help him make better choices. His Jawbone UP and subsequent replacements stopped functioning following limited use thereby rendering them useless. Mr. Frenzel would not have purchased Jawbone UP had he known that the product is defective and stops functioning shortly following purchase. Mr. Frenzel is acting on behalf of a class defined as all persons in the United States who purchased a Jawbone UP (hereafter, the "Class").

By knowingly selling a defective product that fails to perform as described on the label and in your marketing and advertising, Jawbone violates numerous provisions of California law,

including but not limited to the Consumer Legal Remedy Act, Civil Code § 1770(a), Cal. Com. Code § 2313, and Cal. Com. Code § 2314.

We hereby demand that you immediately make full restitution to all purchasers of Jawbone UP of all purchase money obtained from the sales thereof.

We further demand that you preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.  All documents concerning the design, development, and manufacture of Jawbone UP;

2.  All documents concerning defects or issues with Jawbone UP related to its failure to function as warranted and marketed;

3.  All documents concerning the advertisement, marketing, or sale of Jawbone UP; and

4.  All communications with customers concerning complaints or comments concerning Jawbone UP.

We are willing to negotiate to attempt to resolve the demands asserted in this letter. If you wish to enter into such discussions, please contact me immediately. If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation. If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

Warmest Regards,

Julia A. Luster