1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7   ROBERT FRENZEL,                        Case No. 14-cv-03587-WHO
              Plaintiff,
8                                          **ORDER GRANTING MOTION TO
                                           DISMISS**
9        v.
                                           Re: Dkt. No. 13
10  ALIPHCOM,

              Defendant.
11
12                              **INTRODUCTION**

13          Plaintiff Robert Frenzel brings this putative class action against defendant AliphCom dba

14  Jawbone ("Jawbone"), alleging that he was fraudulently induced to purchase a Jawbone UP

15  fitness-tracker wristband by misrepresentations regarding the product's battery life and general

16  functionality.  Jawbone moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing

17  that Frenzel's claims are precluded by California's choice-of-law rules and, in addition, are not

18  adequately alleged.  I agree on both counts and will GRANT the motion.

19                              **BACKGROUND**

20  **I.     FACTUAL BACKGROUND**

21          The following facts are alleged in Frenzel's complaint and are presumed true for the

22  purposes of this motion.  Jawbone is a California corporation headquartered in San Francisco,

23  California.  Compl. ¶ 8 (Dkt. No. 1).  It markets and sells Jawbone UP, a fitness-tracker wristband

24  that contains an accelerometer designed to track the user's daily movements and sleep patterns.

25  Users can connect, or "sync," their Jawbone UP device to a mobile application that helps them set

26  personal exercise and diet goals, monitor their progress, and collaborate with other Jawbone UP

27  users.  Compl. ¶ 2.  Jawbone advertises the device as a "wristband [plus] mobile app[lication] that

28  tracks how you sleep, move and eat so you can know yourself better, make smarter choices and

*United States District Court*
*Northern District of California*

1   feel your best." Compl. ¶ 2. The Jawbone UP box states: "KNOW YOURSELF; LIVE

2   BETTER," "WEAR, SYNC, ACT," and "[u]nderstand your sleep and wake up refreshed;

3   [m]easure daily activity and calories burned; [l]earn which foods help you feel your best." Compl.

4   ¶ 15-17. The box also states: "Battery life up to 10 days." *Id.* Jawbone UP is available in major

5   retail stores across the country and online. Compl. ¶ 46. its retail price is approximately $80.00 to

6   $150.00. *Id.* Jawbone has distributed three generations of the device: a first generation Jawbone

7   UP released in 2011, a second generation Jawbone UP released in 2012, and a Jawbone UP24

8   released in 2013. Compl. ¶ 14.

9       Frenzel alleges that each generation of Jawbone UP has been "plagued with . . . power

10  problems," including "significant delay in charging, syncing problems, flashing lights indicating

11  low charge . . . , extremely short battery life . . . , failure to charge at all, and other similar

12  problems." Compl. ¶ 24. These problems render the device "effectively useless." Compl. ¶ 25.

13      In December 2011, Jawbone's CEO issued a letter acknowledging the power problems.

14  The letter stated in relevant part:

15      > [W]e know that some of you have experienced issues with your [Jawbone] UP
16      > band. Given our commitment to delivering the highest quality products, this is
        > unacceptable and you have our deepest apologies. We've been working around
17      > the clock to identify the root causes and we'd like to thank everyone who has
        > provided us with information and returned their bands for troubleshooting. With
18      > your help, we've found an issue with two specific capacitors in the power system
        > that affects the ability to hold a charge in some of our bands.

19

20  Compl. ¶ 31. From December 9, 2011 through December 31, 2011, Jawbone offered a refund to

21  purchasers of the first generation Jawbone UP. Compl. ¶ 32. Alternatively, purchasers could opt

22  for a replacement device in the form of a second generation Jawbone UP. Compl. ¶ 32.

23      Frenzel alleges that when the second generation Jawbone UP was released in 2012,

24  Jawbone represented that the power problems identified in the first generation had been fixed.

25  Compl. ¶ 33. However, consumers continued to complain about the device's performance, and

26  multiple articles appeared online describing the ongoing power problems. Compl. ¶ 34. Jawbone

27  UP24's performance has also been lackluster. Like its predecessors, Jawbone UP24 suffers from

28  "power problems that disrupt syncing, result in charging issues, and end in downright failure."

United States District Court
Northern District of California

1    Compl. ¶ 38.

2        Frenzel resides in Kansas City, Missouri and is a Missouri citizen. Compl. ¶ 7. In

3    November 2012, Frenzel purchased a second generation Jawbone UP from an Apple store.[1]

4    Compl. ¶ 41. Before purchasing the device, Frenzel "reviewed [Jawbone's] marketing materials

5    and representations." *Id.* "The representations included that Jawbone UP is a fitness and lifestyle

6    tracker that monitors the purchaser's physical activity, sleep patterns, and eating habits, and the

7    battery is expected to last for 10 days when fully charged." *Id.* Frenzel purchased the device

8    based on these representations.[2] *Id.*

9        Within a few months, Frenzel's Jawbone UP stopped maintaining its charge. Compl. ¶ 41.

10   Frenzel contacted Jawbone and was issued a replacement second generation Jawbone UP.[3] *Id.*

11   The replacement also experienced power problems and ultimately "died" when it failed to turn on.

12   Compl. ¶ 42. Frenzel again contacted Jawbone but was told that his only recourse was to purchase

13   a new device. *Id.*

14       On the basis of these allegations, Frenzel seeks to represent a national class defined as all

15   persons who purchased any of the three generations of Jawbone UP for personal use, excluding

16   those who purchased the product for resale. Compl. ¶ 44.

17   **II.    PROCEDURAL BACKGROUND**

18       Frenzel asserts six causes of action in the complaint: (i) violations of California's

19   Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*; (ii) violations of

20   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; (iii)

21   violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et*

22

23   _____

     [1] The complaint does not identify the state in which the Apple store was located. *See* Compl. ¶ 41.

24   [2] A declaration by Frenzel is attached to the complaint. Compl. at 36. The declaration states in
     relevant part: "After reviewing the label and representations made by defendants regarding
25   Jawbone UP, I purchased a Jawbone UP for my personal use. The marketing of the product and
     the representations on the label were substantial factors influencing my decision to purchase
26   Jawbone UP." *Id.*

27   [3] Frenzel alleges that each generation of Jawbone UP is accompanied by a one year warranty that
     provides for a replacement Jawbone UP, and each replacement issued under the one year warranty
28   comes with its own three month warranty. Compl. ¶ 14.

United States District Court
Northern District of California

1   *seq.*; (iv) breach of express warranty; (v) breach of the implied warranty of merchantability; and

2   (vi) breach of the implied warranty of fitness for a particular purpose.  Compl. ¶¶ 50-99.  Frenzel

3   seeks an order certifying a national class, compensatory and punitive damages, and injunctive

4   relief.  Compl. at 34.  Jawbone filed this motion on September 29, 2014, Dkt. No. 13, and I heard

5   argument from the parties on December 17, 2014.

6                                          **LEGAL STANDARDS**

7   **I.      RULE 12(b)(6): MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

8          A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure

9   12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.

10  2001).  A complaint "must contain sufficient factual matter, accepted as true, to state a claim to

11  relief that is plausible on its face."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation

12  marks omitted).  A claim is facially plausible when it "allows the court to draw the reasonable

13  inference that the defendant is liable for the misconduct alleged."  *Id.*  In considering whether the

14  complaint is sufficient to state a claim, the court accepts as true all factual allegations contained in

15  the complaint.  *Id.*  However, the court need not accept as true "allegations that contradict matters

16  properly subject to judicial notice."  *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir.

17  2008) (internal quotation marks omitted).  "Nor is the court required to accept as true allegations

18  that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Id.*  "[I]t

19  is within [the court's] wheelhouse to reject, as implausible, allegations that are too speculative to

20  warrant further factual development."  *Dahlia v. Rodriguez,* 735 F.3d 1060, 1076 (9th Cir. 2013).

