**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          apersinger@bursor.com
          jluster@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT FRENZEL, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>    v.<br><br>ALIPHCOM d/b/a JAWBONE,<br><br>                    Defendant. | Case No. 3:14-cv-03587 (WHO)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1    Plaintiff Robert Frenzel ("Plaintiff") brings this class action on behalf of himself and all

2    others similarly situated against Aliphcom d/b/a Jawbone ("Jawbone" or "Defendant").  Plaintiff

3    makes the following allegations based upon information and belief, except as to the allegations

4    specifically pertaining to himself, which are based on personal knowledge, including investigation

5    conducted by his attorneys.

6                              **I.  NATURE OF THE ACTION**

7        1.        Defendant markets and sells a "fitness tracker" called the "second generation"

8    Jawbone UP ("Jawbone UP").[1]  Jawbone UP is a wristband or bracelet intended to be worn twenty

9    four hours a day, seven days a week.  Defendant represents that when fully charged, Jawbone UP

10   retains a charge for 10 days.  *See* www.web.archive.org/web/20121016195334/

11   https://jawbone.com/up/product#!move (last visited 1/20/2015) (stating the device has a "**10 day**

12   **battery**") (emphasis in the original).  Defendant also represents that when worn, the device

13   accurately "track[s]" and "measure[s]" daily activity, sleep, and calorie intake.  *See* www.

14   Web.archive.org/web/20130320135441/https://jawbone.com/up (last visited 1/20/2015) ("**24/7**

15   **activity tracking**: Track every move, including distance, calories burned, active time, and activity

16   intensity.") (emphasis in the original).  But Jawbone UP does not function as marketed and

17   advertised.  Instead, the product suffers from software and hardware defects that preclude the

18   device from maintaining the advertised charge of 10 days.  The defects also result in inaccurate

19   "track[ing]" and "measur[ing]" of daily activity, sleep, and calorie intake.  In essence, the product

20   does not and cannot perform as Defendant markets and advertises.



---

[1]      Plaintiff asserts claims only related to the so-called "second generation" Jawbone UP
released in 2012, and does not assert any claims as to any other version of the Jawbone UP
regardless of whatever problems those devices experience.

2.      Defendant introduced Jawbone UP in 2012.  Defendant markets it as a "system, wristband + mobile app" that purportedly tracks the user's every step, the length and quality of the user's sleep, and the user's calorie intake based on selection of certain foods combined with the recorded physical activity.  The "system" consists of multiple components, including: the bracelet itself, the software installed on the band to record the user's activity, and the Jawbone Application ("app") and website used to record and display the user's activity.  Each component of the "system" is integral to Jawbone UP's operation.  The bracelet holds the components, including an accelerometer and battery; the software controls the device and "track[s]" or "measure[s]" the activity in the bracelet as the user wears the device; the app and website record and display the data so the user can actually view it.

3.      Consumers purchase fitness trackers like Jawbone UP with the expectation that the product will work as marketed and advertised.  This expectation is created because Defendant represents that after fully charging the product, Jawbone UP will maintain the charge for approximately 10 days.  Further, Defendant advertises that Jawbone UP will accurately "track" and "measure" the user's movement, sleep, and calorie intake when used as directed.  Essentially, Defendant represents that the product is capable of tracking every step taken, every minute of sleep, and every calorie consumed and burned for approximately 10 days at a time before charging.

4.      In truth, Jawbone UP does not and cannot maintain its charge for up to 10 days.  Further, Jawbone UP also does not and cannot accurately "track" or "measure" the user's movement, sleep patterns, and calorie intake.  In contrast to Defendant's marketing and advertising, users are left with a product that has a significantly shorter battery life than 10 days.  Further, the Jawbone UP software does not and cannot accurately "track" and "measure" user activity, leaving users with wildly inaccurate readings of movement, sleep, and calorie intake.

5.      Jawbone UP purchasers pay a high price for the convenience of a device with a long battery life that accurately measures, tracks, and records daily activity.  Significantly less expensive devices and free apps exist to achieve comparable results, but they are not wrapped up in one small device with a purportedly long-lasting battery.  Accordingly, the advertised battery life and

1    promised accuracy of the software motivates purchasers to pay between $60-$150 for a Jawbone

2    UP.

3         6.    A legion of consumer complaints and Plaintiff's own experience demonstrate that

4    Jawbone UP does not and cannot maintain a charge for 10 days and, instead, maintains a charge for

5    a significantly shorter period of time.  Further, the same complaints reveal that contrary to

6    Defendant's assertions, Jawbone UP does not and cannot accurately "track" or "measure" a user's

7    movement, sleep patterns, and calorie intake.

8                                    **II.  THE PARTIES**

9         7.    Plaintiff Robert Frenzel is a citizen of Missouri residing in Kansas City.

10        8.    Defendant Jawbone is a business incorporated in California with its headquarters

11   and principal place of business located at 99 Rhode Island Street, San Francisco, California 94304.

12   Defendant markets and sells Jawbone UP widely throughout California and nationwide.  Defendant

13   has manufactured, marketed, and sold Jawbone UP using the express and implied warranties, and

14   deceptive, false, and misleading claims described herein since at least 2012.

15                            **III.  JURISDICTION AND VENUE**

16        9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

17   because this case is a class action where the aggregate claims of all members of the proposed class

18   are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiff, as well as most

19   members of the proposed Class, are citizens of states different from the states of Defendants.

20        10.   Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because

21   the acts and occurrences that are the subject matter of Plaintiff's and of many Class members'

22   claims, including the challenged mislabeling and marketing practices, have occurred in whole or in

23   substantial part in this District.  Further, Defendant is headquartered in this District, and

24   Defendant's various terms and conditions ("contracts") contain valid California choice of venue

25   provisions.  *See infra* § III.A.

26

27

28

11.     This Court has general jurisdiction over Defendant because Defendant is incorporated in California and headquartered in San Francisco, California.  Defendant also has significant, continuous, and pervasive contacts with the State of California.

**A.     Software and Services Terms of Use**

12.     Further, all Jawbone UP purchasers are subject to California choice of law and venue provisions that Defendant includes in contracts.  Two such contracts are at issue in this case.  The first contract is the Software and Services Terms of Use, which every user agrees to when installing the app and using the device.  The second contract is a more general Terms of Use every user agrees to when installing the Jawbone app.

13.     Jawbone's Service and Software Terms of Use "are a legal agreement between [the user] and AliphCom ('Jawbone')" concerning the use of Jawbone's 'Service and Software.'" *See* Service and Software Terms of Use, attached hereto as **Exhibit A**.  The "Software" is made available [to users] through the Jawbone Service." *Id.*  "Service" is defined as follows: "Jawbone is the provider of the Jawbone service (the 'Jawbone Service') that enables you to update and control your Jawbone® device ('Jawbone Device')." *Id.*  In pertinent part, "Software" is defined as follows: "Two types of Jawbone software are offered through the Jawbone Service: (i) the Jawbone Application; and (ii) firmware for the Jawbone Device ('Device Firmware')." *Id.*

14.     The contract continues to state that "Jawbone may cause the Jawbone Application and updates to the Jawbone Application to be downloaded onto your computer through the Jawbone Service, and may also cause the most recent version of the Device Firmware not already installed onto your Jawbone Device to be downloaded onto the Jawbone device anytime you are connected to the Jawbone Service.  [The user] consent[s] to such downloading of the Jawbone Application and such automatic updating of your Device Firmware." *Id.*

15.     The contract explains that "[t]he Jawbone Application and Device Firmware are collectively referred to as 'Software.'  [][U]se of the Software is subject to [the user's] agreement to be bound by any additional software license terms that accompany the downloading of the Software, all of which are incorporated in and are hereby made part of these Terms of Use." *Id.*