21  **II.     RULE 9(b): HEIGHTENED PLEADING STANDARD FOR FRAUD OR MISTAKE**

22         Claims sounding in fraud or mistake are subject to the heightened pleading standard of

23  Federal Rule of Civil Procedure 9(b), which requires that such claims "state with particularity the

24  circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To satisfy this standard, a

25  plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well

26  as the "circumstances indicating falseness" or "manner in which the representations at issue were

27  false and misleading."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994)

28  (internal quotation marks and modifications omitted).  The allegations "must be specific enough to

United States District Court
Northern District of California

4

1    give defendants notice of the particular misconduct which is alleged to constitute the fraud

2    charged so that they can defend against the charge and not just deny that they have done anything

3    wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

4    **III.     RULE 12(f): MOTION TO STRIKE**

5            Federal Rule of Civil Procedure 12(f) authorizes a court to "strike from a pleading an

6    insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.

7    Civ. P. 12(f). The function of a motion to strike "is to avoid the expenditure of time and money

8    that must arise from litigating spurious issues by dispensing with those issues prior to trial."

9    *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). Motions to strike are

10   generally disfavored and "should not be granted unless the matter to be stricken clearly could have

11   no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F.

12   Supp. 2d 1048, 1057 (N.D. Cal. 2004).

13                                    **DISCUSSION**

14   **I.     CHOICE OF LAW ANALYSIS**

15           Jawbone contends that under *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir.

16   2012), Frenzel's claims should be governed by the law of the state in which he purchased his

17   Jawbone UP, which Frenzel has not identified but has conceded is not California. Mot. 2 (Dkt.

18   No. 13); Opp. 3-9 (Dkt. No. 18). Jawbone argues that Frenzel's claims under the CLRA, UCL,

19   and FAL must therefore be dismissed, and to the extent that Frenzel's warranty claims are based

20   on California law, those claims must be dismissed as well. Mot. 7 n.2, 9. Jawbone also makes the

21   similar but separate argument that under *Mazza*, Frenzel cannot maintain a national class action

22   that seeks to apply California law to nonresident class members who purchased their Jawbone UP

23   devices in other states. Mot. 2.[4]

24           In *Mazza*, a putative class sued Honda for violations of the CLRA, UCL, and FAL.

25

26   _____

27   [4] Jawbone does not argue that the extraterritorial application of California law either to Frenzel or
     to putative class members raises constitutional due process concerns. *Cf. Forcellati v. Hyland's,
     Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012) (distinguishing between the distinct issues of
28   extraterritorial application of California law and choice of law analysis).

                                              5

*United States District Court*
*Northern District of California*

1   Honda was headquartered in California, and the alleged misrepresentations emanated from

2   California, but the transaction that caused the alleged injury (i.e., the lease or purchase of a Honda

3   automobile), had occurred in other states for the majority of class members.  The Ninth Circuit

4   reversed the district court's certification of a national class after concluding that, under

5   California's choice of law rules, "each class member's consumer protection claim should be

6   governed by the consumer protection laws of the jurisdiction in which the transaction took place."

7   666 F.3d at 594.

8       The Ninth Circuit reached this conclusion by applying California's governmental interest

9   test.  *Id.* at 589-90 ("A federal court sitting in diversity must look to the forum state's choice of

10  law rules to determine the controlling substantive law.") (internal quotation marks omitted).  That

11  test requires a three-step analysis:

12      First, the court determines whether the relevant law of each of the potentially
13      affected jurisdictions with regard to the particular issue in question is the same or
        different.
14
        Second, if there is a difference, the court examines each jurisdiction's interest in
15      the application of its own law under the circumstances of the particular case to
        determine whether a true conflict exists.
16
        Third, if the court finds that there is a true conflict, it carefully evaluates and
17      compares the nature and strength of the interest of each jurisdiction in the
18      application of its own law to determine which state's interest would be more
        impaired if its policy were subordinated to the policy of the other state, and then
19      ultimately applies the law of the state whose interest would be more impaired if
        its law were not applied.
20
21  *McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 87-88 (2010) (internal quotation marks and

22  modifications omitted).  The Ninth Circuit found that there were material differences between the

23  consumer protection regimes of California and a number of other states, and that each state's

24  interest in deciding for itself how to "balance[e] the range of products and prices offered to

25  consumers with the legal protections afforded to them" outweighed California's attenuated interest

26  "in applying its law to residents of foreign states."  *Id.* at 590-94.  Since *Mazza*, a number of courts

27  have dismissed CLRA, UCL, and/or FAL claims asserted by named plaintiffs (or on behalf of

28  unnamed class members) who did not purchase the defendant's product in California.  *See, e.g.,*

United States District Court
Northern District of California

6

1 | *Frezza v. Google Inc.*, No. 12-cv-00237-RMW, 2013 WL 1736788, at *5-6 (N.D. Cal. Apr. 22,

2 | 2013); *Granfield v. NVIDIA Corp.*, No. 11-cv-05403-JW, 2012 WL 2847575, at *3 (N.D. Cal.

3 | July 11, 2012); *Littlehale v. Hain Celestial Grp., Inc.*, No. 11-cv-06342-PJH, 2012 WL 5458400,

4 | at *1-2 (N.D. Cal. July 2, 2012).

5 |      Frenzel argues that application of *Mazza* at this juncture would be premature. Opp. 4-5.

6 | While some courts have dismissed California consumer protection claims under *Mazza*, many

7 | others have declined to apply choice of law analysis at the pleading phase, instead deferring the

8 | issue until class certification. *See, e.g., Werdebaugh v. Blue Diamond Growers*, No. 12-cv-02724-

9 | LHK, 2013 WL 5487236, at *15-16 (N.D. Cal. Oct. 2, 2013); *Brazil v. Dole Food Co., Inc.*, No.

10 | 12-cv-01831-LHK, 2013 WL 5312418, at *11 (N.D. Cal. Sept. 23, 2013); *Clancy v. The Bromley

11 | Tea Co.*, No. 12-cv-03003-JST, 2013 WL 4081632, at *7 (N.D. Cal. Aug. 9, 2013); *In re iPhone

12 | 4S Consumer Litig.*, No. 12-cv-01127-CW, 2013 WL 3829653, at *8-9 (N.D. Cal. July 23, 2013);

13 | *Forcellati*, 876 F. Supp. 2d at 1160-61. These courts have reasoned that *Mazza* was decided at

14 | class certification, and that choice of law analysis is a fact-specific inquiry which requires a more

15 | developed factual record than is generally available on a motion to dismiss.

16 |      Notwithstanding these decisions, I find that in the circumstances of this case, it is not

17 | appropriate to delay until class certification to consider the choice of law issue. First, although

18 | *Mazza* was decided at class certification, "the principle articulated in *Mazza* applies generally and

19 | is instructive even when addressing a motion to dismiss." *Frezza*, 2013 WL 1736788, at *6. In

20 | factually analogous cases, *Mazza* is "not only relevant but controlling," even at the pleading phase.

21 | *Id.* at *5. Second, while choice of law analysis is a fact-specific inquiry, this does not necessarily

22 | mean that it can never be conducted on a motion to dismiss. There are cases in which further

23 | development of the factual record is not reasonably likely to materially impact the choice of law

24 | determination. In such cases, it is not clear to me that deferring choice of law analysis until class

25 | certification is either warranted by the inquiry's fact-specific nature or beneficial to plaintiffs in

26 | any meaningful way.