16.     The Software and Services Terms of Use also explains that the user "may be required to establish an account ('Account') in order to use certain aspects of the Jawbone Service." *Id.* By opening the Account, the user agrees to "provide certain registration information, including personally identifiable information ('Registration Date'), … technical data about [the user's] Jawbone Device, computer system, and accompanying hardware or software ('Technical Data'), as well as log certain information about your use of the Jawbone Device ('Usage Data')." *Id.*

17.     This information is pertinent because the Registration Data, Technical Data, and Usage Data, collectively referred to as "Account Data," directly impact the Software's accuracy in "track[ing]" and "measur[ing]" a user's activities. The user also "agree[s] to provide accurate, current and complete Registration Data and to update Registration Data as required to keep it accurate, current and complete at all times." *Id.* In turn, Jawbone states that it will "collect, process and store the Registration Data [users] provide for use in maintaining [the user's] account." *Id.*

18.     Further, Defendant discloses that "Jawbone collects [Account Data] from users of our Web-enabled products" and, "[b]y using the Jawbone Service, [users] unambiguously consent to the collection and processing of [the user's] Account Data by Jawbone and to the transfer of [the user's] Account Data … to and from Jawbone's headquarters in the United States." *Id.* Accordingly, users from all over the United States consistently and automatically have their user data sent to and accessed by Defendant in its California headquarters.

19.     The Software and Services Terms of Use contain a valid California choice of law and venue provision:

> **Governing Law and Venue**. These Terms of Use and your use of the Jawbone Service are governed by the **laws of the State of California**, without reference to its conflicts of law rules. Your use of the Jawbone Service may also be subject to other local, state, national or international laws. You expressly agree that exclusive jurisdiction and venue for any claim or dispute with Jawbone or relating in any way to your use of the Software resides in the state or federal courts of San Francisco County, California. You hereby irrevocably consent to the personal and exclusive jurisdiction and venue of these courts.

*Id.* (emphasis added).

20.     This lawsuit arises from the faulty Jawbone Service because the Jawbone Software inaccurately tracks, records, and measures user activity. The Software and Service also has a direct impact on the product's battery life. Accordingly, California law applies in this case, and venue is proper.

**B.     Terms of Use for the Jawbone App and Defendant's Website**

21.     Jawbone UP purchasers also agree to be bound by a California choice of law and venue provision when they download the Jawbone App or access the Defendant's website. When purchasers first open the packaging of their Jawbone UP, they encounter Defendant's user manual. In the user manual, Defendant directs the user to its website to install the Jawbone app.



22.     The Terms of Use on the Jawbone website explicitly state that California law controls with regard to disputes arising out of the use of Defendant's website. *See* Jawbone's Terms of Use, hereinafter referred to as **Exhibit B**.



23.     The User Manual also demonstrates how the app and the website are inextricably linked. For example, to obtain "Help" using the device or to learn more about it, a user may either

1  visit Jawbone.com/Support/UP or, while within the app itself, the user may use the app Menu to

2  access "Help," which sends the user to the website from the app.  The app allows users to access

3  the website to "[d]iscover how the UP band and app work together to help you learn more about

4  yourself and make smart choices," "[l]earn how to care for your band and the electronics inside,"

5  and "[g]et help, find an answer or talk to [Jawbone]."

6          24.     When installing the Jawbone UP app, a user must access Defendant's website, the

7  Apple Store, or Google Play store.  No matter where the user chooses to download the app, every

8  user must agree to certain terms before the app will function.

9          25.     When users first install the Jawbone app, they are prompted to agree to certain terms

10  immediately upon use and before the app can be configured with the device.[2]  Users are first

11  prompted to create an account, which simultaneously signs the user up for an account on

12  Defendant's website.  As shown in the picture below, the user must agree to Jawbone's Terms of

13  Service and Privacy Policy, which can be viewed by clicking the link.



2        For the sake of brevity, relevant portions of the Terms of Service are excerpted herein.  A
true and complete copy of the Terms of Service is attached hereto as **Exhibit C**.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



27　　　26.　　The Terms of Service expressly indicate that users must also agree to be bound by

28

1  Defendant's Terms of Use.  To ensure the Terms of Use control, Defendant includes it in two

2  locations: in the Terms of Service itself, and at the very bottom of the screen in fine grey font

3  (enlarged for clarity below).

4
5  © 2014 Jawbone. All rights reserved. See our
   terms of use.
6

7  27.    The user is agreeing to be bound by the Terms of Use by using the app, and the user

8  can view the Terms of Use by clicking on the words "terms of use" either in the Terms of Service

9  itself or at the bottom of the screen.

10  28.    By clicking on either link,[3] users are sent to the following page on the Jawbone

11  website:



26
—————————————
[3]    The full Terms of Use are attached as **Exhibit B**.  As seen in the image above, users also
27  agree to be bound by the Software and Services Terms of Use when installing the Jawbone App.
   *See also* **Exhibit A**.
28

FIRST AMENDED CLASS ACTION COMPLAINT                    9
CASE NO. 3:14-CV-03587-WHO



 JAWBONE 

# TERMS OF USE

AliphCom dba Jawbone (**"Jawbone"**, **"Jawbone"**, or **"We"**) grants you the right to use this website (**"Site"**) subject to the terms and conditions of use (**"Terms of Use"** or **"Agreement"**) set forth below. THE PURCHASE OF ANY PRODUCT OR SERVICE THROUGH THE SITE IS GOVERNED BY THE TERMS OF SALE.

PLEASE READ THESE TERMS OF USE CAREFULLY. BY ACCESSING THE SITE, YOU AGREE TO BE BOUND BY THE TERMS OF USE. IF YOU DO NOT WISH TO BE BOUND BY THESE TERMS OF USE, YOU MAY NOT ACCESS OR USE THIS SITE.

**LICENSE**. Jawbone owns and operates the Site. The documents and other information and content available on the Site (the "Site Content") are protected by copyright laws throughout the world.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**GENERAL PROVISIONS**. If any provision of these Terms of Use is, for any reason, held to be invalid or unenforceable, the other provisions of these Terms of Use will be unimpaired and the invalid or unenforceable provision will be deemed modified so that it is valid and enforceable to the maximum extent permitted by law. These Terms of Use and any action related thereto will be governed, controlled, interpreted, and defined by and under the laws of the State of California, without giving effect to any principles that require the application of the law of a different jurisdiction. By using this Site, you hereby expressly consent to the personal jurisdiction and venue in the state and federal courts for San Francisco county, California, and you agree that any claim brought by you pursuant to these Terms of Use will be brought solely in those courts and no other court.

If you have any questions about the

29.     This is not the only time users simultaneously access the Jawbone app and the Jawbone website.  The use of the Jawbone app and/or website is essential for the function of the device.  The app and website act as the *only* displays for information gathered by the device.  The app and website allow users to see their Account Data or input and alter their Registration Data.  That, in turn, affects the function of the accelerometer and the device's ability to record calorie intake and burn.  Further, to see what charge the device still has (*e.g.* number of days left before charging), the user must use the app or website.

30.     Every event is captured simultaneously on the website and recorded in the user log.  Whether users know it or not, they use the Jawbone website each and every time they log an activity on their app or plug their Jawbone UP into their phone or smart device to sync and record their user data.

31.     In short, the Jawbone app and Defendant's website are linked by Defendant's design, and use of one results in use of the other.  Accordingly, both the app and website simultaneously calculate and display user data.  For example:

- Users must create an account to use the app and the website.  Creating an account in the Jawbone app when prompted *automatically* signs the user up for an account on the website.  Accordingly, users have the same login information and only have to create the account once when setting up the app.