27 |      Two recent cases from this district exemplify this point. In *Werdebaugh v. Blue Diamond

28 | Growers*, the court declined at the pleading phase to apply the governmental interest test to CLRA,

United States District Court
Northern District of California

UCL, and FAL claims asserted on behalf of a national class, concluding that application of the test would be premature. 2013 WL 5487236, at *15-16. At class certification, however, the court applied the test and concluded, with minimal fact-specific analysis, that a national class could not be certified in light of *Mazza*. 2014 WL 2191901, at *18-21. Likewise, in *Brazil v. Dole Food Co., Inc.*, the court deferred until class certification to consider whether California state-law claims could be asserted on behalf of nonresident class members, but then held that *Mazza* precluded certification of a national class. 2014 WL 2466559, at *12-14. As in *Blue Diamond*, the court was able to reach this conclusion with minimal fact-specific analysis. *See id.*

Here, as in *Blue Diamond* and *Dole*, I find it highly unlikely that discovery will uncover information relevant to whether Frenzel may maintain a national class action asserting claims under California law. Moreover, this is a case, unlike many of those which have deferred the choice of law analysis until class certification, in which even the named plaintiff is a nonresident who did not purchase the defendant's product in California. The upshot is that Frenzel's individual claims, in addition to the claims he asserts on behalf of the putative national class, must undergo a choice of law analysis at some point during the course of this litigation. This circumstance provides further support for applying the governmental interest test at the pleading phase. Indeed, in each of the three cases cited above in which the court considered the choice of law issue on a motion to dismiss, the named plaintiff or plaintiffs were, like Frenzel, nonresidents who made their purchase in another state. *See Littlehale*, 2012 WL 5458400, at *1-2 (Pennsylvania named plaintiff); *Granfield*, 2012 WL 2847575, at *3 (Massachusetts named plaintiff); *Frezza*, 2013 WL 1736788, at *5-6 (North Carolina named plaintiffs).

Under California's choice of law rules, Frenzel's claims, both individual and class, must be dismissed. Frenzel's individual claims must be dismissed because he has not identified the state in which he purchased his Jawbone UP. The burden is on the party opposing the presumption that California law applies to show that foreign law should govern the case. *See Mazza*, 666 F.3d at 589-90; *see also, Washington Mut. Bank, FA v. Superior Court*, 24 Cal.4th 906, 919 (2001) ("Generally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event that party must demonstrate that the latter rule of

1   decision will further the interest of the foreign state and therefore that it is an appropriate one for

2   the forum to apply.") (internal quotation marks and modifications omitted).  The first step in

3   satisfying this burden is to demonstrate material differences in the relevant law of California and

4   the other state or states with regard to the particular claims and facts of the case.  *See McCann*, 48

5   Cal.4th at 87-88.  While Jawbone has the burden of making this showing, Frenzel may not

6   preclude Jawbone from making it by obfuscating the state in which he purchased his product.

7   Frenzel must plead the state in which he purchased his device.  Because Frenzel has not done so,

8   his CLRA, UCL, and FAL claims must be dismissed, as well as his warranty claims to the extent

9   they seek to apply California law.

10        As to Frenzel's class claims, I find that given the current state of his pleadings, Jawbone

11  has adequately demonstrated that this is a case, like *Mazza*, where "each class member's consumer

12  protection claim[s] should be governed by the consumer protection laws of the jurisdiction in

13  which the transaction took place."  666 F.3d at 594.  The CLRA, UCL, and FAL claims on behalf

14  of the putative class are subject to dismissal for this reason as well.

15        Frenzel's counterarguments are not persuasive.  In addition to requesting that choice of law

16  analysis be delayed until class certification, Frenzel contends that California law is properly

17  applied here, irrespective of *Mazza*, because the terms of use for Jawbone's website include a

18  choice of law provision selecting California law.  Opp. 3.  In his opposition brief, Frenzel excerpts

19  the following portion of the terms of use:

20        These Terms of Use and any action related thereto will be governed, controlled,
          interpreted, and defined by and under the laws of the State of California, without
21        giving effect to any principles that require the application of the law of a different
          jurisdiction.  By using this site, –you hereby expressly consent to the personal
22        jurisdiction and venue in the state and federal courts for San Francisco County,
          California, and you agree that any claim brought by you pursuant to these Terms
23        of Use will be brought solely in those courts and no other court.

24  Opp. 3-4.  Frenzel argues that because of this provision, *Mazza* is inapplicable, and California law

25  must govern his claims.  *Id.*

26        This argument lacks merit.  The complaint makes no reference to the terms of use.  Frenzel

27  does not allege that the terms of use exist, that he ever agreed to them, or that he at any point used

28

United States District Court
Northern District of California

9

1    Jawbone's website.  The venue allegation in the complaint states that venue is proper in this

2    district not because of the terms of use, but because Jawbone is headquartered here and because

3    "the acts and occurrences that are the subject matter of plaintiff's . . . claims . . . have occurred in

4    whole or in substantial part in this district."  Compl. ¶ 12.  "[I]t is axiomatic that the complaint

5    may not be amended by the briefs in opposition to a motion to dismiss."  *Car Carriers, Inc. v.*

6    *Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984); *see also, Lee v. City of Los Angeles,* 250

7    F.3d 668, 688 (9th Cir. 2001) ("[W]hen the legal sufficiency of a complaint's allegations is tested

8    by a motion under Rule 12(b)(6), review is limited to the complaint.") (internal quotation marks

9    and modifications omitted).  If Frenzel would like me to consider whether the choice of law

10   provision in the terms of use controls the choice of law issue, Frenzel must include appropriate

11   allegations in his complaint.

12          That said, even if Frenzel were to add allegations regarding the terms of use, it does not

13   appear that they would support his position.  The opening paragraph of the terms of use makes

14   clear that the word "use" in "terms of use" refers to the use of Jawbone's website, while "the

15   purchase of any product or service through the [website] is governed by the terms of sale," not the

16   terms of use.  Lateiner Decl. Ex. 1 (Dkt. No. 20-1).[5]  Given that Frenzel's claims are based on his

17   alleged purchase of a Jawbone UP not from Jawbone's website, but from an Apple store, it is not

18   clear how Frenzel's claims could possibly be construed as arising under or relating to the terms of

19   use.  Moreover, at least two district courts have already considered and rejected nearly identical

20   arguments:

21          Plaintiff also relies on the "Terms of Use" page found on [defendant's] website to
22          argue that New Jersey law applies to her claims. [T]he Court does not see how
            they support plaintiff's argument.  By its express language, the "Terms of Use"
23          "govern [the website visitor] while on this site," and in a subsection titled
            "Violation of Terms of This Site," they state that New Jersey law governs "[a]ny
24          action related to these Terms." . . . Plaintiff has not alleged that either she or
            [defendant] violated the terms of [the] website, and plaintiff has not alleged that
25          her claims arise under the website's terms.  Accordingly, the Court rejects

26

27   [5] Although Frenzel does not allege the terms of use in the complaint, Jawbone submitted a copy of
     the terms of use "out of an abundance of caution in the event the Court wishes to address them at
28   this time."  Reply 2 n.1.  Neither Jawbone nor Frenzel requests judicial notice of the terms of use,
     and I do not grant it.

United States District Court
Northern District of California

10

> Plaintiff's argument, presented for the first time in opposing [the] motion to dismiss, that the forum selection and choice-of-law clause of the "Terms of Use" applies to her claims.

*Nikolin v. Samsung Electronics Am., Inc.*, No. 10-cv-01456, 2010 WL 4116997, at *4 (D.N.J. Oct. 18, 2010); *see also, In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 964-65 (S.D. Cal. 2012) (rejecting argument that plaintiffs' CLRA, UCL, and FAL claims were governed by the choice of law provision in defendants' terms of service contract, where "[b]y its own terms, . . . the provision dictates only that California law applies to the construction and interpretation of the contract, and thus the provision does not apply to plaintiffs' non-contractual claims asserted under California's consumer protection statutes").   Like the plaintiffs in *Nikolin* and *Sony Gaming Networks*, Frenzel cannot rely on a choice of law provision in a terms of use that is not related to his claims.