- The website and the app are linked.  Any registration for a new account or alteration of an existing account occurs simultaneously on the website and on the Jawbone app.

- A user's recorded data is stored automatically on the device's firmware and simultaneously saved on Defendant's website and in the app when it is plugged into a phone or another smart device.

- Whenever a user logs information into the app (calorie intake, food intake, mood, etc…), that information is updated in real time on the Defendant's website.

- Any "activity" a user records is automatically saved in the app and on the website. It is stored both in the app and on the website in the user's data, and the activity can clearly be seen on the phone with the descriptive "Uploading User Event."

- All account changes on the website, such as a password change, are reflected by the app, and vice versa.

- Personalization of settings is also simultaneous. Settings that are synced between the website and the app include: the user's actual name and user name, gender, height and weight (to calculate calorie intake, calories burned, and length of stride), photos for a profile picture, birthday, address, and country. Any change to this information on the website or in the app results in simultaneous alteration on the other platform.

*See generally* Frequently Asked Questions, Jawbone.com, available at http://jawbone.com/up/faq (last visited 1/20/2015) (attached hereto as **Exhibit D**).

32. The Software and Service inaccurately records user activity and reports inaccurate charge remaining for the battery. Because the Jawbone app and Defendant's website are the sole displays for the misleading information and are integral to the accurate recording of the device, Plaintiff and Class members' claims arising from this lawsuit are subject to the California choice of law provision.

## IV.  FACTUAL BACKGROUND

### A.  Jawbone UP: A Brief History

33. Since 2006, Jawbone has designed, manufactured, and sold consumer electronics. It specializes in wearable technology (like the fitness tracker Jawbone UP) and portable audio

devices, including wireless speakers like Jambox and Big Jambox, and noise-cancelling Bluetooth headsets like Jawbone Era and Jawbone Icon.

34.     Since Jawbone entered the fitness tracker market in 2011, it has distributed three generations of the Jawbone UP.  Only the "second generation" Jawbone UP is the subject of this suit.  Each Jawbone UP is accompanied by a one year warranty that provides for a replacement Jawbone UP, and each replacement issued has a three month warranty.

35.     Jawbone UP is marketed as a lifestyle device that accurately tracks and monitors a user's movements, calorie intake and output, and sleeping patterns.  Defendant's packaging explicitly states that the battery maintains a charge for 10 days, and it both "measure[s]" and "track[s]" daily activity, calories burned, and sleep.

36.     To do this, Jawbone UP contains a built-in accelerometer that is supposed to track the user's movements, measure how long the user has been active, and record how long a user has been sitting.  Before going to sleep, the user is instructed to press a button at the end of the band to change the tracker from "awake mode" to "sleep mode."  While in nighttime mode, the wristband purportedly tracks the user's sleep movements to determine the quality of the user's sleep, including a breakdown of light and deep sleep.  Defendant claims the product syncs to Jawbone's app and its website, allowing users to view their data, set their activity and diet goals, track their progress, and work in tandem with other Jawbone UP users.  This is made possible because the Jawbone Software and Service supposedly connects the device to the user's app and accurately records the user's data.  Specifically, the device also contains MotionX Software that accrues and records user data.

37.     The collected data is then simultaneously stored in multiple locations.  The user's data is stored by the firmware on the wristband itself.  That data is transferred to a computer or smart device when the wristband is plugged into it, and the data can be displayed on the Jawbone app or on the Jawbone website.  The information is also simultaneously saved in Jawbone's remote data storage server, also knowns as a cloud server, located at Jawbone's San Francisco

headquarters, which connects the software and firmware located inside Jawbone UP to the app and the website.  *See* **Exhibit B** (Software and Service Terms of Use) and **Exhibit D** (FAQs).

    **B.**    **Defendant's False and Misleading Marketing of Jawbone UP**

    38.    Defendant makes three false and misleading representations about the Jawbone UP. First, on the packaging, Jawbone represents that the battery life of the Jawbone UP is "up to **10 days**" (emphasis in the original).  Second, Jawbone represents that the Jawbone UP will "track your daily activity, food and sleep."  Third, Jawbone represents that the Jawbone UP will "measure daily activity and calories burned."  Each of these statements is false.  In reality, the defective Jawbone Service and Software causes the device to have dramatically shorter battery life than 10 days.  The Jawbone Service and Software is also unable to accurately record and report user data.

    **1.**    **Defendant's Representation That Jawbone UP Has a Battery Life of 10 Days Is False and Misleading**

    39.    On the Jawbone UP packaging, Defendant falsely represents that Jawbone UP maintains a charge for approximately 10 days.  In fact, the product does not and cannot maintain a charge for 10 days following a full charge.  Instead, the product suffers from a significantly shorter battery life ranging from a few hours to a couple of days.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1

2          40.     Defendant also makes these false and misleading statements on its website.  When

3   describing the features of Jawbone UP, Defendant's website states in bold: **10 day battery.**  *See*

4   www.web.archive.org/web/20130320135441/https://jawbone .com/up.  *See id.* ("**Power &**

5   **Battery**: Lithium-ion polymer battery, Up to 10 days of use between charges, USB charging cable

6   – fully charges in 80 minutes).  *See also* "Up By Jawbone Helps You Know Yourself: A Wristband

7   and App System, Powered by MotionX, is a New and Innovative Tool for Better Daily Living,"

8   Jawbone.com (Nov. 13, 2012), *available at* http://www.web.archive.org/web/20130512135401/

9   http://content.jawbone.com/static/www/pdf/press-releases/pr-111312.pdf ("...[Y]ou can wear it all

10  day and night.  With up to ten days of battery life you rarely have to take it off to charge."); "UP

11  By Jawbone Launches in Europe, Expands to Android Platform: Jawbone's Wristband & App

12  System is an Innovative Tool for Better Daily Living," Jawbone.com (Mar. 20, 2013), *available at*

13  http://www.web.archive.org/web/20130418025328/http://content.jawbone.com/static/www/pdf/pre

14  ss-releases/pr-032013.pdf (same).

15         41.     Identical false and misleading representations are made by online retailers who use

16  marketing materials prepared by Defendant.  For example, Amazon.com includes identical false

17  and misleading representations:

18
19
20
21
22          
23
24
25
26
27
28

1    *See* http://www.amazon.com/UP-Jawbone-Medium-Retail-

2    Packaging/dp/B00A17IAO0/ref=sr_1_3?ie=UTF8&qid=1422132201&sr=8-

3    3&keywords=jawbone+up (last visited 1/20/2015).  The website states the device tracks user

4    activity, has a 10 day battery life.  *Id.*  Amazon shoppers can also view the Jawbone UP

5    commercial.  *See also, e.g.*, **Exhibit E** (Amazon.com Description of Jawbone UP).

6          42.     This is not the first time Defendant has experienced battery problems with a

7    Jawbone UP product.  Defendant originally launched Jawbone UP in 2011, and just months after

8    introducing the product, Defendant issued a letter acknowledging a problem with the battery and

9    problems with the software syncing the device with a phone or smart device.  *See* Letter from the

10   CEO, JAWBONE.COM, https://jawbone.com/up/guarantee (last visited 7/17/2014).  In 2012,

11   Defendant launched the "second generation" Jawbone UP that purportedly fixed the battery

12   problems with the "first generation" device.  *See infra* Section G (explaining the allegedly rigorous

13   testing done after the 2011 device was removed from the market and prior to release of the

14   Jawbone UP devices at issue in the current suit).  Despite this, problems continue to plague

15   Jawbone UP that negatively impact the device's battery life to this day.

16         43.     Jawbone's Software directly affects the battery life of the Jawbone UP, and it is one

17   of the root causes of the battery problems in the device.  To illustrate this point, Defendant recently

18   released an update to the Jawbone UP Software for a related device (Jawbone UP24) that

19   purportedly doubles the battery life of the product from 7 days to 14 days.  *See* Hari

20   Chakravarthula, "UP24 Lasts 14 days on a Single Charge," Jawbone.com, *available at*

21   https://jawbone.com/blog/up24-now-lasts-14-days-single-charge/ (last visited 1/26/2015).