Because Frenzel has conceded that he did not purchase his Jawbone UP in California but has not identified the state in which he did purchase it, Frenzel's individual CLRA, UCL, and FAL claims, as well as his individual warranty claims to the extent they seek to apply California law, must be dismissed.   The CLRA, UCL, and FAL claims on behalf of the putative national class must also be dismissed, both because they are precluded under *Mazza*, and because the underlying individual claims are deficient.   Because it is possible that an amended complaint can address the choice of law issues described above, these claims are DISMISSED WITH LEAVE TO AMEND.

Frenzel's individual claims are additionally subject to dismissal for the reasons described below.

## II.   FIRST, SECOND, AND THIRD CAUSES OF ACTION: VIOLATIONS OF THE CLRA, UCL, AND FAL

Frenzel's first, second, and third causes of action, for violations of the CLRA, UCL, and FAL, all sound in fraud and are thus governed by Rule 9(b)'s heightened pleading standard.   *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003).   Frenzel does not dispute that Rule 9(b) governs these claims but contends that he has alleged them with sufficient particularity.   He has not.   Nor has he shown that he has standing to seek injunctive relief, or that his CLRA notice is sufficient to

United States District Court
Northern District of California

1    support his CLRA damages claims.

2        **A.  Actionable Misrepresentation Under Rule 9(b)**

3        Jawbone asserts that Frenzel's claims under the CLRA, UCL, and FAL are deficient

4    because the complaint does not adequately allege an actionable misrepresentation by Jawbone.

5    "The standard for all three statutes is the 'reasonable consumer' test, which requires a plaintiff to

6    show that members of the public are likely to be deceived by the business practice or advertising

7    at issue." *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854 (N.D. Cal. 2012).  "A

8    reasonable consumer is an ordinary consumer acting reasonably under the circumstances who is

9    not versed in the art of inspecting and judging a product."  *Id.* (internal quotation marks and

10   modifications omitted).

11       Frenzel relies on three theories to show that Jawbone's conduct was likely to deceive

12   reasonable consumers.  First, Frenzel alleges that Jawbone represented that the power problems

13   which plagued the first generation Jawbone UP had been fixed in the second generation, when in

14   fact the second generation continued to exhibit the same or similar problems.  Opp. 12; Compl. ¶

15   30-33.  Second, Frenzel points to the statements on the Jawbone UP box, "KNOW YOURSELF,

16   LIVE BETTER," "WEAR, SYNC, ACT," and "[u]nderstand your sleep and wake up refreshed;

17   [m]easure daily activity and calories burned; [l]earn which foods help you feel your best."  Opp.

18   12; Compl. ¶ 15-17.  Frenzel asserts that these statements constitute affirmative representations

19   regarding Jawbone UP's reliability, and that Jawbone deceived the public by representing that the

20   device would record a user's daily movements and sleep patterns when the power defects prevent

21   the product from working at all.  Opp. 12.  Third, Frenzel relies on Jawbone's statement that a

22   second generation Jawbone UP's battery lasts "up to 10 days."  Opp. 12; Compl. ¶ 3.  Frenzel

23   alleges that this representation proved false in that, within a few months of purchasing his initial

24   second generation Jawbone UP, the device's battery "stopped maintaining its charge," while his

25   replacement device "could not retain a charge" and "ultimately died."  Compl. ¶ 41-42.

26       As currently alleged, none of these theories is sufficient to support Frenzel's claims under

27   the consumer protection statutes.  The first theory is inadequate because Frenzel does not point to

28   any specific representation by Jawbone that the power problems identified in the first generation

United States District Court
Northern District of California

12

Jawbone UP had been cured in the second generation Jawbone UP.  As excerpted in the complaint, the December 2011 letter from Jawbone's CEO states that Jawbone had "found an issue with two specific capacitors in the power system," but the letter does not state that the issue had been corrected.  *See* Compl. ¶ 31.  Indeed, as excerpted, the letter does not reference the second generation Jawbone UP at all.  *See id.*  Frenzel alleges that when the second generation Jawbone UP was released, Jawbone "represented that the power defects were fixed."  Compl. ¶ 33.  But Frenzel offers only this vague, unsupported allegation and does not explain who made the representation, when and where it was made, or what specific information it conveyed.  That is not enough to satisfy Rule 9(b).  *See Gross v. Symantec Corp.*, No. 12-cv-00154-CRB, 2012 WL 3116158, at *4-5 (N.D. Cal. July 31, 2012) (dismissing fraud claims against software maker where plaintiff failed to provide "direct quotations" from defendant's marketing materials or other "allegations indicating what [defendant] actually said regarding the functional capabilities of its software").

The second theory fails because it relies on the sort of vague statements about general functionality that are not actionable under California's consumer protection statutes.  "Although misdescriptions of specific or absolute characteristics of a product are actionable, generalized, vague, and unspecified assertions constitute mere puffery upon which a reasonable consumer could not rely."  *McKinney v. Google, Inc.*, No. 10-cv-01177-EJD, 2011 WL 3862120, at *6 (N.D. Cal. Aug. 30, 2011) (internal quotation marks, citations, and modifications omitted).  "[T]o be actionable as an affirmative misrepresentation, a statement must make a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact."  *Vitt v. Apple Computer, Inc.*, 469 F. Appx. 605, 607 (9th Cir. 2012) (internal quotation marks omitted).

*Morgan v. Harmonix Music Sys., Inc.*, No. 08-cv-05211-BZ, 2009 WL 2031765 (N.D. Cal. July 7, 2009), cited by Jawbone, is on point.  In that case, the plaintiffs based their CLRA claim on allegations that drum pedals sold as part of defendant's "Rock Band" video game were defective in that they "broke within months of purchase."  *Id.* at *1.  The plaintiffs failed to identify "any affirmative representation by defendant that the drum pedals had a characteristic that they do not

have, or are of a standard or quality of which they are not." *Id.* at *3. Rather, the plaintiffs

asserted that they had been deceived because they were not able to play the game "as advertised."

The court disagreed:

> Essentially, plaintiffs contend that any statement made by defendants that the . . .
> game could be played with drums was false because for certain customers, the
> pedals eventually failed. But California courts require more than "vague
> statements" about a product to form the basis of an actionable CLRA
> misrepresentation claim.

> *Id.* at *3.

Here also, Frenzel's second theory amounts to the position that because his second

generation Jawbone UP eventually "died," any statement by Jawbone regarding the device's

functionality – regardless of whether the statement claimed the device "had a characteristic [it]

do[es] not have, or [is] of a standard or quality of which [it is] not," *id.* – was deceptive to a

reasonable consumer. This position is wrong as a matter of law. *See In re MyFord Touch*

*Consumer Litig.*, No. 13-cv-03072-EMC, 2014 WL 2451291 (N.D. Cal. May 30, 2014) (product

manufacturer that does not make claims about "a product's quality or reliability" cannot be held

liable on an affirmative misrepresentation theory where the product simply "do[es] not work");

*Long v. Hewlett-Packard Co.*, No. 06-cv-02816-JW, 2007 WL 2994812, at *7 (N.D. Cal. July 27,

2007) ("Plaintiffs' contention that the word 'notebook' is actionable is unavailing. The word

'notebook' describes the type of product being sold; it does not constitute a representation

regarding the quality of the computer's parts, nor a representation regarding the consistency or

longevity of the computer's operation."). Frenzel's attempt to characterize the statements on the

Jawbone UP box as affirmative representations regarding the product's reliability is not supported

by what the statements actually say. *See* Compl. ¶¶ 15-17. A reasonable consumer would not

understand the statement, "KNOW YOURSELF, LIVE BETTER," for example, to represent a

guarantee regarding Jawbone UP's quality or reliability.