22   Accordingly, the Jawbone UP Software/Firmware directly impacts the battery life of the product.

23                    **2.      Defendant's Representation That Jawbone UP**
                              **Accurately "Track[s] Daily Activity, Food, and Sleep"**
24                            **and "Measure[s] Daily Activity Details Including**
                              **Steps, Distance, Speed, Intensity, and Calories**
25                            **Burned" Is False and Misleading**

26         44.     The Jawbone UP packaging falsely and misleadingly states that the device

27   "[m]easure[s] your daily activity details including steps, distance, speed, intensity, and calories

28

burned."  Defendant further warrants that Jawbone UP will accurately "track your daily activity, food and sleep."



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







45.     On the packaging (pictured below), Defendant specifies *exactly* how the Jawbone Software and Services, powered by MotionX Software, will purportedly "track," "measure," and display the user's activity, including steps taken, distance walked, total active time, longest active time, longest idle time, total resting burn (*i.e.* total calories burned each day).



46.     The packaging also represents that the Jawbone Software and Services will accurately track and display the user's sleep data.  It specifies time slept, whether the sleep was light sleep or deep sleep, how long it took the user to fall asleep, how long the user was in bed, and how long the user was awake before falling asleep.

47.     Further, the packaging shows how the Jawbone Software and Services track and display the user's food intake.  It includes the number of calories the user has taken in, which is directly tied to the amount of calories burned by the purportedly measured and recorded activity.

48.     Despite these numerous, specific representations on the packaging, the Jawbone UP Software and Services do not accurately "track" and "measure" daily activity, sleep, and calorie intake.  This is because the Software and Services fail to accurately measure and record the data, thereby displaying inaccurate results in the Jawbone app and on Defendant's website.

49.     Defendant misrepresents the accuracy of the device on its website, as well.  *See* **Exhibit D**.  In its Frequently Asked Questions page located in its website, Defendant explains how the device presents such an accurate picture of the user's activity.  In response to the question "How do I know it's accurate?," Defendant responds, "Your UP band uses cutting-edge MotionX technology to track activity, giving it **superior accuracy**.  While variations in user, terrain, and activity conditions can influence specific calculations, **testing has shown UP to provide industry leading accuracy in tracking activity and sleep**.  You can also use the built-in calibration feature to make UP even more accurate for you." *Id.* (emphasis added).  In reality, the Jawbone software is unable to record and report accurate user data, and large chunks of user activity go unrecorded.



50.     Defendant repeats these false and misleading representations on its website.  For example, Defendant states:   "Use the UP wristband and iPhone© app to **track your steps, distance, calories burned, pace, intensity level, active vs. inactive time, GPS routes and more**."  *See* www.web.archive.org/web/20121016195334/https://jawbone.com/up/product#!move (last visited 1/20/2015).

51.     The website continues to represent that "[t]he precision motion detection system in UP **tracks every move – capturing a complete record of your day's activity**."  *See* www.web.archive.org/web/20130320135441/https://jawbone.com/up (emphasis added).

52.     The website also represents that when the user places the product into sleep mode, the band "automatically **track[s] your hours slept, deep vs. light sleep, awake time** and overall sleep quali**ty**."  *Id.* (emphasis added).



53.     The same website states that Jawbone UP's sleep mode is so accurate, it even "tracks small movements while you're asleep."  *See* www.web.archive.org/web/20130320135441/https://jawbone.com/up.  As a result, users not only see how long they sleep, they can also purportedly see "time to fall asleep, light vs. deep sleep and waking moments."  *Id.*   Indeed, Defendant warrants it is so accurate, "it will wake you up at the optimal time."  *Id.*  The software does this by waking the user "at the right moment in your sleep cycle."  *Id.*

**C.**     **The Jawbone UP Commercials Are False and Misleading**

54.     Defendant's commercials repeat the false and misleading representations that Jawbone UP will accurately "track" and "measure" user activity.  One commercial follows the daily activities of a user to demonstrate how Jawbone UP works.  The commercial opens with the user unboxing his new Jawbone UP purchase:



55.     The user places his Jawbone UP on his wrist and installs the Jawbone app on his phone.







56.     The commercial continues to describe the device's basic function: it accurately tracks sleep.



57.     It accurately tracks movement, down to the very step.



58.     And it accurately tracks calorie intake based on the user's activity and reported diet.



59.    In another commercial, a Jawbone UP user is shown walking while wearing the device.  As she takes each step, a counter simultaneously displays the number of steps she has taken.





60.    As the user awakens, she reaches over to her smartphone to sync her device and receive an accurate report of her sleep patterns.

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21



22   61.   The commercial concludes with a father playing with his child in the pool, still

23 wearing Jawbone UP.  Again, a counter appears on the screen to record to the second how long the

24 user has been active.

25
26
27
28

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19



20
21
22
23
24
25
26
27
28



62.     These images falsely and misleadingly convey that Jawbone UP accurately records a user's activity, from every step taken, to every calorie consumer, and every second of activity.

63.     Contrary to Defendant's colorful advertising campaign, Jawbone UP does not accurately "track" and "measure" movement, sleep, and calorie intake for 10 days on a full charge. Jawbone UP is unsuitable for its intended purpose because it is incapable of accurately recording movement, sleep patterns, and calorie intake.  It is also incapable of maintaining a 10 day charge. The very features that set Jawbone UP apart do not function as advertised.  Namely, the Jawbone Software and Service, including MotionX, which detects the user's movement and is tied to the device's purportedly long-lasting battery, inaccurately records user data and drains the device's battery.  The Jawbone Software experiences gaps in recording and monitoring the user's activity that result in inaccurate user data.  Plaintiff Frenzel's own experiences are demonstrative.

**D.     Plaintiff Robert Frenzel's Experience with Jawbone UP**

64.     On November 25, 2012 at 2:30 p.m., Plaintiff purchased a Jawbone UP from the Apple store located at 4712 Broadway Street, Kansas City, Missouri 64112 for approximately $129.99 before tax.  In the store prior to purchasing his Jawbone UP, Plaintiff carefully reviewed the product packaging and compared the representations Defendant made on the Jawbone UP labels with those of other fitness trackers, including the Nike FuelBand.  In comparing the products, Plaintiff specifically noted that unlike the Nike Fuelband, the Jawbone UP had an advertised battery life of 10 days.  Further, Plaintiff specifically noted that the product would "measure" and "track" not only his movement and calorie intake, but also his sleep cycles. Plaintiff relied on these representations Defendant made on the product packaging when deciding to purchase the Jawbone UP instead of another fitness tracker available at Apple, including the Nike Fuelband.

65.     While in the store and prior to purchase, Plaintiff also downloaded the Jawbone UP app to see how the Jawbone Software and Service worked and to determine if he wanted to purchase the device.  In doing so, he agreed to Defendant's Terms of Service, Terms of Use, and Software and Service Terms of Use.  By downloading the app and agreeing to these contracts when

1    the option was made available to him to accept and agree to be bound by their terms therein,

2    Plaintiff agreed to be bound by the California choice of law and venue provisions contained

3    therein.  By continuing to use the Jawbone Service following sale, he again agreed to be bound by

4    the California choice of law and venue provision in the Software and Service Terms of Use.