The third theory relies on Jawbone's statement that a second generation Jawbone UP's

battery lasts "up to 10 days." Opp. 12; Compl. ¶ 3. Contrary to Jawbone's position, the phrase

"up to" does not necessarily preclude the statement from providing the basis for a

United States District Court
Northern District of California

misrepresentation claim under California's consumer protection statutes.  *See Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1171-73 (E.D. Cal. 2013) (noting that "multiple courts have found that 'up to' representations may materially mislead reasonable consumers") (citing cases); *see also, Maloney v. Verizon Internet Servs., Inc.*, 413 F. Appx. 997, 999 (9th Cir. 2011) ("A reasonable consumer would not have been deceived by defendants' statements, which included the qualifier 'up to' . . . *and an explanation that each consumer's maximum speed would vary depending on several listed customer-specific factors,* including factors that applied to plaintiff.") (emphasis added).

The theory still falls short, however, because Frenzel has not adequately alleged the manner in which the representation was false or misleading, as required under Rule 9(b).  Frenzel alleges that "within a few months" of purchasing his initial Jawbone UP, the device's battery "stopped maintaining its charge."  Compl. ¶ 41.  Frenzel states that symptoms of this issue included the device "losing its clock, sync problems, and failure to maintain the indicated charge." *Id.* (internal quotation marks omitted).  Regarding his replacement Jawbone UP, Frenzel similarly alleges that the device "experienced power problems," "could not retain a charge," and "ultimately died."  Compl. ¶ 42.

These allegations leave much to be desired.  Jawbone's alleged misrepresentation is not that the battery would *always* last up to 10 days.  Rather, the Jawbone UP box depicted in the complaint states only, "Battery life up to 10 days."  Compl. ¶ 15.  Accordingly, Frenzel's allegations that his initial Jawbone UP "stopped maintaining its charge" after "a few months," and that his replacement Jawbone UP "could not retain a charge" and "died" at some unspecified point in time, are not enough to show that Jawbone's statement was false or misleading.  *Cf. Herron*, 924 F. Supp. 2d at 1171-73 (plaintiff stated claim under CLRA and UCL where defendants represented that laptop's battery life was "up to 3.32 hours" and plaintiff alleged that "he has *never once* achieved even close to the represented 3.32 hours of battery life") (emphasis added). Frenzel has not stated with any degree of specificity, e.g., (i) whether either device ever maintained a charge for ten days; (ii) how long after he acquired each device it began exhibiting power problems; (iii) for how long each device would maintain a charge after it began exhibiting

power problems; or (iv) how much time passed between when his second generation Jawbone UP began exhibiting power problems and when it "died."  Frenzel may not need to answer each of these questions to satisfy Rule 9(b) (and he may still fail to satisfy Rule 9(b) despite answering all of them).  But Frenzel does need to provide sufficient information regarding the manner in which Jawbone's statements were allegedly false or misleading to give Jawbone notice of what it is charged with doing wrong.  *See Swartz*, 476 F.3d at 764.  As currently alleged, the third theory does not satisfy this requirement.[6]

### B.  Additional Rule 9(b) Problems

The CLRA, UCL, and FAL causes of action are further deficient under Rule 9(b) because Frenzel has not alleged with sufficient detail what representations he reviewed, when he first reviewed them, or which ones he relied on in deciding to purchase his Jawbone UP.  In *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009), the Ninth Circuit affirmed the district court's dismissal of the plaintiff's CLRA and UCL claims arising from alleged misrepresentations by Ford regarding its Certified Pre-Owned ("CPO") vehicles.  The Ninth Circuit reasoned that dismissal was proper because the plaintiff had failed to allege the particular circumstances surrounding the alleged misrepresentations, including "what [they] specifically stated," "when he was exposed to them," or "which [ones] he relied upon in making his decision to buy a CPO vehicle."  *Id.* at 1126.  The plaintiff had thus "failed to articulate the who, what, when, where, and how of the misconduct alleged," as required to state a claim under Rule 9(b).  *Id.* at 1126.

Like the plaintiff in *Kearns*, Frenzel does not identify what representations he reviewed and relied on in making his decision to purchase a Jawbone UP.  While the complaint references a number of specific statements by Jawbone, it fails to specify which, if any, of these statements Frenzel personally reviewed and relied on.  Instead, the complaint broadly alleges that Frenzel "reviewed [Jawbone's] marketing materials and representations," and that he purchased his second generation Jawbone UP "based on those representations."  Compl. ¶ 41.  As Jawbone points out,

---

[6] In addition to the three affirmative representation theories discussed above, Frenzel argues in his opposition brief that Jawbone's nondisclosure of the power defects constituted a fraudulent omission.  This argument is not supported by Frenzel's complaint, which is based exclusively on affirmative misrepresentation theories.  Accordingly, I do not consider it here.

United States District Court
Northern District of California

1    this amounts to the incredible claim that Frenzel reviewed all existing representations by Jawbone,

2    and relied on all of them in deciding to purchase his Jawbone UP device.  Frenzel provides

3    slightly more detail when he alleges that the representations he reviewed "included that Jawbone

4    UP is a fitness and lifestyle tracker that monitors the purchaser's physical activity, sleep patterns,

5    and eating habits, and [that] the battery is expected to last for 10 days when fully charged."

6    Compl. ¶ 41.  This allegation still misses the mark, however, because it does not identify what the

7    representations "specifically stated."  *Kearns*, 567 F.3d at 1126; *see also, Gross*, 2012 WL

8    3116158, at *4-5 (a plaintiff alleging fraudulent misrepresentations must provide "direct

9    quotations" or other "allegations indicating what [the defendant] actually said").  It is possible that

10   the specific statements by Jawbone regarding Jawbone UP's general functionality and battery life

11   recited elsewhere in the complaint are the ones that Frenzel personally reviewed.  But Frenzel

12   must draw this connection with more clarity to satisfy Rule 9(b).  *See In re iPhone 4S Consumer*

13   *Litig.*, No. 12-cv-01127-CW, 2013 WL 3829653, at *11-12 (N.D. Cal. July 23, 2013) (dismissing

14   fraud claims where plaintiffs alleged the specific contents of some of defendant's advertisements

15   but failed to state "whether the [advertisements] that plaintiffs saw and relied on were those whose

16   contents were alleged elsewhere in the [complaint]"); *Wang v. OCZ Tech. Grp., Inc.*, 276 F.R.D.

17   618, 627-28 (N.D. Cal. 2011) (dismissing fraud claims where plaintiff provided representative

18   examples of defendant's allegedly deceptive statements but did not "specify the material that

19   caused him to rely on [defendant's] representations").  Similarly, the claim that Frenzel read and

20   relied on "the representations on the label," while relatively more specific, is insufficient because

21   it does not identify which particular label representations Frenzel personally read and relied on.

22   *See* Compl. at 36.

23          Also like the *Kearns* plaintiff, Frenzel fails to allege with sufficient particularity when he

24   was exposed to the alleged misrepresentations.  *See Kearns*, 567 F.3d at 1126.  The allegation that

25   he reviewed them before purchasing his Jawbone UP device is not enough, as there is no

26   indication as to how long before the purchase his review occurred.  *See id.* at 1125-26; *Wang*, 276

27   F.R.D. at 627 ("[Plaintiff] provides a time frame in which [defendant] allegedly engaged in

28   deceptive conduct, but fails to allege when in that period he . . . read . . . or otherwise came to rely

United States District Court
Northern District of California

17

1  upon [defendant's] representations.").