5           66.      Plaintiff read and relied on Defendant's instructions to set up his Jawbone UP and

6    used the wristband as directed.  From the first day, Plaintiff's Jawbone UP did not maintain a

7    charge for the advertised 10 days following a complete charge.  In fact, the device maintained its

8    charge for a dramatically shorter period of time, such as a few hours or a day.  Further, from the

9    first day, his device did not accurately record his movement, sleep patterns, and calorie intake

10   although he used the device as Defendant directed.  For example, although used as Defendant

11   directed, Plaintiff's device failed to record significant periods of physical activity over the course

12   of a day so that he appeared inactive while he had actually been active.  That resulted in inaccurate

13   readings of both movement and calorie intake.  Further, the device frequently failed to record his

14   sleep patterns making it appear he had not slept when, in fact, he had.  Plaintiff went to

15   Defendant's website to troubleshoot his problems, and he eventually contacted customer support.

16   He was within his one year warranty period, and he was issued a replacement band.

17          67.      The problems did not stop there.  Mr. Frenzel experienced identical problems with

18   his second band.  Following a complete charge, the band again did not maintain a charge for 10

19   days.  Like his first band, his second band immediately suffered from a significantly shorter battery

20   life, sometimes maintaining a charge for only a few hours.  Further, as before, the band failed to

21   accurately record his movement, caloric intake, and sleep patterns from day one.  Plaintiff's device

22   failed to record significant periods of physical activity over the course of a day so that he appeared

23   inactive while he had actually been active.  That resulted in inaccurate readings of both movement

24   and calorie intake.  Further, the device frequently failed to record his sleep patterns making it

25   appear he had not slept when, in fact, he had.  Ultimately, the band stopped working again after it

26   failed to perform as marketed and advertised, and again he contacted customer support.  Although

27   Mr. Frenzel alerted Jawbone of the recurring problems with his device, he was informed that they

28

would be unable to assist him and would not issue any refund or replacement because he was outside the three month warranty period on the replacement device. Instead, customer support advised him that he should purchase a new Jawbone UP.

68. Mr. Frenzel would not have purchased a Jawbone UP if he had known that the product would not and could not maintain a charge for the advertised 10 days following a complete charge. Further, Plaintiff would not have purchased the device is he had known that the product would not and could not "track" or "measure" his movement, sleep patterns, and calorie intake.

**E. Customer Reports Show That Jawbone UP Inaccurately Records User Data and Cannot Maintain a 10 Day Charge**

69. Plaintiff Frenzel's experience is not unique. In fact, it is the usual experience. An incredible number of purchasers have complained about Jawbone UP's failure, including on Jawbone's own website. On one Amazon.com listing, over 1000 reviews rated Jawbone UP with only one star. *See* Jawbone UP Customer Reviews, amazon.com, http://www.amazon.com/UP-Jawbone-Medium-Retail-Packaging/dp/B00A17IAO0/ref=sr_1_3?ie=UTF8&qid=1422137931&sr=8-3&keywords=jawbone+up (last visited 1/24/2015). Most of these complaints center on the short battery life of the product and the software's inaccuracy in recording movement, sleep patterns, and calorie intake. There are also regular posts from disgruntled Jawbone UP customers on the Jawbone Facebook page.[4] *See* Jawbone Electronics, Facebook.com, https://www.facebook.com/jawbone?fref=ts (last visited 1/27/2015). A small sampling of complaints regarding the battery life and accuracy of the Jawbone UP is included below:

> **83 of 95 people found the following review helpful**
> **1.0 out of 5 stars On 3rd Replacement Band, March 12, 2013**
> **By**
> **Marlena (Philadelphia, PA United States) - See all my reviews**
> **This review is from: UP by Jawbone - Medium - Retail Packaging - Onyx (Wireless Phone Accessory)**
> This band is simply flawed. My first band stopped working. Jawbone agreed that the band needed to be replaced. They used pony express to send me a new band a week or 2 later. 2nd band worked great for a month. 2nd band just stopped working too. Jawbone agreed

---

[4] Since Plaintiff filed his 8/7/2014 Complaint, Defendant appears to also monitor its Facebook page by filtering out some negative comments regarding Jawbone UP's failure to perform as marketed and advertised, as frustrated Facebook users have noted.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-CV-03587-WHO

32

that this band needed to be replaced too. They said it was crazy odds that I would get a second dud. Pony express is currently on it's way to me with my 3rd replacement band. Should be here next week. My advice to the consumer- wait for the fitbit band and hope that they figured out the technology. My advice to Jawbone - call it. Your second attempt didn't work - give people their money back. (I asked that before my second replacement, figuring if it broke within the first 2 weeks I should just get a refund) but Jawbone refused my refund because I bought it from Best Buy.

**255 of 298 people found the following review helpful**
**1.0 out of 5 stars Save your money--buy a fitbit, April 10, 2013**
**By Virginia (Brooklyn, New York, US) - See all my reviews**
**Verified Purchase(What's this?)**
**This review is from: UP by Jawbone - Large - Retail Packaging - Onyx (Wireless Phone Accessory)**
I purchased UP by Jawbone on February 27, 2013. I read the reviews about the band not working properly after a short period of time as well as the reviews raving about how great the band is at tracking activity and sleep. I decided to purchase the band based on my very positive past experience with Jawbone's products (I own a Jambox, which I highly recommend). On April 9, 2013 the band began to act funny, not holding a charge, and while I think about it for the past week it has not been recording sleep properly which I put it down to my own forgetfulness by not putting the band in sleep mode. Today, April 10, 2013 the band is dead, I charged it and did a soft reboot of the band and nothing. I should have given more weight to the reviews about the band not working properly since there were so many of them and upon reflection should have bought a Fitbit or Nike Fuel. I would like to return the UP band and get a refund but Amazon will only accept returns within 30 days and I think I have owned the band for 40 days. It's a shame because I really liked the UP band while it worked, it is a real fitness motivator.

5/9/2013

UPDATE: I received a replacement band from Jawbone and it has been working fine, I have been using it for the past 14 days and I do like it, the true test will be if it works in 6 months or a year. I will update and revise my rating if the product continues to work.

6/13/2013

UPDATE: I received a replacement band on 4/27 so it is about 48 days and the band seems to be working. I am happy about that, because as I stated earlier I do like the band, I just did not like that it died after 40 days. I am increasing my star rating because as long as the band keeps working I think it's a good product, although I would not be comfortable recommending it to anyone until I am certain that the band will work for a longer period of time.

6/15/2013

UPDATE: The replacement band stopped working. I am finished with this product and resent that I paid to be a beta tester. I will try to get my money back.

**155 of 183 people found the following review helpful**
**1.0 out of 5 stars Do Not Buy! Product is seriously flawed, April 10, 2013**
**By Kate (Illinois) - See all my reviews**
**This review is from: UP by Jawbone - Medium - Retail Packaging - Onyx (Wireless Phone Accessory)**

I have never felt a need to write a negative review more than I have for this product. This has just been an awful experience for me, to the point where I will never own another Jawbone product. Even if one was given to me as a gift, I'd throw it out.

I've gone through multiple Gen 2 Up bands. The reason being is after 6 weeks, they just stop working. There is no gradual decline or indication that it will die. They just die. I've gone through the RMA process, where they will make you do multiple resets of the device and then will send you a replacement after you send them back the broken band. The new one will come, work OK for awhile (notice that I didn't say "well"), and then like clockwork, at about the 6 week mark, it just stops working.