2      These deficiencies provide additional grounds for dismissing Frenzel's CLRA, UCL, and

3  FAL claims with leave to amend for failure to satisfy Rule 9(b).

4      **C. Injunctive Relief**

5      Jawbone contends that Frenzel lacks standing to seek injunctive relief because he has not

6  alleged that he is likely to purchase another Jawbone UP.  Jawbone is correct, and Frenzel's

7  request for injunctive relief will be dismissed.

8      A plaintiff seeking prospective injunctive relief in federal court must demonstrate not only

9  that "he has suffered or is threatened with a concrete and particularized legal harm," but also that

10  there is "a sufficient likelihood that he will again be wronged in a similar way."  *Bates v. United*

11  *Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal quotation marks and citations

12  omitted).  This requires the plaintiff to show a "real and immediate threat of repeated injury" that

13  is "likely to be redressed by the prospective injunctive relief."  *Id.* (internal quotation marks

14  omitted).  A plaintiff who is not himself entitled to seek injunctive relief may not represent a class

15  that seeks such relief.  *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).  Thus,

16  to demonstrate standing in a consumer protection class action such as this one, the named plaintiff

17  "must allege that he intends to purchase the produc[t] at issue in the future."  *Rahman v. Mott's*

18  *LLP*, No. 13-cv-03482-SI, 2014 WL 325241, at *10 (N.D. Cal. Jan. 29, 2014).  "Allegations that a

19  defendant's continuing conduct subjects unnamed class members to the alleged harm is

20  insufficient if the named plaintiffs are themselves unable to demonstrate a likelihood of future

21  injury."  *Wang*, 276 F.R.D. at 626.

22      The complaint does not allege that Frenzel is likely to purchase another Jawbone UP.

23  Even if the complaint did include such an allegation, Frenzel cannot plausibly allege that he is

24  likely to be fraudulently induced by the same representations he now claims he knows are false.

25  *See Ham v. Hain Celestial Grp., Inc.*, No. 14-cv-02044-WHO, 2014 WL 4965959, at *6 (N.D.

26  Cal. Oct. 3, 2014) ("Because [plaintiff] is now aware that [defendant's] products [are mislabeled],

27  she cannot allege that she would be fraudulently induced to purchase the products in the future.").

28  Frenzel's request for injunctive relief is DISMISSED WITHOUT LEAVE TO AMEND.

United States District Court
Northern District of California

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**D.  CLRA Notice**

Jawbone argues that Frenzel's claims for damages under the CLRA must be dismissed insofar as they are based on representations regarding the first generation Jawbone UP and the Jawbone UP24, because Frenzel did not identify those products in his CLRA notice.  Reply 13-14.  The CLRA requires plaintiffs to notify defendants of alleged CLRA violations before bringing an action seeking damages.  The Act provides:

> (a) Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following:
>
> (1) Notify the person alleged to have employed or committed the methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770.
>
> (2) Demand that the person correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770.

Cal. Civ. Code § 1782(a).  The purpose of this notice requirement "is to give the manufacturer or vendor sufficient notice of alleged defects to permit appropriate corrections or replacements." *Outboard Marine Corp. v. Superior Court*, 52 Cal. App. 3d 30, 40 (1975) (footnote omitted); *see also, Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 1001-02 (N.D. Cal. 2007).

Frenzel's CLRA notice is attached as an exhibit to his complaint and states in relevant part:

> Mr. Frenzel purchased Jawbone UP based on representations on the label and in other marketing and advertising material stating that the product would track his exercise, his sleep patterns, and his eating habits to help him make better choices. His Jawbone UP and subsequent replacements stopped functioning following limited use thereby rendering them useless.   Mr. Frenzel would not have purchased Jawbone UP had he known that the product is defective and stops functioning shortly following purchase. Mr. Frenzel is acting on behalf of a class defined as all persons in the United States who purchased a Jawbone UP.

Compl. Ex. A.  As Jawbone points out, this language did not provide notice that Frenzel's claims extended to the first generation Jawbone UP or the Jawbone UP24.  *See* Mot. 22.  Throughout the notice, Frenzel uses the term "Jawbone UP" without distinguishing between the three generations of the device.  Frenzel states that he "purchased Jawbone UP" and refers to "[h]is Jawbone UP

United States District Court
Northern District of California

and subsequent replacements,"[7] but he does not provide additional specificity regarding which generations of the device his claims concern.  Jawbone was thus given notice only of the device that Frenzel purchased and received as a replacement – i.e., the second generation Jawbone UP.

In response, Frenzel dedicates several pages of his opposition brief to arguing that the first generation Jawbone UP and the Jawbone UP24 are substantially similar to the second generation Jawbone UP.  Opp. 22-24.  Even assuming this is so, it does not cure the deficiency in Frenzel's CLRA notice.  A plaintiff seeking damages under the CLRA must advise the defendant of "the particular alleged violations" of the statute.  Cal. Civ. Code § 1782(a)(1).  Courts in this circuit have accordingly held that a plaintiff must provide notice regarding each particular product on which his CLRA damages claims are based, even where the products qualify as substantially similar.  *See, e.g., Herron v. Best Buy Stores, L.P.*, No. 12-cv-02103, 2014 WL 2462969, at *2-3 (E.D. Cal. May 29, 2014) (dismissing plaintiff's CLRA damages claims arising from unpurchased laptops where "plaintiff's CLRA notice failed to notify defendant of the particular alleged violations of the CLRA concerning laptops other than the [one] plaintiff purchased") (internal modifications omitted); *Ang v. Bimbo Bakeries USA, Inc.*, No. 13-cv-01196-WHO, 2013 WL 5407039, at *12 (N.D. Cal. Sept. 25, 2013) (dismissing plaintiff's CLRA damages claims "based on the Substantially Similar Products identified in the Amended Complaint, [which plaintiffs did not purchase themselves,] as plaintiffs failed to provide adequate notice under Cal. Civ. Code § 1782(a)").  Because Frenzel's CLRA notice does not comply with this rule, Frenzel's claims for damages under the statute, insofar as they are based on representations regarding the first generation Jawbone UP and the Jawbone UP24, must be dismissed.

Jawbone requests that I deny Frenzel leave to amend his CLRA damages claims to address the notice issue.  Courts in this circuit are split on whether to allow leave to amend to address an insufficient CLRA notice.  *Compare, e.g., Waller v. Hewlett-Packard Co.*, No. 11-cv-00454, 2011 WL 6325972, at *5-6 (S.D. Cal. Dec. 16, 2011) (dismissing with prejudice) *and Cattie v. Wal-*

---

[7] Frenzel's use of "replacements" instead of "replacement" appears to be a typo, as he alleges in the complaint that he received only one replacement and that his request for a second replacement was denied.  *See* Compl. ¶¶ 41-42.

20

*Mart Stores, Inc.*, 504 F. Supp. 2d 939, 949-50 (S.D. Cal. 2007) (dismissing with prejudice) *with Trabakoolas v. Watts Water Technologies, Inc.*, No. 12-cv-01172-YGR, 2012 WL 2792441, at *4-8 (N.D. Cal. July 9, 2012) (dismissing with leave to amend) *and Deitz v. Comcast Corp.*, No. 06-cv-06352-WHA, 2006 WL 3782902, at *5-6 (N.D. Cal. Dec. 21, 2006) (dismissing with leave to amend).  Notwithstanding the split, judges in this district, including myself, generally allow leave to amend.  *See, e.g., Ang v. Bimbo Bakeries USA, Inc.*, No. 13-cv-01196-WHO, 2013 WL 5407039, at *12 (N.D. Cal. Sept. 25, 2013); *Trabakoolas*, 2012 WL 2792441, at *4-8; *Deitz*, 2006 WL 3782902, at *5-6.  Jawbone does not offer any persuasive reason for departing from this approach here.  Accordingly, Frenzel's claims for damages arising from the first generation Jawbone UP and the Jawbone UP24 are DISMISSED WITH LEAVE TO AMEND.