When the band was working, my results fluxuate between extremely precise to so inaccurate I don't know what it's doing. It wasn't uncommon for it to just disappear during workout mode. I'd have a 45 minute workout, and there would be a 15 minute window in the middle of it where it didn't record anything, even though my movements were identical before and after the blackout.

If you call Jawbone about this, they'll tell you it's you, and you should do a soft reset of the device.

The sleep mode is nowhere near accurate, especially when I compared it with a Lark. It'll have me in a deep sleep when I'm in bed, reading a book, may even get up and get a glass of water, so there is plenty of movement. It doesn't detect this, I'm in deep sleep. However, when I am asleep, I get lots of awake time and footsteps captured. I'm pretty sure I'm not sleep walking to the extent of 1500 steps.

If you call Jawbone about this, they'll tell you it's you, and you should do a soft reset of the device.

There is a calibration feature that is supposed to make the device more accurate. So I got on the treadmill and walked exactly 1/2 mile so I could use that to calibrate. The band detected that I walked much greater than that, and when I was able to "adjust" the distance for the walk, the lowest option they offered was 1.2 miles. Yet the number of steps it counted was pretty close to what I was counting in my head. It must think that I am 9 feet tall and my strides cover a great distance.

I didn't bother calling Jawbone about this. By this point, I know they are of no help.

I had a band that wouldn't even accept a soft or hard reset. I tried this on one before I called, knowing they would tell me to.

If you call Jawbone about this, they tell you that nobody else has experienced this, but they will begrudingly replace it. Yet their forums are full of people who have this exact issue.

After my most recent band started vibrating and wouldn't stop until the battery died, I've decided I had enough. There isn't anything out there yet that tracks movements, sleep, and provides an awesome workout and food journal really well, but that doesn't mean any of us should settle for a product that is so flawed that I spend more time on the phone with customer support than I do analyzing the data it gathered.

Here's to hoping that Fitbit Flex is a little better when it makes it to market.

**252 of 287 people found the following review helpful**
**1.0 out of 5 stars HATE! Product Blows! Customer Service is Worthless., February 24, 2014**
**By atx_boomerang - See all my reviews**
**This review is from: UP by Jawbone - Large - Retail Packaging - Onyx (Wireless Phone Accessory)**
I am furious with this company. I bought my band last February and by May it malfunctioned. The band stopped syncing with my phone. I contacted Jawbone Support and they made me jump through a big fat bunch of trouble shooting crap and finally decided they would ship me a new band. Fantastic I thought, what lovely customer service. It was a a pain to ship the damn thing back via UPS, but whatever... I had my new band, joined back up with my "team" and went on my merry way crushing the competition in uninterrupted sleep per night. (I thought I was an average sleeper, but it turns out I am world class.)

Well, my daily smack talk was rudely cut short because the stupid new band stopped syncing too. So, I go through the routine again....contact Jawbone, run the trouble shooting, it fails and I ready myself for band #3.

I got an e-mail reply from some perky little sucker wishing me a "Happy Monday" and then telling me I didn't complain soon enough and my year warranty had expired. So let's do a little math.... my first band worked for 3 months and my second band worked for 5 months for a grand total of 8 months of use. I never got the opportunity to run out the 12 months of the warranty on either band.

After rejecting my request, but before signing off, the super duper excitedly friendly Jawbone rep encourage me to rush out and buy the new UP24. I swear to sweet Jesus this is what she wrote me, "if you enjoyed UP the first time around, you'll love the wireless sync features this time." Ummmmmmm..... I just sent 8 emails saying how much I hated/despised/was infuriated by the UP band. There wasn't one word in my complaint that indicated I "enjoyed" my experience with the brand or the product. Clearly, customer service and loyalty analytics are low priorities for these guys.

I feel bad though. When I got my UP band, I was so excited I convinced about 12 friends and coworkers to buy them so they could join my team. Ugh. How embarrassing. Almost every one of them has had an issue with the band and one of them has also had her band malfunction twice and is now on her third (obviously, both of hers failed within one year since they didn't hesitate to send her the third one.)

Before writing this review, I wrote Jawbone Support one more email to give them a chance to make it right. I simply asked for a new band that would last at least 12 months (hahahahaha) or a credit towards the new UP24. Nothing. No response. Crickets. So, as I

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-CV-03587-WHO

promised them, I am reviewing their product and sharing my experience with everyone that is thinking about purchasing an UP band.

For the record, I didn't want to write this review and I've never taken the time to write one before. I would rather be outside in this glorious weather taking a walk while wearing my UP band and calculating my steps, but I wanted to encourage people to stay away from this crappy thing. You're welcome.

Final Review: Zero stars. No thumbs up. Dislike. Run far away. Find another alternative. Keep your money. This company does not stand by this product. I think I covered it. Now I'm going to go for a non-calculated walk and get a drink.

**F.      Defendant Knew or Should Have Known the Product Does Not Perform as Advertised**

70.     Defendant is aware that its product does not work as advertised.  First, Defendant is aware that Jawbone UP is defective because Customer Service makes it a point to ***respond directly*** to dissatisfied customers in the comments section of customer reviews both on websites within their control and the websites of their distributers.  Accordingly, Defendant is aware that the device does not accurately "track" or "measure" purchaser's movement, sleep patterns, and calorie intake for 10 days on a full charge.

71.     Second, by Defendant's own admission, it has conducted extensive tests on Jawbone UP.  Jawbone CEO and Founder Hosain Rahman explained:  "We've combined hardware, software and data, developed 28 new manufacturing processes, and created unparalleled testing standards validated by nearly **three million hours of real-world testing**."  *See* "Jawbone Announces Second-Generation UP, On Sale Now," CULT OF MAC (Nov. 13, 2012), *available at* http://www.cultofmac.com/201060/jawbone-announces-second-generation-up-on-sale-now/ (last visited 1/18/2015) (emphasis added).  *See also* "UP: Designed for Everyday Life," Youtube.com (November 13, 2012), *available at* https://www.youtube.com/watch?v=l3xk48GsPIg (last visited 1/24/2015) (describing and showing the testing process the Jawbone UP went through prior to sale).  Accordingly, Defendant knew of should have known the product does not perform as advertised.

**CLASS ACTION ALLEGATIONS**

72.     Plaintiff seeks to represent a nationwide class defined as all persons who purchased Jawbone UP for personal use, excluding those who purchased Jawbone UP for resale.  As used here, Jawbone UP is defined as the "second generation" Jawbone UP released in November 2012.

73.     Defendant has sold hundreds of thousands of Jawbone UP bracelets.  According to the NPD Group, the overall digital fitness device market was worth approximately $330 million in 2013 alone.  *See* "Fitbit, Jawbone, Nike had 97 percent of fitness tracker retail sales in 2013," MobiHealthNews.com, http://mobihealthnews.com/28825/fitbit-jawbone-nike-had-97-percent-of-fitness-tracker-retail-sales-in-2013/ (last visited 7/24/2014).  According to the report, ninety-seven percent of those sales were comprised of FitBit, Jawbone UP, and Nike Fuel Band.  *Id.*  Jawbone UP accounts for approximately nineteen percent of the $330 million in sales for 2013, making Defendant's total sales of Jawbone UP in 2013 alone approximately $62.7 million.  *Id.*

74.     Jawbone UP is available in major retail stores nationwide and online.  Defendant distributes the product to leading retailers across the nation and throughout the world, including Amazon, Apple, Target, WalMart, Best Buy, AT&T, Verizon, Sprint, T-Mobile, and Radio Shack. Jawbone UP sells for a retail price of approximately $60-$150.00 through Defendant and it's various distributors.