## III.    FOURTH, FIFTH, AND SIXTH CAUSES OF ACTION: WARRANTY CLAIMS

The complaint does not identify under which state's law Frenzel seeks to assert his warranty claims.  In his opposition brief, Frenzel treats the claims as if they are asserted under California law.  Opp. 18-22.  To the extent this is the case, the warranty claims must be dismissed because, as discussed above, Frenzel has conceded that he did not purchase his second generation Jawbone UP in California but has not identified the state in which he did purchase it.  The warranty claims are also subject to dismissal for the following reasons.

### A.  Breach of Express Warranty

The factual basis for Frenzel's breach of express warranty claims is largely identical to the factual basis for his CLRA, UCL, and FAL claims.  Frenzel alleges that Jawbone's statement that the second generation Jawbone UP has a "[b]attery life of up to 10 days," as well as various statements by Jawbone describing the device's general purpose and functionality,[8] created express

---

[8] Frenzel alleges that the following statements describing the second generation Jawbone UP's general purpose and functionality created express warranties:

> (i) It "track[s] how you sleep, move, and eat.  Understand more about yourself to make smarter choices and feel your best."

> (ii) It "measure[s] your daily activity details including steps, distance, speed, intensity, and calories burned.  Learn how active you are throughout the day to help you reach your  goals."

1   warranties which Jawbone breached because the device's power defects "make delivering these

2   promises impossible."  Opp. 19; Compl. ¶¶ 75-81.

3        Under California law, express warranties may be created either by an "affirmation of fact

4   or promise made by the seller to the buyer which relates to the goods and becomes part of the

5   basis of the bargain," or by a "description of the goods which is made part of the basis of the

6   bargain."  *Keith v. Buchanan*, 173 Cal. App. 3d 13, 19 (1985).  "Formal words such as 'warranty'

7   or 'guarantee' are not required."  *Id.*  However, to constitute an express warranty, the alleged

8   statement must be "specific and unequivocal."  *Smith v. LG Electronics U.S.A., Inc.*, No. 13-cv-

9   04361-PJH, 2014 WL 989742, at *4 (N.D. Cal. Mar. 11, 2014).  "Vague statements" regarding

10  "reliability," "safety," and "fitness for use" which "say nothing about the specific characteristics

11  or components" of the product at issue are not actionable express warranties.  *Id.* at *5-6.  When

12  analyzing a claim for breach of an express warranty, a court must consider three issues: (1)

13  "whether the seller's statement constitutes an affirmation of fact or promise or description of the

14  goods[,] or whether it is rather merely the seller's opinion or commendation of the goods;" (2)

15  "whether the statement was part of the basis for the bargain;" and (3) "whether the warranty was

16  breached."  *Keith*, 173 Cal. App. 3d at 20.

17       Jawbone contends that Frenzel has not alleged facts sufficient to satisfy any of these

18  elements.  Reply 9-11.  First, the statement regarding battery life is too equivocal to constitute an

19  affirmation of fact or promise, and the statements describing the purpose and functionality of the

20  second generation Jawbone UP amount to mere puffery.  Second, even if Jawbone's statements

21

22  ───────────────────────────────

23       (iii) It "helps you see your sleep details including when you went to bed, when
     you fell asleep, total hours slept, and time spent in deep versus light sleep."

24       (iv) It "also vibrates to wake you up at the ideal moment in your natural sleep
     cycle so you feel refreshed."

25       (v) It "helps you make smarter daily decisions when you understand your actions.
     [It] helps you learn how sleep, movement, food, and drink impact how you feel.

26   In turn, as [it] gets to know you, it delivers personal insights based on your  daily
     activities, guiding you to take action, understand your  choices, and know yourself

27   better."

28   Compl. ¶ 78.

did constitute express warranties, Frenzel has not alleged facts showing he was exposed to the statements before deciding to purchase the product. Third, because Frenzel admits that Jawbone replaced his initial device, and does not allege that his replacement device died within the applicable warranty period, Frenzel has not shown that Jawbone breached its obligations under any express warranty that did exist. Jawbone also argues that the limited warranty which governed Frenzel's device effectively disclaimed all express warranties. The limited warranty provides in relevant part:

> THE LIMITED WARRANTY SET FORTH ABOVE IS PROVIDED IN LIEU OF ALL OTHER WARRANTIES AND JAWBONE HEREBY DISCLAIMS ALL OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE OR PURPOSE, NONINFRINGEMENT, QUALITY, AND TITLE. JAWBONE DOES NOT WARRANT THAT THE PRODUCT IS ERROR FREE OR THAT IT WILL FUNCTION WITHOUT INTERRUPTION.

RJN Ex. 1 (Dkt. No. 14).[9]

Frenzel's express warranty claims must be dismissed because, whether or not the alleged express warranties in fact existed, Frenzel has not shown that Jawbone breached them. Under California law, "a plaintiff cannot maintain a breach of warranty claim . . . for a product that is repaired within the warranty period and fails again months after the warranty has expired." *Long v. Hewlett-Packard Co.*, No. 06-cv-02816-JW, 2007 WL 2994812, at *4 (N.D. Cal. July 27, 2007); *see also, Bros. v. Hewlett-Packard Co.*, No. 06-cv-02254-RMW, 2006 WL 3093685, at *7 (N.D. Cal. Oct. 31, 2006) ("To the extent plaintiff contends that [defendant] failed to repair the defect while his [computer] was under warranty, it is undisputed that [defendant] replaced the

---

[9] Jawbone's unopposed request for judicial notice of the limited warranty is GRANTED. *See Gross*, 2012 WL 3116158, at *10 (N.D. Cal. July 31, 2012) ("Under the incorporation-by-reference doctrine, courts may consider relevant documents not physically attached to the plaintiff's pleading if (1) the contents are central to the allegations and (2) no party questions the authenticity of the documents.") (internal quotation marks omitted). The rest of Jawbone's requests for judicial notice concern documents that are not necessary to decide this motion. *See* Dkt. No. 14. They are DENIED AS MOOT.

motherboard at the time, which corrected the asserted . . . problems. To the extent plaintiff alleges that [defendant] breached the warranty by failing to repair the computer when it again displayed problems, it is undisputed that the warranty had already expired."). The reason for this rule is simple: "an express warranty does not cover defects after the applicable warranty period has elapsed." *Smith*, 2014 WL 989742, at *6; *see also, Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 830-32 (2006).

Frenzel's express warranty claims are barred under this rule. According to the complaint, when Frenzel's initial second generation Jawbone UP malfunctioned, Jawbone issued him a replacement device. Compl. ¶ 41. In doing so, Jawbone complied with its warranty obligations as described both in Frenzel's complaint and in the limited warranty submitted by Jawbone. *See* Compl. ¶ 14 ("Each Jawbone UP is accompanied by a one year warranty that provides for a replacement Jawbone UP, and each replacement Jawbone UP has a three month warranty."); RJN Ex. A ("Consumer's sole and exclusive remedy, and Jawbone's sole and exclusive responsibility under this warranty will be, at Jawbone's option, either to repair or replace the defective product during the [one year] warranty period."). When Frenzel's replacement device subsequently died, Jawbone refused to issue him an additional replacement. Compl. ¶ 41. But Frenzel has not alleged facts indicating that this occurred within the applicable warranty period. Absent such an allegation, Frenzel may not maintain his claims for breach of express warranty against Jawbone. *Long*, 2007 WL 2994812, at *4; *Bros.*, 2006 WL 3093685, at *7.