75.     Accordingly, members of the Class are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendant and third party retailers and vendors.

76.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

   a.   Whether Defendant breached an express warranty made to Plaintiff and the Class;

   b.   Whether Defendant breached an implied warranty made to Plaintiff and the Class;

c. Whether Defendant made false and misleading representations regarding the Jawbone UP;

d. Whether Defendant's conduct was false, misleading, or reasonably likely to deceive ordinary consumers;

e. Whether Class members have been injured by Defendant's conduct;

f. Whether Class members suffered an ascertainable loss as a result of Defendant's misrepresentations; and

g. Whether Class members are entitled to damages, restitution, injunctive relief, and/or monetary relief and, if so, the amount and nature of such relief;

h. Whether Defendant violated California Civil Code §§ 1750, *et seq.*;

i. Whether Defendant violated California Business & Professions Code §§ 17200, *et seq.*; and

j. Whether Defendant violated California Business & Professions Code §§ 17500, *et seq.*

77. The claims of the named Plaintiff are typical of the claims of the Class in that Plaintiff (a) was exposed to Defendant's false and misleading packaging, marketing, and promotion of Jawbone UP; (b) relied on Defendant's misrepresentations; and (c) suffered a loss as a result of his purchase. Each Class Member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

78. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

79. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and

extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750,** *et seq.*

80. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

81. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

82. Plaintiff and the Class members are consumers who purchased Jawbone UP for personal purposes. Plaintiff and the Class members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d). Plaintiff and the Class members are not sophisticated experts with independent knowledge of pedometer, sleep monitor, and fitness tracker design, battery life, or other characteristics of fitness trackers like Jawbone UP.

83. Jawbone UP, purchased by Plaintiff and other Class members from Defendant, is a "good" within the meaning of Cal. Civ. Code § 1761(a).

84. Defendant's actions, representations, and conduct have violated and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

85. Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not

have …." Cal. Civ. Code § 1770(a)(9) further prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

86.     Defendant violated Cal. Civ. Code § 1770(a)(5) and (a)(9) by misrepresenting that Jawbone UP retains its charge for 10 days when fully charged.  Further, Defendant also violated Cal. Civ. Code § 1770(a)(5) and (a)(9) by representing that the device would accurately "track" and "measure" a user's movement, sleep patterns, and calorie intake when the Jawbone Software fails to accurately record and display the user's data.  Defendant knew, or should have known, based on pre-market testing that Jawbone UP does not and cannot maintain a charge for 10 days following a full charge, and the product does not and cannot accurately record a user's movement, sleep patterns, and calorie intake.

87.     Plaintiff and the Class suffered injuries caused by Defendant because: (a) they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and the truth about the accuracy with which the device "tracks" or "measures" the user's activity; (b) they paid for a product that does not perform as advertised which renders it effectively worthless; (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and accurate tracking and measuring of the user's activity; and (d) Jawbone UP did not have the characteristics, uses, or benefits as promised.

88.     On or about July 1, 2014, prior to filing this action, Mr. Frenzel, by and through his counsel, served a CLRA notice letter on Defendant Jawbone which complies in all respects with California Civil Code § 1782(a).  Plaintiff sent Defendant a letter via certified mail, return receipt requested, advising Defendant that it is in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter provided Defendants with notice that Jawbone UP is defective, and as a result, the product does not function as marketed and advertised.  He also informed Defendant that he acted on behalf of himself and a putative class and demanded relief for the class.  A true and correct copy of Plaintiff's letter is attached hereto as **Exhibit F**.

89.     Following the December 17, 2014 hearing on Defendant's Motion to Dismiss, on or about December 19, 2014, Mr. Frenzel, by and through his counsel, served a supplemental CLRA notice letter on Defendant Jawbone which complies in all respects with California Civil Code § 1782(a).  Plaintiff sent Defendant a letter via certified mail, return receipt requested, advising Defendant that it is in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter again provided Defendants with notice that Jawbone UP is defective, and as a result, the product does not functions as marketed and advertised.  He also informed Defendant that he acted on behalf of himself and a putative class, and he demanded relief for the class.  A true and correct copy of Plaintiff's letter is attached hereto as **Exhibit G**.

90.     Wherefore, Plaintiff seeks damages, restitution, and injunctive relief for this violation of the CLRA.

**COUNT II**
**Violation of California's Unfair Competition Law ("UCL"),**
**California Business & Professions Code §§ 17200, *et seq.***

91.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

92.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

93.     Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

94.     Defendant violated the "unlawful" prong of the UCL by violating the CLRA, the FAL, and by breaching its express and implied warranties as described herein.

95.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the

conduct outweighs any alleged benefits. Defendant's practice of promising a lifestyle device that maintains a 10 day charge and will accurately "track" and "measure" movement, sleep patterns, and calorie intake and then delivering an expensive bracelet that does not perform as marketed and advertised is of no benefit to consumers. Defendant's conduct of selling Jawbone UP despite pre-market tests, or, alternatively, Defendant's failure to test Jawbone UP before releasing it on the market offends public policy. Further, Defendant's refusal to remedy the problems or its representations even after numerous customers have requested that Defendant do so is unscrupulous.

96.     Defendant violated the "fraudulent" prong of the UCL by making misrepresentations about Jawbone UP, as described herein.

97.     Plaintiff and the Class members are not sophisticated experts with independent knowledge of fitness trackers and personal electronics like Jawbone UP, or how fitness trackers like Jawbone UP retain power in their batteries or record users' data. Thus, Plaintiff and the Class members acted reasonably when they purchased Defendant's products based on their belief that Defendant's representations were true.

98.     Plaintiff and the Class lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and the truth about the accuracy with which the device "tracks" or "measures" the user's activity; (b) they paid for a product that does not perform as advertised which renders it effectively worthless; (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and accurate tracking of the user's activity; and (d) Jawbone UP did not have the characteristics, uses, or benefits as promised.

**COUNT III**
**Violation of California's False Advertising Law ("FAL"),**
**California Business & Professions Code §§ 17500,** *et seq.*

99.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-CV-03587-WHO

100.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

101.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

102.     Defendant committed acts of false advertising, as defined by §§17500, *et seq.*, by making misrepresentations about Jawbone UP's battery life and its accuracy in tracking and measuring the user's movements, sleep patterns, and calorie intake.

103.     Defendant knew or should have known through the exercise of reasonable care (i.e. pre-market testing) that their representations about Jawbone UP were untrue and misleading.

104.     Defendant's actions in violation of §§ 17500, *et seq.* were false and misleading such that the general public is and was likely to be deceived.

105.     Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because:  (a) they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and the truth about the accuracy with which the device "tracks" or "measures" the user's activity; (b) they paid for a product that does not perform as advertised which renders it effectively worthless; (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and accurate tracking of the user's activity; and (d) Jawbone UP did not have the characteristics, uses, or benefits as promised.

1

## COUNT IV
### Breach of Express Warranty

2
3

106.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

4
5

107.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

6
7
8
9
10
11
12
13

108.    Plaintiff, and each Class member, formed a contract with Defendant at the time Plaintiff and each Class member purchased a Jawbone UP.  The terms of the contract include the promises and affirmations of fact relating to the longevity of the product's battery and the accuracy of the device's ability to record movement, sleep patterns, and calorie intake, on Defendant's product packaging, online, and through its marketing campaign, as described above.  Defendant's online and packaging representations became part of the basis of the bargain and are part of a contract between Plaintiff and the members of the Class on the one hand, and Defendant on the other, and thus constituted express warranties.