Frenzel appears to argue that because the express warranty statements that he alleges are not contained within Jawbone's limited warranty, the limitations prescribed by that warranty – i.e., the one year warranty period and the restriction on remedies – do not apply to his claims. *See* Opp. 20. However, "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other." Cal. Com. Code § 2316; *see also, Smith*, 2014 WL 989742 at *6. The only reasonable and consistent reading of the alleged express warranty statements and the limited warranty is to read the limited warranty – including its one year warranty period and restriction on remedies – as applying to the statements. An alternative reading would mean that

United States District Court
Northern District of California

24

1  the statements created express warranties "of indefinite duration" – a "wholly untenable"

2  construction that would leave Jawbone susceptible to a breach of express warranty claim anytime

3  a second generation Jawbone UP experienced a power failure. *Smith*, 2014 WL 989742, at *6;

4  *Long,* 2007 WL 2994812, at *6 n.4. Frenzel's breach of express warranty claims are

5  DISMISSED WITH LEAVE TO AMEND.

6  **B. Breach of the Implied Warranty of Merchantability**

7  Frenzel asserts that Jawbone breached the implied warranty of merchantability in violation

8  of California Commercial Code section 2314.[10] Opp. 20-22. Jawbone contends this cause of

9  action must be dismissed because Jawbone's limited warranty effectively disclaimed the implied

10  warranty of merchantability. Alternatively, Jawbone asserts that even if the limited warranty did

11  not disclaim the implied warranty, it effectively restricted Frenzel's remedy in the event of breach

12  to repair or replacement during the applicable warranty period. As stated above, Jawbone

13  complied with this warranty obligation by replacing Frenzel's Jawbone UP when it malfunctioned.

14  *See* Compl. ¶ 41. Jawbone also argues that the cause of action fails because Frenzel cannot show

15  vertical privity or that any exception to the vertical privity requirement applies here. Mot. 18-21;

16  Reply 11-13.

17  Frenzel's breach of the implied warranty of merchantability claims fail for the same reason

18  as his breach of express warranty claims: Frenzel has not alleged that Jawbone refused to repair or

19  replace his device during the applicable warranty period. Under California law, where a remedy

20  "is expressly agreed to be exclusive, . . . it is the sole remedy." Cal. Com. Code § 2719.

21  Jawbone's limited warranty states that a consumer's "sole and exclusive remedy" is the "repair or

22  replace[ment]" of the defective product. RJN Ex. 1. This remedy was available for one year with

23  respect to Frenzel's initial second generation Jawbone UP, and for three months with respect to his

24  replacement device. *See* Compl. ¶ 14. These restrictions on Jawbone's warranty obligations

25

26  _____

[10] Frenzel does not assert claims under the Song-Beverly Act, which applies only to consumer
27  goods sold at retail within California. *See* Cal. Civ. Code § 1792 ("[E]very sale of consumer
goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail
28  seller's implied warranty that the goods are merchantable.").

United States District Court
Northern District of California

1  extend to claims under the implied warranty of merchantability.  *See Galitski v. Samsung*

2  *Telecommunications Am., LLC*, No. 12-cv-04782, 2013 WL 6330645, at *9 (N.D. Tex. Dec. 5,

3  2013) (applying California law and holding that "because plaintiffs do not plausibly allege that . . .

4  Samsung failed to repair or replace their defective phones – the only remedies available under the

5  terms of Samsung's [express] warranty – plaintiffs' UCC implied warranty claim is dismissed");

6  *Hovsepian v. Apple, Inc.*, No. 08-cv-05788-JF, 2009 WL 2591445, at *8 (N.D. Cal. Aug. 21,

7  2009) (dismissing implied warranty of merchantability claim based on computer's malfunction

8  approximately two years after sale where defendant's "express warranty clearly limits the duration

9  of any implied warranty of merchantability to one year after . . . sale"). [11]  Thus, because Frenzel

10  has not alleged that Jawbone's refusal to issue an additional replacement device occurred during

11  the applicable warranty period, Frenzel has not stated a claim for breach of the implied warranty

12  of merchantability.  These claims are DISMISSED WITH LEAVE TO AMEND.

13        **C.  Breach of the Implied Warranty of Fitness for a Particular Purpose**

14        "An implied warranty of fitness for a particular purpose arises only where (1) the purchaser

15  at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time

16  of contracting has reason to know of this particular purpose, (3) the buyer relies on the seller's skill

17  or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the

18  time of contracting has reason to know that the buyer is relying on such skill and judgment."

19  *Keith*, 173 Cal. App. 3d at 25.

20        "A particular purpose differs from the ordinary purpose for which the goods are used in

21  that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas

22  the ordinary purposes for which goods are used are those envisaged in the concept of

23  merchantability and go to uses which are customarily made of the goods in question."  *Am. Suzuki*

24  *Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1295 n.2 (1995) (internal quotation marks

25  omitted).  To state a claim for breach of the implied warranty of particular purpose, the plaintiff

26

27  ───────────────

28  [11] Frenzel does not oppose Jawbone's contention that the limited warranty effectively restricted the available remedies in the event of breach to repair or replacement during the applicable warranty period.  *See* Opp. 20-22.

1   must identify a particular purpose for which he obtained the product at issue. *See Smith*, 2014 WL

2   989742, at *8 ([P]laintiff has identified no particular purpose for which she purchased the washing

3   machine.  She purchased it to wash her laundry, which is the ordinary purpose of a washing

4   machine.") (internal quotation marks omitted); *Kent v. Hewlett-Packard Co.*, No. 09-cv-05341-JF,

5   2010 WL 2681767, at *5 (N.D. Cal. July 6, 2010) ("Plaintiffs have not alleged that they used the

6   computers . . . for anything other than their ordinary purpose.  Thus, plaintiffs have not stated a

7   claim for breach of an implied warranty for a particular purpose.").

8        Frenzel alleges that he intended to use his second generation Jawbone UP for "its particular

9   purpose of acting as a fitness and lifestyle tracker with a . . . 10 day battery life."  Compl. ¶ 94.

10  This is not a particular purpose, as the term is used in this context, but rather the ordinary purpose

11  for which a Jawbone UP device is customarily purchased.  Accordingly, Frenzel's claims for

12  breach of the implied warranty of fitness for a particular purpose are DISMISSED WITH LEAVE

13  TO AMEND.

14  **IV.    MOTION TO STRIKE**

15       Frenzel seeks to represent a national class defined as all persons who purchased any of the

16  three generations of Jawbone UP for personal use, excluding those who purchased the product for

17  resale.  Compl. ¶ 44.  Jawbone argues this class definition is "grossly overbroad" and should be

18  struck.  Mot. 22-24.  Because I have dismissed all of Frenzel's claims, the motion to strike is

19  DENIED WITHOUT PREJUDICE.  Jawbone may renew the motion when Frenzel files an

20  amended complaint.

21                              **CONCLUSION**

22       For the foregoing reasons, the motion to dismiss is GRANTED as follows:

23       (i) The first, second, and third causes of action for violations of the CLRA, UCL, and FAL

24  are DISMISSED WITH LEAVE TO AMEND.

25       (ii) The request for injunctive relief is DISMISSED WITHOUT LEAVE TO AMEND.

26       (iii) The claims for damages under the CLRA, insofar as they are based on representations

27  regarding the first generation Jawbone UP and the Jawbone UP24, are DISMISSED WITH

28  LEAVE TO AMEND.

United States District Court
Northern District of California

1      (iv) The fourth cause of action for breach of express warranty, fifth cause of action for

2 breach of the implied warranty of merchantability, and sixth cause of action for breach of the

3 implied warranty of fitness for a particular purpose are DISMISSED WITH LEAVE TO AMEND.

4      (v) The motion to strike is DENIED WITHOUT PREJUDICE to renewal upon the filing of

5 an amended complaint.

6      Frenzel shall file an amended complaint, if any, within 30 days of the date of this order.

7      **IT IS SO ORDERED**.

8 Dated: December 29, 2014



WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California