14
15

109.    Defendant, as the designer, manufacturer, marketer, distributor, or seller expressly warranted, among other things, the following material terms about Jawbone UP:

16

    a.   Jawbone UP devices have a "10 day battery" and/or "[b]attery life up to 10 days."

17

    b.   Jawbone UP will accurately "track how you sleep, move, and eat."

18
19

    c.   Jawbone UP accurately "measure[s] your daily activity details," including movement, sleep patterns, and calorie intake.

20
21
22
23
24
25
26

110.    Defendant sold the goods to Plaintiff and the other Class members, who bought the goods from Defendant.  Plaintiff and the Class members are ordinary consumers who are not experts with independent knowledge of fitness trackers and personal electronics like Jawbone UP, or how fitness trackers like Jawbone UP retain power in their batteries or record users' data.  Plaintiff and the Class acted reasonably based on Defendant's representations regarding battery life and the accuracy of the device in tracking and measuring movement, sleep patterns, and calorie intake.

27
28

---

111.     Defendant breached the terms of this contract, including the express warranties described in this Count IV as well as above, because Jawbone UP (a) has does not retain its charge for 10 days but instead retains a charge for a significantly shorter period of time; and (b) does not accurately "track" or "measure" daily activity, sleep patterns, and calorie intake.    Therefore, Defendant has breached its express warranties.  As a result of this breach, Plaintiff and the Class did not receive the goods as warranted by Defendant.

112.     Plaintiff and Class members were injured and harmed as a direct and proximate result of Defendant's breach because:  (a) they would not have purchased Jawbone UP on the same terms if they had known the true facts concerning Jawbone UP's battery life and the truth about the accuracy with which the device "tracks" or "measures" the user's activity; (b) they paid for a product that does not perform as advertised which renders it effectively worthless; (c) they did not receive the promised benefits of Jawbone UP, including the advertised battery life of the product and accurate tracking of the user's activity; and (d) Jawbone UP did not have the characteristics, uses, or benefits as promised.

## COUNT V
### Breach of the Implied Warranty of Merchantability

113.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

114.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

115.     Defendant is and was at all relevant times a "merchant" within the meaning of the Uniform Commercial Code ("UCC").  Defendant manufactured, distributed, and marketed Jawbone UP, which is a "good" within the meaning of the UCC.  Consequently, Defendant impliedly warranted that Jawbone UP were merchantable, including that they could pass without objection in the trade under the contract description, that they were fit for the ordinary purposes for which such goods are used, that they were of fair average quality within the description, that they were adequately labeled, and that they would conform to the promises or affirmations of fact made

1    on their container or labels.  However, each of these implied warranties was false with respect to

2    the goods of the kind sold to Plaintiff and members of the Class.  Indeed, Jawbone UP is not fit for

3    the ordinary purpose for which fitness trackers and lifestyle devices are used, which includes

4    measuring and tracking the user's activity, movement, exercise, and sleep.

5         116.    Plaintiff and Class members purchased Jawbone UP for the purpose of accurately

6    recording, tracking, and measuring their activity, sleep patterns, and calorie intake.  Plaintiff and

7    Class members also purchased Jawbone UP because it is advertised and marketed as maintaining a

8    charge for 10 days.

9         117.    Plaintiff and the Class members did not alter their Jawbone UP devices.

10        118.    The Jawbone UP devices were defective when they left the exclusive control of

11   Defendant and, accordingly, could not perform was warranted.

12        119.    Defendant knew the Jawbone UP devices would be purchased and used by Plaintiff

13   and Class members without additional testing.  The Jawbone UP devices were unfit for their

14   ordinary purpose, and Plaintiff and Class members did not receive the goods as warranted.

15        120.    More specifically, Defendant breached its implied warranty of merchantability to

16   Plaintiff and the Class because the Jawbone UP devices would not pass without objection in the

17   trade because they were incapable of performing the functions that fitness and lifestyle trackers are

18   intended to perform.  First, they are not capable of maintaining the advertised 10 day charge and

19   instead maintain a significantly shorter charge, thereby failing to deliver their promised functions.

20   Second, they are not capable of accurately tracking and recording users' activities, sleep patterns,

21   and calorie intake, thereby rendering the device unable to deliver their promised functions.

22        121.    Plaintiff and Class members were injured and harmed as a direct and proximate

23   result of Defendant's breach because:  (a) they would not have purchased Jawbone UP on the same

24   terms if they had known the true facts concerning Jawbone UP's battery life and the truth about the

25   accuracy with which the device "tracks" or "measures" the user's activity; (b) they paid for a

26   product that does not perform as advertised which renders it effectively worthless; (c) they did not

27   receive the promised benefits of Jawbone UP, including the advertised battery life of the product

28

and accurate tracking of the user's activity; and (d) Jawbone UP did not have the characteristics, uses, or benefits as promised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant as follows:

a. For an order certifying a nationwide Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

b. For an order declaring that Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff, and the nationwide Class on all counts asserted herein;

d. For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For injunctive relief as pleaded or as the Court may deem proper;

h. For an order awarding Plaintiff and the Class their reasonable attorneys' fees, and expenses;

i. Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

j. For such other and further relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

---

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-CV-03587-WHO

Dated: January 28, 2015                  Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Julia A. Luster*
           Julia A. Luster

L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
Julia A. Luster (State Bar No. 295031)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        apersinger@bursor.com
        jluster@bursor.com

*Attorneys for Plaintiff*

I, Robert Frenzel, declare as follows:

1.      I am a plaintiff in this action and a citizen of the State of Missouri. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently thereto.

2.      The complaint filed in this action is filed in the proper place for trial under California Civil Code Section 1780(d) in that Defendant conducts a substantial amount of business in this District and maintains its headquarters here. Additionally, as described in the First Amended Class Action Complaint, the Jawbone Service and Software Terms of Service, and the Terms of Use available on Defendant's website, contain a valid choice of venue provision requiring disputes arising from the use and purchase of Jawbone UP to be brought in this District.

3.      Further, as described in the First Amended Class Action Complaint, I agreed under the Jawbone Service and Software Terms of Service and the Terms of Use (available on Defendant's website) to resolve disputes arising from my use and purchase of Jawbone UP under California law. I do not contest the validity of the choice of law provision contained therein, and I seek to enforce the choice of law provision(s).

4.      As stated in the First Amended Class Action Complaint, I purchased a Jawbone UP from the Apple store in Kansas City, Missouri for approximately $129.99 before tax on November 25, 2012 at 2:30 p.m. In the store prior to purchase, I reviewed the product packaging and compared the representations Defendant made on the Jawbone UP labels with those of other fitness trackers, including the Nike FuelBand. I specifically relied on Jawbone's representation that the battery would maintain a charge for 10 days. I also relied on Defendant's representation that Jawbone UP would "measure" and "track" not only my movement and calorie intake, but also my sleep patterns. The marketing of the product and these specific representations on the label were substantial factors influencing my decision to purchase Jawbone UP instead of another fitness tracker, like Nike Fuelband. I bought a Jawbone UP for my own personal use. I would not have purchased Jawbone UP had I known that the product would not function as advertised.

5.      While I was in the store, I also downloaded and reviewed the Jawbone UP app to see how the operating system worked and to determine if I wanted to purchase Jawbone UP. In downloading the app and using the Jawbone Software and Service, I agreed to be bound by the California choice of law provision contained in Defendant's Service and Software Terms of Use and the Terms of Use (available on Defendant's website).

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, executed on January 27 , 2015 at Kansas City, Missouri.

Robert Frenzel