1  **BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
2  Annick M. Persinger (State Bar No. 272996)
Julia A. Luster (State Bar No. 295031)
3  1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
4  Telephone: (925) 300-4455
Facsimile: (925) 407-2700
5  E-Mail: ltfisher@bursor.com
          apersinger@bursor.com
6          jluster@bursor.com

7  *Attorneys for Plaintiff*

8

9

10                    **UNITED STATES DISTRICT COURT**

                    **NORTHERN DISTRICT OF CALIFORNIA**

11

12  ROBERT FRENZEL, individually and on behalf     Case No. 3:14-cv-03587 (WHO)
    of all others similarly situated,
13                                                 **PLAINTIFF'S OPPOSITION TO**
                                 Plaintiff,        **DEFENDANT ALIPHCOM DBA**
14                                                 **JAWBONE'S MOTION TO DISMISS**
           v.                                      **FIRST AMENDED COMPLAINT**
15
    ALIPHCOM d/b/a JAWBONE,                        Date: May 27, 2015
16                                                 Time: 2:00 p.m.
                                 Defendant.        Courtroom 2, 17th Floor
17
                                                   Judge: Hon. William H. Orrick
18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

PAGE(S)

I.    INTRODUCTION ..................................................................................................... 1

II.   ARGUMENT ........................................................................................................... 2

      A.    Application of California Law to a Nationwide Class Is Appropriate ..................... 2

            1.    Defendant's Software and Services Terms of Use Contain a
                  Valid California Choice of Law Provision .................................... 2

                  a.    Plaintiff's Claims Arise from or Are Related to the
                        Software and Services Terms of Use Containing a
                        Choice of Law Provision ..................................................... 3

                  b.    The Choice of Law Provision Is Valid ............................... 9

            2.    Defendant's Website Terms of Use Contain a Valid
                  California Choice of Law Provision ............................................. 9

                  a.    Plaintiff's Claims Arise from or Are Related to the
                        Website Terms of Use Containing the Choice of Law
                        Provision ............................................................................ 9

                  b.    Alternately, the Terms of Use Are a Part of the
                        Contract of Sale Because Defendant Required
                        Plaintiff to Accept the Contracts to Use the Product ...... 12

            3.    Because Defendant's Misrepresentations Emanated from
                  California, Plaintiff's Claims Do Not Require Extra-
                  Territorial Application of California Law ................................... 13

            4.    Although Premature, the *Mazza* Analysis Does Not Prevent a
                  Nationwide Class ....................................................................... 15

      B.    Plaintiff Has Stated Claims Under the CLRA, UCL, and FAL ............................... 18

            1.    Plaintiff Pled His California Claims with Particularity ................... 18

            2.    Plaintiff Has Alleged Actionable Misrepresentations ................... 20

                  a.    Plaintiff Has Sufficiently Pled His Battery Life Claim .............. 20

                  b.    Plaintiff Has Sufficiently Pled His Product Function
                        Claim .................................................................................. 22

            3.    Plaintiff Has Stated a Valid Claim for Breach of Express and
                  Implied Warranties .................................................................... 23

      C.    It Is Premature to Limit the Class Definition Prior to Class
            Certification .......................................................................................... 24

III.  CONCLUSION ..................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**PAGE(S)**

**CASES**

3

*Baba v. Hewlett-Packard Co.*,

4

   2010 WL 2486353 (N.D. Cal. June 16, 2010)...................................................... 24

5

*Beal v. Lifetouch, Inc.*,
   2011 WL 995884 (C.D. Cal. Mar. 15, 2011) ..................................................... 24

6

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,

7

   2006 WL 3422198 (N.D. Cal. Nov. 28, 2006) ................................................... 24

8

*Bias v. Wells Fargo & Co.*,
   943 F. Supp. 2d 915 (N.D. Cal. 2013) ............................................................... 16

9

*Bruno v. Quten Research Institute, LLC*,

10

   280 F.R.D. 524 (C.D. Cal. 2011) ....................................................................... 18

11

*Cal-State Bus. Products & Servs., Inc. v. Ricoh*,
   12 Cal. App. 4th 1666 (1993) .............................................................................. 2

12

*Cannon v. Wells Fargo Bank N.A.*.

13

   917 F. Supp. 2d 1025 (N.D. Cal. 2013) ............................................................... 8

14

*Chan v. Soc'y Expeditions, Inc.*,
   123 F.3d 1287 (9th Cir. 1997) .............................................................................. 8

15

*Clothesrigger, Inc. v. GTE Corp.*,

16

   191 Cal. App. 4th 605 (1987) ............................................................................ 16

17

*Cont'l Airlines, Inc. v. Mundo Travel Corp.*,
   412 F. Supp. 2d 1059 (E.D. Cal. 2006) ............................................................ 5, 9

18

*Delarosa v. Boiron, Inc*,

19

   275 F.R.D. 582 (C.D. Cal. Aug. 24, 2011) ................................................... 17, 24

20

*Ehret v. Uber Technologies, Inc.*,
   2014 WL 4640170 (N.D. Cal. Sept. 17, 2014) ...................................... 13, 14, 15, 18

21

*Forcellati v. Hyland's*,

22

   876 F. Supp. 2d 1155 (C.D. Cal. 2012) ....................................................... 16, 17, 18

23

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ............................................................................... 19

24

*Gooden v. Suntrust Mortg., Inc.*,

25

   2012 WL 996513 (E.D. Cal. Mar. 23, 2012) ..................................................... 24

26

*Gustafson v. Bac Home Loans Servicing*,
   2013 WL 5911252 (C.D. Cal. Nov. 4, 2013) ...................................................... 2

27

*Haskell v. Time, Inc.*,

28

   857 F. Supp. 1392 (E.D. Cal. 1994) .................................................................. 19

PLAINTIFF'S OPPOSITION TO DEFENDANT ALIPHCOM DBA JAWBONE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:14-CV-03587 (WHO)

ii

*Hatfield v. Halifax PLC*,
    564 F.3d 1177 (9th Cir. 2009) ............................................................ 8

*Herron v. Best Buy Co. Inc.*,
    934 F. Supp. 2d 1161 (E.D. Cal. 2013) ............................................ 20

*Hill v. Novartis Pharmaceutical Corp.*,
    2012 WL 967577 (E.D. Cal. Mar. 21, 2012) ................................ 17, 18

*Hills v. Gateway 2000, Inc.*,
    105 F.3d 1147 (7th Cir. 2000) .......................................................... 12

*In re iPhone 4S Consumer Litigation*,
    2013 WL 3829653 (N.D. Cal. July 21, 2015) ........................ 14, 16, 17

*In re Jamster Mktg. Litig.*,
    2009 WL 1456632 (S.D. Cal. May 22, 2009) .................................... 24

*In re Mattel, Inc.*,
    588 F. Supp. 2d 1111 (C.D. Cal. 2008) ............................................ 15

*In re MyFord Touch Consumer Litig.*,
    2014 WL 2451291 (N.D. Cal. May 30, 2014) .................................... 22

*In re NVIDIA GPU Litig.*,
    2009 WL 4020104 (N.D. Cal. Nov. 19, 2009) .................................. 24

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012) .............................................. 11

*In re Wal-Mart Stores, Inc. Wage & Hour Litig.*,
    505 F. Supp. 2d 609 (N.D. Cal. 2007) .............................................. 24

*Keniston v. Roberts*,
    717 F.2d 1295 (9th Cir. 1983) .......................................................... 25

*Lima v. Gateway, Inc.*,
    886 F. Supp. 2d 1170 (C.D. Cal. 2007) ............................................ 12

*Long v. Hewlett Packard Co.*,
    2007 WL 2994812 (N.D. Cal. July 27, 2007) .................................... 23

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir. 2004) .............................................................. 19

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) .................................................. 16, 17, 18

*McCarthy v. Am. Int'l Grp., Inc.*,
    283 F.3d 121 (2d Cir. 2002) .............................................................. 8

*Meridian Project Systems, Inc. v. Hardin Const. Co., LLC*,
    426 F. Supp. 2d 1101 (E.D. Cal. 2006) ............................................ 12

*Miller-Leigh LLC v. Henson*,
    152 Cal. App. 4th 1143 (2007) ................................................................................. 2

*Morgan v. Harmonix Music Sys., Inc.*,
    2009 WL 2031765 (N.D. Cal. July 7, 2009) ........................................................ 22

*Nedlloyd Lines B.V. v. Sup. Ct.*,
    3 Cal.4th 459 (1992) ................................................................................... 2, 6, 16

*Nikolin v. Samsung Electronics Am., Inc.*,
    2010 WL 4116997 (D.N.J. Oct. 18, 2010) ...................................................... 11, 13

*Pecover v. Elec. Arts Inc.*,
    2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ................................................... 9, 18

*Pokorny v. Quixtar, Inc.*,
    601 F.3d 987 (9th Cir. 2010) ........................................................................... 16

*ProCD, Inc. v. Zeidenberg*,
    86 F.3d 1447 (7th Cir. 1996) ...................................................................... 12, 13

*Rams v. Royal Caribbean Cruise Lines, Inc.*,
    17 F.3d 11 (1st Cir. 1994) ................................................................................ 8

*Sierra Diesel Injection Service, Inc. v. Burroughs Corp., Inc.*,
    890 F.2d 108 (9th Cir. 1989) .......................................................................... 23

*Sullivan v. Oracle Corp.*,
    51 Cal.4th 1191 (2011) .................................................................................. 14

*TRC & Assocs. v. NuScience Corp.*,
    2013 WL 6073004 (C.D. Cal. Nov. 18, 2013) ..................................................... 15

*VFD Consulting, Inc. v. 21st Servs.*,
    425 F. Supp. 2d 1037 (N.D. Cal. 2006) .......................................................... 1, 8

*Wallis v. Princess Cruises, Inc.*,
    306 F.3d 827 (9th Cir. 2002) ............................................................................. 8

*Wang v. OCZ Tech. Group, Inc.*,
    276 F.R.D. 618 (N.D. Cal. 2011) ..................................................................... 15

*Washington Mutual Bank v. Superior Court*,
    24 Cal.4th 906 (2001) .................................................................................... 16

*Wershba v. Apple Computer, Inc.*,
    91 Cal. App. 4th (2001) .................................................................................. 16

*Williams v. Gerber Prods. Co.*,
    552 F.2d 934 (9th Cir. 2008) ........................................................................... 20

**STATUTES**

Cal. Bus. & Prof. Code § 17200 .................................................................................. 1

PLAINTIFF'S OPPOSITION TO DEFENDANT ALIPHCOM DBA JAWBONE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:14-CV-03587 (WHO)

iv

Cal. Bus. & Prof. Code § 17500 ........................................................................................... 1

Cal. Civ. Code § 1750 ........................................................................................................... 1

**OTHER AUTHORITIES**

2 Witkin, *Jurisdiction*, § 289(b) .......................................................................................... 2

31 A.L.R.4th 404 (1984) ...................................................................................................... 2

Restatement (Second) of Conflicts of Law, § 80 ................................................................. 2

UCC § 2–204(1) ................................................................................................................. 12

PLAINTIFF'S OPPOSITION TO DEFENDANT ALIPHCOM DBA JAWBONE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:14-CV-03587 (WHO)

v

# I.  INTRODUCTION

Defendant Aliphcom d/b/a Jawbone ("Defendant") argues that Plaintiff Robert Frenzel ("Plaintiff") has merely re-packaged his complaint and nothing has changed.  Not so.  In fact, Plaintiff carefully responded to each of the Court's criticisms in its 12/29/2014 Order granting the previous Motion to Dismiss.

First, the Court asked Plaintiff submit a First Amended Complaint ("FAC") that included Defendant's contracts with California choice of law provisions.  Plaintiff included those contracts, demonstrated how each and every Jawbone UP purchaser agrees to the contracts as a prerequisite to using Jawbone UP, and explained how the claims arise from those contracts.  Given that Defendant itself added the choice of law and venue provision in its Terms of Use, it is remarkable that Defendant seeks so adamantly to avoid its application.  It appears that Defendant would like to have its cake and eat it, too - in other words, it seeks to impose the choice of law provision when it benefits the company but to avoid its application when it does not.  In reality, "California courts generally respect contractual choice-of-law clauses. … [A] choice-of-law provision encompasses all causes of action arising out of, or related to, the agreement."  *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1046-47 (N.D. Cal. 2006).  Plaintiff also explains that alternate bases exist to apply California law in this case, as well.

Second, to satisfy the heightened Rule 9(b) pleading standard, the Court asked Plaintiff to re-allege his claims arising from the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq*., California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*., and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.  Plaintiff has done just that.  He clarified when he entered into the contracts, and he explained how his claims arose from the contracts containing the choice of law provision.  Plaintiff clarified his reliance on representations Defendant placed on the product packaging regarding function and power.  He also included greater detail about his purchase and personal experiences with his Jawbone UP, down to the very time he purchased the device.  Per the Court's request, he clarified that the device never functioned as advertised on the packaging, and that he specifically relied on the packaging in purchasing the product.

PLAINTIFF'S OPPOSITION TO DEFENDANT ALIPHCOM DBA JAWBONE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:14-CV-03587 (WHO)

1

Third, Defendant misunderstands Plaintiff's warranty claims.  Defendant argues that replacement bands it issued satisfy its obligations under its limited warranty.  That is incorrect.  Plaintiff's claims arise *outside* the terms of the written warranty because they arise from representations on the packaging.  Accordingly, the replacement bands should have no impact on the Court's analysis.  Finally, it is premature to limit the class definition at this point, and it should be addressed later in this litigation.[1]

## II.  ARGUMENT

### A.    Application of California Law to a Nationwide Class Is Appropriate

#### 1.    Defendant's Software and Services Terms of Use Contain a Valid California Choice of Law Provision

At the hearing on the Motion to Dismiss and in its 12/29/2014 Order, the Court expressed concerns regarding the applicability of the California choice of law provision in this case.  To allay those concerns, Plaintiff's FAC included the Defendant's complete contracts containing the choice of law provisions.  FAC, Exs. A and B.  Generally, forum selection clauses are presumed valid, and California courts treat choice of law clauses the same as forum selection clauses.  *See, e.g.*, *Gustafson v. Bac Home Loans Servicing*, 2013 WL 5911252, *3-*4 (C.D. Cal. Nov. 4, 2013) (applying the California choice of law test to determine if choice of law provision should apply to class action asserting UCL claims); *Miller-Leigh LLC v. Henson*, 152 Cal. App. 4th 1143, 1149 (2007) ("[F]orum selection clauses are valid and may be given effect, in the court's discretion and in the absence of a showing that enforcement of such a clause would be unreasonable.").  California courts and federal courts within California analyze the validity of choice of law and forum provisions using California law.  *See, e.g.*, *Nedlloyd Lines B.V. v. Sup. Ct.,* 3 Cal.4th 459, 464 (1992).  Under California law, "the parties' agreement as to the place of the action … will be given effect unless it is unfair or unreasonable."  *See Cal-State Bus. Products & Servs., Inc. v. Ricoh*, 12 Cal. App. 4th 1666, 1678 (1993) (citing Restatement (Second) of Conflicts of Law, § 80 *accord* Annot., 31 A.L.R.4th 404 (1984); 2 Witkin, *Jurisdiction*, § 289(b), p. 696).

---

[1]      Defendant also points out that in his prayer for relief, Plaintiff requests injunctive relief the court sees fit to provide.  That was an oversight, and Plaintiff does not seek injunctive relief subsequent to this Court's 12/29/2014 Order.

a.   *Plaintiff's Claims Arise from or Are Related to the Software and Services Terms of Use Containing a Choice of Law Provision*

In its 12/29/14 Order, the Court expressed concern that Plaintiff's claims do not fall within the scope of the choice of law provision.  12/29/14 Order at 9-11; *see also* Motion at 6.  The Court's concerns, however, were related to the *website* Terms of Use, not the Software and Services Terms of Use.  The Software and Services Terms of Use are clear and controlling. Jawbone's Software and Services Terms of Use is "a legal agreement between [the user] and AliphCom ('Jawbone')" concerning the use of Jawbone's 'Service and Software.'"  *See* FAC at ¶ 12-13.  The "Software" is made available [to users] through the Jawbone Service."  *Id.*  "Service" is defined as follows: "Jawbone is the provider of the Jawbone service (the 'Jawbone Service') that enables you to update and control your Jawbone® device ('Jawbone Device')."  *Id.*  The terms of use define "Software" as follows: "Two types of Jawbone software are offered through the Jawbone Service: (i) the Jawbone Application; and (ii) firmware for the Jawbone Device ('Device Firmware')."  *Id.*

The contract goes on to explain that "[t]he Jawbone Application and Device Firmware are collectively referred to as 'Software.'  [][U]se of the Software is subject to [the user's] agreement to be bound by any additional software license terms that accompany the downloading of the Software, all of which are incorporated in and are hereby made part of these Terms of Use."  *Id.* at ¶ 15.  The Software and Services Terms of Use also explain that the user "may be required to establish an account ('Account') in order to use certain aspects of the Jawbone Service."  *Id.* at ¶ 16.   By opening the Account, the user agrees to "provide certain registration information, including personally identifiable information ('Registration Date'), … technical data about [the user's] Jawbone Device, computer system, and accompanying hardware or software ('Technical Data'), as well as log certain information about your use of the Jawbone Device ('Usage Data')."  *Id.*  Importantly, the Registration Data, Technical Data, and Usage Data, collectively referred to as "Account Data," directly impact the Software's accuracy in "track[ing]" and "measur[ing]" a user's activities.  *Id.* at ¶ 17.  The user also "agree[s] to provide accurate, current and complete Registration Data and to update Registration Data as required to keep it accurate, current and

complete at all times." *Id.*  In turn, Jawbone states that it will "collect, process and store the Registration Data [users] provide for use in maintaining [the user's] account." *Id.*

The Software and Services Terms of Use contain a valid California choice of law and venue provision:

> **Governing Law and Venue**.  **These Terms of Use and your use of the Jawbone Service are governed by the laws of the State of California**, without reference to its conflicts of law rules.  Your use of the Jawbone Service may also be subject to other local, state, national or international laws.  You expressly agree that exclusive jurisdiction and venue for any claim or dispute with Jawbone or relating in any way to your use of the Software resides in the state or federal courts of San Francisco County, California.  You hereby irrevocably consent to the personal and exclusive jurisdiction and venue of these courts.

*Id.* at ¶ 19 (emphasis added).

Defendant seemingly styles the Software and Services Terms of Use as only controlling during patent infringement or copyright cases.  Motion at 9-10.  Not so.  It makes little sense to include a choice of law provision in a consumer contract if it only applies to patent infringement or copyright cases related to Jawbone UP.  Further, Defendant did not specify that any patent infringement or copyright cases are governed by California law; instead, the language in the contract is broader than Defendant's deliberately narrow reading.  *See infra* 8:16-28.

Pursuant to the Software and Services Terms of Use, the question is simple: do Plaintiff's claims arise from his "use of the Jawbone Service?"  If the answer is "yes," the Software and Services Terms of Use apply, and California law controls.  *See* FAC, Ex. A (stating under the subsection "Miscellaneous" that "[t]hese Terms of Use constitute the entire agreement between you and Jawbone concerning your use of the Jawbone Service, and they supercede any prior agreements between you and Jawbone concerning the Jawbone Service").  Defendant defines "Jawbone Service" as use of the "software products," including (i) the Jawbone Application and (ii) firmware for the Jawbone device.  The Software is the brain of the Jawbone UP device, and is responsible not only for recording the consumer's activity but also directly impacts the product's battery life.  *See* FAC at ¶¶ 12-32; 38-63.  Accordingly, Plaintiff's claims arise under the Software and Services Terms of Use, and California law applies.  The Court should reject Defendant's attempt to re-write its own contract.

Moreover, Defendant's language in the Software and Services Terms of Use communicates a broader scope than Defendant now intones.  For example, under the subsection entitled "Termination," Defendant specifies: "If you fail to comply with any of the provisions of these Terms of Use, including, but not limited to, failing to provide Jawbone with accurate and complete Registration data … Jawbone, at its sole discretion, without notice to you may: (i) terminate these Terms of Use; (ii) terminate all rights of your Account; and (iii) preclude you from accessing the Jawbone Service or any part of it."  FAC, Ex. A.  Defendant specifies that complying with these Terms of Use includes providing accurate and complete registration data which, as described above, results in purportedly accurate user tracking data.  Accordingly, the Terms of Use encompass the accuracy of the software and as well as the function of the device.

Further, Defendant concedes in its Software and Services Terms of Use that "Jawbone will be responsible for providing any maintenance and support services for the Software that are specified in the applicable license terms, or are required under applicable law."  *Id.*  That also falls outside the scope of patent and copyright law insofar as it relates to Jawbone's responsibility to ensure the software is up to date and accurate for users.  Because it has not complied with its obligation, the Jawbone UP (comprised of the device and the software) fails to perform as advertised or maintain the advertised charge.

It is also nonsensical to argue that the Software and Services Terms of Use do not apply to the function of the device's software when the terms themselves include a disclaimer that the Jawbone services will not be without interruptions or "error free."  FAC, Ex. A, ¶ 14.1.  *See generally Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1065 (E.D. Cal. 2006), citing *Nedlloyd*, 3 Cal.4th at 468-70 ("No rational business entity would intend to subject itself to a dispute involving the laws of multiple jurisdictions or to face 'a protracted litigation battle' concerning which law to apply to each issue.  Consequently, the court read the phrase 'governed by' broadly to 'reflect the parties clear contemplation that 'the agreement' is to be completely and absolutely controlled' by the law of the chosen jurisdiction.").  This section includes the continued function of the device within the ambit of the Software and Services Terms of Use.  The contract language again makes it clear that the "*use of … the Jawbone service*," and

even "*the inability to use*" the Jawbone service is incorporated into the Software and Services Terms of Use. *Id.* ("You expressly agree that your use of, or inability to use, the Jawbone service is at your sole risk. … Because some jurisdictions do not allow the exclusion of implied warranties, the above exclusion of implied warranties may not apply to you.").

Accordingly, Defendant's attempt to circumvent application of the choice of law provision by arguing Plaintiff's claims do not fall within the scope of the Software and Services Terms of Use is unavailing. Motion at 9-10. Jawbone UP is a device that is powered and controlled exclusively through the software. Without the software, which is displayed using the website and the app, the device is absolutely useless. That same software and firmware causes the device's malfunction. *See* FAC at ¶¶ 20, 36, 64-71. Without the software or firmware, the device would not power on. The software also has a direct impact on the battery life of the product, and causes the device's battery to drain. *Id.* at ¶¶ 39-43. The same software and firmware is responsible for tracking and measuring a user's movement, sleep, and calorie intake, which it fails to do accurately. *Id.* at ¶¶ 32, 44-63. Because this lawsuit arises from the faulty Jawbone software and service that inaccurately tracks, records, and measures user activity while negatively impacting the product's battery life, California law applies in this case, just as venue is proper in this Court.

Defendant also argues that "[b]y it's terms, the California choice-of-law provision in the Software and Service Terms of Use applies only to the Service and the Software 'Terms of Service' themselves and Plaintiff's 'use of the Jawbone Service.'" Motion at 10. In other words, Defendant argues it does not extend to anything involving the Jawbone UP device. That is incorrect, and it splits hairs to an atomic level of absurdity. *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459 (1992) is instructive. There, plaintiff Seawinds argued that regardless of "whether or not the choice-of-law clause governs [Plaintiff's] implied covenant claim, [Plaintiff's] fiduciary duty claim is somehow independent of the shareholders' agreement and therefore *outside the intended scope of the clause*. [Plaintiff] thus concludes [law other than that in the choice of law provision] must be applied to this claim." *Nedlloyd*, 3 Cal.4th at 468 (emphasis added). The California Supreme Court plainly responded: "We disagree." *Id.* It explained "the most reasonable interpretation" of the contract and the parties' action was "that **they intended for the**

**clause to apply to all causes of action *arising from or related to their contract*.**"  *Id.* (emphasis added).  There, the contract said "[The] agreement shall be governed by and construed in accordance with Hong Kong law and each party hereby irrevocably submits to the non-exclusive jurisdiction and service of process of the Hong Kong courts."  *Id.*  The Court explained:

> The phrase "governed by" is a broad one signifying a relationship of absolute direction, control, and restraint.  Thus, the clause reflects the parties' clear contemplation that "the agreement" is to be completely and absolutely controlled by Hong Kong law.  No exceptions are provided.  In the context of this case, the agreement to be controlled by Hong Kong law is a shareholders' agreement that expressly provides for the purchase of shares in Seawinds by Nedlloyd and creates the relationship between shareholder and corporation that gives rise to Seawinds's cause of action. …

> In order to control completely the agreement of the parties, Hong Kong law must also govern the stock purchase portion of that agreement and the legal duties created by or emanating from the stock purchase, including any fiduciary duties.  If Hong Kong law were not applied to these duties, it would effectively control only part of the agreement, not all of it. Such an interpretation would be inconsistent with the unrestricted character of the choice-of-law clause.
> …

> For the reasons stated above, we hold **a valid choice-of-law clause, which provides that a specified body of law "governs" the "agreement" between the parties, encompasses all causes of action arising from or related to that agreement, *regardless of how they are characterized*, including tortious breaches of duties emanating from the agreement or the legal relationships it creates**.

*Nedlloyd*, 3 Cal.4th at 468-70 (emphasis added).

Here, Defendant's contract contains the same language described in *Nedlloyd*.  *See* FAC at ¶ 19 ("**These Terms of Use *and your use of the Jawbone Service* are governed by the laws of the State of California**, without reference to its conflicts of law rules.").  Simply put, Plaintiff's claims arise from "the Jawbone Service" because the contract "expressly provides for" Defendant's maintenance of the Jawbone UP Software and "creates the relationship between" Defendant and its customers "that give[s] rise to [Plaintiff's] cause[s] of action."  FAC at ¶ 19; *Nedlloyd*, 3 Cal.4th at 468-70.  Defendant's protestation that the choice of venue provision is broader than the choice of law provision is simply a post-facto attempt to avoid liability under California law.  *See* Motion at 10.  "[R]egardless of how they are characterized," Defendant's responsibilities related to the Jawbone UP software, and the subsequent relationship with the Plaintiff and class members, arise from and exists as a result of the contract.  *See Nedlloyd*, 3 Cal.4th at 470.

PLAINTIFF'S OPPOSITION TO DEFENDANT ALIPHCOM DBA JAWBONE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:14-CV-03587 (WHO)

7

1    Further, even if the Court concludes that the claims do not arise directly from the contract,

2    Defendant's agreement to provide the Jawbone UP services and software are "causes of action …

3    *related to that agreement*, regardless of how they are characterized" because they have resulted in

4    "tortious breaches of duties emanating from the agreement or the legal relationship it creates." *Id.*

5    at 468-70.  *See also Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1051-52 (N.D. Cal.

6    2013) (adopting the rational in *Nedlloyd*); *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d

7    1037, 1047 (N.D. Cal. 2006) ("Although the defendant in *Nedlloyd* argued that its claim for breach

8    of fiduciary duty was independent of the contract, the court rejected this argument and found that

9    all claims arising out of the contract or contractual relationship would be governed by the choice-

10   of-law provision.").

11   Finally, Defendant argues that because "Plaintiff … was misled by the product packaging

12   about the battery life and measurement of ability of his Jawbone UP," his claims do not fall within

13   the scope of the Software and Services Terms of Use.  Motion at 11.  That argument is

14   disingenuous, at best.  Jawbone's "representations and the battery's performance" are false and

15   misleading *because of the product's faulty software*, not simply because of some ink on paper.  *Id.*

16   There is no question that Defendant included the choice of law provision within the

17   Software and Services Terms of Use.  Any ambiguities in contracts of adhesion are construed

18   against the drafter.  *See, e.g.*, *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1292 (9th Cir. 1997)

19   (explaining contracts of adhesion "must be construed against" the drafter to the extent they contain

20   "ambiguities"); *Rams v. Royal Caribbean Cruise Lines, Inc.*, 17 F.3d 11, 13 (1st Cir. 1994) (same).

21   *See also McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) (following "the well-

22   established *contra proferentem* principle which requires that equivocal contract provisions are

23   generally to be construed against the drafter").  The same can be said regarding "opaque" language

24   that "obscures the meaning of an instrument."  *See Wallis v. Princess Cruises, Inc.*, 306 F.3d 827,

25   838 (9th Cir. 2002) (citing *Rams*).  Accordingly, if the Court determines the scope of the choice of

26   law clause is ambiguous, the Court should conclude that it was the parties' intention to be bound by

27   California law at the time they entered into the contract, even though Defendant now seeks to avoid

28   its application.  *See, e.g.*, *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1181-82 (9th Cir. 2009).

*b.*     *The Choice of Law Provision Is Valid*

Once the Court is satisfied that the parties intended to be bound by the choice of law provision, under California law a court must next analyze whether (1) the chosen jurisdiction has a substantial relationship to the parties, or (2) whether any other reasonable basis for the choice of law provision exists. *Nedlloyd*, 3 Cal.4th at 466 (1992).  Finally, application of California law must not violate public policy.  *Id.*  Notably, Defendant does not address these components of the test, and it focuses solely on the "intent" portion of its application.  Motion at 9-11.

Because Defendant is headquartered and incorporated in California, all contracting parties have a substantial relationship to California for choice-of-law purposes, and this also constitutes a "reasonable basis" to apply California law.  Restatement (Second) of Conflicts of Laws ¶ 187(2).  "If either test is met, the chosen state's law applies unless it is contrary to a *fundamental* policy of California."  *Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1064 (E.D. Cal. 2006) (internal citations and quotations omitted).  The choice of law provision is not contrary to a fundamental California policy, and Defendant has not identified any public policy impeded by the application of California law.  *See, eg.*, *Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, *20 (N.D. Cal. Dec. 21, 2010).  Accordingly, the choice of law provision should be enforced.

**2.**     **Defendant's Website Terms of Use Contain a Valid California Choice of Law Provision**

*a.*     *Plaintiff's Claims Arise from or Are Related to the Website Terms of Use Containing the Choice of Law Provision*

As stated above, the Court expressed concerns that the choice of law provision on the website did not control in this case.  12/29/2014 Order at 9-11; Motion at 7-8.  In his FAC, Plaintiff explained how the website is integral to the function of the device and, therefore, the claims arise from his use of the website, as well.  FAC at ¶¶ 21-37.  Specifically, the website itself plays an integral part in the both tracking and recording a user's activity.  *Id.* at ¶ 2.  Every user also agrees to be bound by the Terms of Use for the website when they download the app and access the software used to power the device because they are simultaneously using the website, even if they are unaware of the connection.  *Id.* at ¶¶ 21-28.

Further, the use of the Jawbone app and/or website is essential for the function of the device.  The app and website act as the *only* displays for information gathered by the device.  *Id.* at ¶ 29.  The app and website allow users to see their Account Data or input and alter their Registration Data.  *Id.*  That, in turn, affects the function of the accelerometer and the device's ability to record calorie intake and burn.  *Id.*  Further, to view remaining battery life, the user must use the app or website.  *Id.*

Every user event is captured simultaneously on the website and recorded in the user log.  *Id.* at 30.  Whether users know it or not, they use the Jawbone website each and every time they log an activity on their app or plug their Jawbone UP into their phone or smart device to sync and record their user data.  *Id.*  In short, the Jawbone app and Defendant's website are linked by Defendant's design, and use of one results in use of the other.  *Id.* at ¶ 31.  Accordingly, both the app and website simultaneously calculate and display user data.  For example:

- Users must create an account to use the app and the website.  Creating an account in the Jawbone app when prompted *automatically* signs the user up for an account on the website.  Accordingly, users have the same login information and only have to create the account once when setting up the app.

- The website and the app are linked.  Any registration for a new account or alteration of an existing account occurs simultaneously on the website and on the Jawbone app.

- A user's recorded data is stored automatically on the device's firmware and simultaneously saved on Defendant's website and in the app when it is plugged into a phone or another smart device.

- Whenever a user logs information into the app (calorie intake, food intake, mood, etc…), that information is updated in real time on the Defendant's website.

- Any "activity" a user records is automatically saved in the app and on the website.  It is stored both in the app and on the website in the user's data, and the activity can clearly be seen on the phone with the descriptive "Uploading User Event."

- Any account changes on the website, such as a password change, is reflected by the app, and vice versa.

- Personalization of settings is also simultaneous.  Settings that are synced between the website and the app include: the user's actual name and user name, gender, height and weight (to calculate calorie intake, calories burned, and length of stride), photos for a profile picture, birthday, address, and country.  Any change to this information on the website or in the app results in simultaneous alteration on the other platform.

*Id.*  The software and website inaccurately record user activity and report inaccurate charge

PLAINTIFF'S OPPOSITION TO DEFENDANT ALIPHCOM DBA JAWBONE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:14-CV-03587 (WHO)

10

1    remaining for the battery.  *Id.* at ¶ 32.

2          Defendant argues that "whether the website somehow affects the accuracy of the device is

3    irrelevant" to Plaintiff's claims.  Motion at 8.  That position flies in the face of Plaintiff's actual

4    claims - that the website, through its affiliation with the software and firmware, generates

5    inaccurate user information and displays inaccurate battery life remaining on the device.  FAC at ¶¶

6    21-32.  That also connects it to the Software and Services Terms of Use.  FAC, Ex. A ("Jawbone

7    will be responsible for providing any maintenance and support services for the Software that are

8    specified in the applicable license terms, or are required under applicable law.").  As with the

9    Software and Services Terms of Use, Defendant's website Terms of Use "creates the relationship

10   between" Defendant and its customers "that give rise to [Plaintiff's] cause[s] of action."  *Nedlloyd*,

11   3 Cal.4th at 468-70.  Further, Plaintiff's "causes of action … related to that agreement [website

12   Terms of Use], regardless of how they are characterized" because they are "tortious breaches of

13   duties emanating from the agreement or the legal relationship it creates."  *Nedlloyd*, 3 Cal.4th at

14   468-70.

15         To support its arguments, Defendant relies on *Nikolin v. Samsung Electronics Am., Inc.*,

16   2010 WL 4116997 (D.N.J. Oct. 18, 2010) and *In re Sony Gaming Networks & Customer Data Sec.*

17   *Breach Litig.*, 903 F. Supp. 2d 942, 964-65 (S.D. Cal. 2012).  Those cases are readily

18   distinguishable.  In *Nikolin*, the Plaintiff relied on the website "Terms of Use" page which

19   contained a New Jersey choice of law provision.  2010 WL 4116997, at *9 fn 3.  There, the *only*

20   connection the plaintiff had to the website was that she "consulted the website prior to purchasing

21   her television."  *Id.*  In contrast, here, Plaintiff continuously used the website as part of an

22   integrated Jawbone UP experience, so his claims arise under those terms alongside the software

23   usage.

24         The *In re Sony* court rejected the Plaintiff's contention that a "choice of law provision in the

25   [Defendant's] Terms of Service Agreement dictated that California law applies to claims relating to

26   [the plaintiffs'] PSN accounts."  903 F. Supp. 2d at 964-65.  As in *Nikolin*, the *In re Sony* plaintiffs

27   did not continuously access the website when using the Play Station Network at issue in the case.

28

*Id.* at 950-51. In contrast, here, the website actually contributes to the recording of inaccurate information in the Jawbone UP device. Accordingly, this case is also distinguishable on the facts.

Because the Jawbone software is displayed solely through the product app and Defendant's website, and both are integral to the Jawbone UP's functionality and battery life, Plaintiff and Class members' claims arising from this lawsuit are subject to the California choice of law provision. The website choice of law provision is valid for the same reasons stated above, and California law applies. *See supra* section II.A.1.b.

b.  *Alternately, Terms of Use Are a Part of the Contract of Sale Because Defendant Required Plaintiff to Accept the Contracts to Use the Product.*

Defendant argues that the terms of use specify that disputes arising from the use of Jawbone UP are governed by the location of the sale rather than the choice of law provision. Motion at 8. That is untrue. Generally, terms of use become a part of the sale of goods where use of the product is conditioned on the consumer's acceptance of the additional terms. *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1452-53 (7th Cir. 1996); *Meridian Project Systems, Inc. v. Hardin Const. Co., LLC*, 426 F. Supp. 2d 1101, 1108 (E.D. Cal. 2006) (adopting *ProCD* rationale). Other courts have extended this rationale beyond software to other products. *Hills v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 2000) (including additional shrinkwrap terms on a computer where Plaintiff was aware that there would be additional terms), *Lima v. Gateway, Inc.*, 886 F.Supp.2d 1170, 1177-78 (C.D. Cal. 2007) (adopting *Hills*). Because the terms of use in both contracts contain valid choice of law provisions, those provision are also incorporated into the contract of sale.

In *ProCD*, Judge Easterbrook explained that manufacturers often condition a contract for the sale of goods upon the consumer's acceptance of additional terms in a consumer's purchase of software. *See ProCD, Inc.* 86 F.3d at 1452 (Judge Easterbrook relying on UCC § 2–204(1)). The buyer had this opportunity to accept or decline the terms where "the software splashed the license on the screen and would not let him proceed without indicating acceptance.*" Id.* In Judge Easterbrook's estimation, these "[t]erms of use are no less a part of 'the product' than are the size of the database and the speed with which the software compiles listings." *Id.* at 1453.

Accordingly, where use of the product was conditioned in this way, the terms of use became a part of the contract for sale.  *Id.* at 1452

Here, Defendant's device does not, and cannot, deliver the advertised features without the software and accompanying use of the website.  FAC at ¶¶ 2-89.  Because the device alone is not the product Defendant advertised, Plaintiff purchased both the device and the right to use the Software necessary to the product's function.  Without the software and website, consumers cannot access any of these product features and are left with a $60-$120 plastic bracelet.

Plaintiff was required to accept Defendant's terms of use to use the product as intended. Similar to *ProCD*, when Plaintiff attempted to use the product, Defendant's terms appeared on the screen and Plaintiff was not allowed to proceed until he indicated acceptance.  *See ProCD, Inc.*, 86 F.3d at 1452.  Without this indication of acceptance, the device would not function.  Accordingly, the terms of use are a part of the product, and a part of the contract of sale.

Defendant's cited case, *Nikolin*, is inapposite.  There, the defendant did not insist on the terms of use as part of the sale of goods.  *Nikolin*, 2010 WL 4116997, at *4 (noting that the plaintiff failed to allege that her claims arose under the website terms of use).  Conversely here, Defendant did insist that Plaintiff accept the terms to use the product, thus they became part of the contract of sale.  Therefore, California law applies even under this theory.

### 3. Because Defendant's Misrepresentations Emanated from California, Plaintiff's Claims Do Not Require Extra-Territorial Application of California Law

If the Court determines that the choice of law provision does not control in this case, California law may still be applied because Defendant's misrepresentations emanated from California.  *Ehret v. Uber Technologies, Inc.*, 2014 WL 4640170 (N.D. Cal. Sept. 17, 2014) is instructive.  There, the court considered whether a plaintiff from Chicago, Illinois could assert UCL and CLRA claims against San Francisco-based company Uber.  *Id.* at *1-*2.

The *Ehret* court explained that "the critical question presented by Plaintiff's complaint is whether application of the UCL and CLRA in the circumstances alleged actually entails an extraterritorial application of those statutes."  *Id.* at *4.  It continues to explain that "[m]ultiple courts – including the California Supreme Court in *Sullivan* – have permitted the application of

California law where the plaintiff's claims were based on alleged misrepresentations that were disseminated from California." *Id.* (citing *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191 (2011) (holding the California Labor Code applied to work performed by nonresidents)).

The plaintiff in *Ehret* alleged that the "deceptive practices … were conceived, reviewed, approved, and otherwise controlled from Defendant's headquarters in San Francisco, California. Furthermore, the misrepresentations and omissions alleged [t]herein were contained on Defendant's website and mobile phone application, which are maintained in California. When Plaintiff and class members used Defendant's services those [sic] transactions, including the billing and payment for those services, were processed on Defendant's servers in San Francisco, California." *Id.* at *5. The court concluded that the plaintiff "ha[d] provided sufficient factual allegations from which the Court can plausibly infer that [Defendant's alleged misrepresentations] emanated from California. Accordingly, the Court conclude[d] that, for purposes of the motion to dismiss, **application of the UCL and CLRA … would not constitute extra-territorial application of these statutes**." *Id.* at *5. It denied Defendant's motion to dismiss the California claims asserted by an Illinois resident.

Other cases have reached the same conclusion and denied motions to dismiss California claims on the basis of alleged extraterritorial application of California law. In *In re iPhone 4S Consumer Litigation*, 2013 WL 3829653 (N.D. Cal. July 21, 2015), out-of-state plaintiffs asserted claims under the UCL, FAL, and CLRA on grounds that Apple misrepresented the functionality of the phone, specifically in relation to a software feature called "Siri." *Id.* at *1-*2. Apple argued that the out-of-state plaintiffs could not pursue California claims where they did not purchase the product in California. *Id.* at *7. The court rejected that argument, explaining:

> California courts have concluded that "**state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California.**" *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal.App. 4th 214, 224–25 (1999). Plaintiffs have alleged that their injuries were caused by Apple's wrongful conduct in false advertising that originated in California. Here, Plaintiffs have alleged that Apple's purportedly misleading marketing, promotional activities and literature were coordinated at, emanate from and are developed at its California headquarters, and that all "critical decisions" regarding marketing and advertising were made within the state. CCAC ¶¶ 30, 62. **California's presumption against the extraterritorial application of its statutes therefore does not bar the claims of the out-of-state Plaintiffs**, because this principle is "one against an intent to encompass conduct occurring in a foreign jurisdiction in the prohibitions and remedies of a domestic

PLAINTIFF'S OPPOSITION TO DEFENDANT ALIPHCOM DBA JAWBONE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:14-CV-03587 (WHO)

14

statute."

*Id.*

Still other cases are in accord.  *See TRC & Assocs. v. NuScience Corp.*, 2013 WL 6073004, at *5 (C.D. Cal. Nov. 18, 2013) ("[T]he alleged fraudulent conduct occurred in California.  The Complaint is not based solely on a commercial transaction outside of California, but is instead based on material misrepresentations originating in California with NuScience, traveling through Florida, and ending up in Ohio with TRC."); *Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618, 630 (N.D. Cal. 2011) ("Though Wang's allegations of OCZ's California-based conduct are general, they provide a sufficient basis at the pleading stage for the invocation of California law.... [T]he facts alleged are that the misleading marketing, advertising, and product information are 'conceived, reviewed, approved, or otherwise controlled from [OCZ's] headquarters in California.' "); *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1119 (C.D. Cal. 2008) ("Plaintiffs have adequately alleged that Mattel and Fisher–Price's conduct occurred, if at all, in—or had strong connections to—California.  Plaintiffs complain of misrepresentations made in reports, company statements, and advertising that are reasonably likely to have come from or been approved by Mattel corporate headquarters in California.") (citation omitted).

The basis for applying California law in *Ehret* and in similar cases is true here.  Defendant Jawbone's "deceptive practices were conceived, reviewed, approved, and otherwise controlled from Defendant's headquarters in San Francisco, California."  *Ehret*, 2014 WL 4640170, at *5; FAC at ¶ 8.  Additionally, the misrepresentations at issue in this case were "contained on Defendant's website and mobile phone application, which are maintained in California."  *Ehret*, 2014 WL 4640170, at *5; FAC at ¶¶ 8, 10, 37.  Whenever Plaintiff and putative class members use the Jawbone UP device and software, the activity is "processed on Defendant's servers in San Francisco, California."  *Ehret*, 2014 WL 4640170, at *5; FAC at ¶ 37.  Allowing claims under the UCL, CLRA, and in this case the FAL, "would not constitute extra-territorial application of these statutes."  *Ehret*, 2014 WL 4640170, at *5.

### 4.   Although Premature, the *Mazza* Analysis Does Not Prevent a Nationwide Class

Courts in this circuit have routinely recognized that a "choice-of-law analyses is a case-and

1   fact-specific inquiry." *Forcellati v. Hyland's*, 876 F. Supp. 2d 1155, 1160-61 (C.D. Cal. 2012)

2   (holding that reliance on *Mazza* without "discuss[ing] the differences between the consumer

3   protection laws" of the states is insufficient to support a dismissal"); *Pokorny v. Quixtar, Inc.*, 601

4   F.3d 987, 995 (9th Cir. 2010) (holding that *the facts* presented in each case impact a court's finding

5   of whether there is a "material difference" between the laws of different states in a class action).

6       Nevertheless, should the Court determine that the issue is ripe for consideration,

7   Defendant's application of the governmental interest choice of law analysis articulated in *Mazza v.*

8   *Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) is incorrect because there is a valid choice of

9   law provision.  "The governmental interest test, although overlapping with [*Nedlloyd Lines B.V. v.*

10  *Superior Court*, 3 Cal.4th 459 (1992)] to the extent that state interests or policies must be

11  examined, applies where 'there is **no advance agreement** or applicable law."  *Bias v. Wells Fargo*

12  *& Co.*, 943 F. Supp. 2d 915, 929 (N.D. Cal. 2013).

13      Should the Court determine that the choice of law provision does not control, *Mazza* still

14  does not prevent application of California law in this case.  *Mazza* re-affirmed the "governmental

15  interest standard" articulated by the California Supreme Court in *Washington Mutual Bank v.*

16  *Superior Court*, 24 Cal.4th 906 (2001), which imposes the burden on Defendant to prove that

17  California law should not apply in an action.  *See, e.g., Wershba v. Apple Computer, Inc.*, 91 Cal.

18  App. 4th at 224, 243 (2001) and *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 4th 605, 612-613

19  (1987).  Further, multiple courts in this Circuit have held that *Mazza* does not necessarily preclude

20  application of California law to a nationwide class.  *See Forcellati v. Hyland's*, 876 F. Supp. 2d at

21  1160-61; *In re iPhone 4S Consumer Litig.*, 2013 WL 3829653, at *9-*10.

22      California's choice of law rules require Jawbone to demonstrate that the relevant law is

23  *materially* different across the affected jurisdictions, such that any differences "must have a

24  *significant effect on the outcome of the trial*."  *Mazza*, 666 F.3d at 590-91.  Defendant argues that

25  the Missouri Merchandizing Practices Act ("MMPA") "differs materially from the California

26  statutes both in the elements necessary to make a claim as well as the available damages."  Motion

27  at 12.  Defendant only focuses on Missouri and California.  Defendant argues that Missouri does

28  not require actual reliance to sustain a claim, whereas California requires actual reliance to state a

---

1    claim under its consumer protection laws.  *Id.*  Defendant contends that because Plaintiff included

2    information in his FAC that he did not rely upon, claims arising from those representations would

3    be actionable in Missouri but not in California.  *Id.*  Plaintiff, however, included that information as

4    background detail to explain what the device is, how it functions, and how its labeling conveys

5    false and misleading messaging.  His claims arise only from the representations that Plaintiff saw

6    on the package, which were false and misleading.  FAC at ¶¶ 64-68.  Accordingly, because

7    Plaintiff actually relied on those representations, there is no material difference between California

8    and Missouri in this case.  *See Delarosa v. Boiron, Inc*, 275 F.R.D. 582, 586 (C.D. Cal. Aug. 24,

9    2011) (noting ease of establishing materiality of "a statement that a product, which appears to have

10   no purpose other than to remedy cold, does, in fact, relieve the symptoms of a cold").

11       Defendant also argues that "[a]nother material difference is the available remedies between

12   the states."  Motion at 13-14.  Defendant cites to *Hill v. Novartis Pharmaceutical Corp.*, 2012 WL

13   967577, at *4 (E.D. Cal. Mar. 21, 2012) to support its assertions.  The *Novartis* court determined

14   that material differences existed and created a conflict between California and New Jersey.  But

15   other courts have come to different conclusions based on persuasive reasoning.  *See Forcellati v.

16   Hyland's*, 2014 WL 1410264, at *5-*6 (C.D. Cal. Apr. 9, 2014) (certifying plaintiffs' CLRA, UCL,

17   and FAL claims for a nationwide class, and separately noting that defendants have no due process

18   interest in how damages are distributed).  *See also In re iPhone 4S Consumer Litig.*, 2013 WL

19   3829653, at *9-*10.  Nevertheless, the Court must still determine which state has a superior

20   interest before reaching a conclusion regarding choice of law.

21       Finally, the Court must determine whether Missouri or California has a superior interest in

22   applying its state law.  In *Novartis*, the Court acknowledged that both California and New Jersey

23   had strong interests in regulating the defendant's unlawful activity.  *Novartis*, 2012 WL 967577, at

24   *6-*7.  The Court continued to state that "with respect to the issue of punitive damages, 'the place

25   of the wrong has the predominant interest,' and 'California considers the place of the wrong to be

26   the state where the last event necessary to make the actor liable occurred.'"  *Id.* at *7 (citing *Mazza,

27   supra,* 666 F.3d at 593.  Here, the last event necessary to make Defendants liable occurred in

28

California, where Defendant controls and maintains its software and service, and disseminates the fraudulent statements. That suggests California, not Missouri, has the greater interest. *Id.*

Further, like the Defendant in *Novartis*, Defendant Jawbone seeks application of another state's law to shield itself from liability under California law. *Id.* at *8; Motion at 13 ("Missouri law caps punitive damages to the greater of $500,000 or five times the net amount of the judgment awarded. … California, by contrast, permits larger punitive damage awards."). The *Novartis* court looked on this motivation disfavorably. *Id.* Further, California has an overwhelming interest in regulating businesses headquartered in California and actions taken by those businesses that emanate from California, and California's interests would be substantially more impaired if its policy were subordinated to the policy of other states that have minimal contacts with the conduct at issue in this litigation. *See Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, *20 (N.D. Cal. Dec. 21, 2010) ("The California Supreme Court has held that, in cases involving resident defendants, foreign states do not have a legitimate interest in limiting the amount of recovery for nonresident plaintiffs under California law."); *cf. Mazza*, 666 F.3d at 586-87 (noting the defendant established dealerships in other states). There can be no real dispute that Defendant's deceptive conduct emanates from California and similarly affected class members nationwide, making application of California law appropriate. *Ehret*, 2014 WL 4640170, at *5. As aptly stated in *Bruno v. Quten Research Institute, LLC*, before Defendant can "deprive consumers in several states who were exposed to misrepresentations of the most efficient vehicle for adjudication of their injury: a nationwide class action…, the California Supreme Court requires that Defendant analyze various states' laws under the circumstances of the particular case and given the particular legal issue in question." 280 F.R.D. 524, 550 (C.D. Cal. 2011). Because "[t]he extent to which [Missouri's] interest would be impaired if California law applie[s] is speculative at best," and Defendant failed to analyze conflicts with any other state laws, California law may be applied. *See Forcellati*, 876 F. Supp. 2d at 1161.

**B.      Plaintiff Has Stated Claims Under the CLRA, UCL, and FAL**

**1.      Plaintiff Pled His California Claims with Particularity**

In granting Plaintiff an opportunity to amend his complaint, Plaintiff followed the Court's guidance to satisfy the heightened Rule 9(b) pleading standard for his California claims. The

allegations in the FAC provide sufficient particularity to place Defendant on notice of the "precise misconduct with which [it is] charged." *See Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004).[2]  In the FAC, Plaintiff specifically alleges that Defendant engaged in the following, more narrowed misconduct:

- Defendant promised that the battery life of the product was 10 days or approximately 10 days on a full charge, and
- Defendant represented that the product was capable of tracking and measuring movement, sleep patterns, and calories burned.

FAC at ¶¶ 39-48.  In reality, the product cannot and does not deliver on those promises.

Defendant contends that Plaintiff also failed to satisfy the heightened pleading standard with respect to the details of his purchase of Jawbone UP.  That is untrue.  In response to the Court's guidance in its 12/29/2014 Order, Plaintiff specified the following regarding his purchase of Jawbone UP:

- **Time**: On November 25, 2012 at 2:30 p.m., Plaintiff purchased a Jawbone UP from an Apple store located at 4712 Broadway Street, Kansas City, Missouri. While there, he reviewed the packaging prior to purchase and compared it to other products, noting the product function as a measuring and tracking device and the advertised battery life of 10 days.  He also reviewed the Jawbone UP software prior to purchase by downloading it on his phone to see how the product would display measured and tracked data, and remaining battery life. (FAC at ¶¶ 64-65);[3]

- **Place**: Plaintiff specifically identified the false and misleading representations made on the product packaging at point of sale, and he was exposed to and relied upon those representation prior to purchase, having compared the packaging to other available fitness trackers (*id.* at ¶¶ 64-68);

- **Content**: Plaintiff identified the content of the particular misrepresentations as detailed in the FAC, and even included images to demonstrate the content of the representations he relied on (*id.* at ¶¶ 39-43 (power representation), ¶¶ 44-53 (function representations));

---

[2]      As a preliminary matter, a determination that conduct is likely to deceive a "reasonable consumer" is fact intensive, and a motion to dismiss CLRA, UCL, and FAL claims should be granted only where misrepresentations are not false, misleading or deceptive as a matter of law. *See, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285, 290 (9th Cir. 1995) (holding that the "reasonable consumer" standard applied to claims under California's false advertising and unfair business practices statutes); *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1398 (E.D. Cal. 1994) (same).  Here, whether Defendant's representations were deceptive or misleading to a reasonable consumer is a question of fact rather than a question of law, so the motion to dismiss should not be granted on those grounds.

[3]      Because every Jawbone UP user must install the Jawbone app to use the device, they also review the representations upon installation and when they open the app to see their "progress." This is also where purchasers affirmatively agree to be bound by the contracts containing the choice of law provision; without agreeing to the terms of use, the device is inoperable.

- **Identity of Person Engaged in Misconduct**: Plaintiff identified Defendant as the sole entity responsible for engaging in the misconduct (*id.* at ¶¶ 2-89);

- **Circumstances Indicating the Conduct False and Misleading**: Plaintiff provided evidence that Defendant's conduct was false and misleading (*id.* at ¶¶ 2-89), and he also stated that he relied upon those representations prior to purchasing and forwent purchasing other products as a result (*id.* at ¶¶ 64-68).

Plaintiff also alleges how Defendant's conduct led to an ascertainable loss. *Id.* at ¶¶ 64-68. Contrary to Defendant's assertions, these allegations more than satisfy Rule 9(b)'s specificity requirement.

## 2.    Plaintiff Has Alleged Actionable Misrepresentations

Defendant also argues that Plaintiff has not alleged actionable misrepresentations in his FAC. Motion at 15-21. That is incorrect. In amended his complaint, Plaintiff followed the Court's guidance to sharpen his allegations. *See supra* Section II.B.1. Under the CLRA, UCL, and FAL, conduct is deemed deceptive or misleading if the conduct is likely to deceive a reasonable consumer. *See Williams v. Gerber Prods. Co.*, 552 F.2d 934, 938 (9th Cir. 2008). As demonstrated below, Plaintiff has satisfied that test.

### a.    *Plaintiff Has Sufficiently Pled His Battery Life Claim*

Defendant incorrectly argues that "the battery life representation does not support Plaintiff's CLRA, UCL, and FAL claims." Motion at 16. As this Court noted in its 12/29/14 Order, "Contrary to Jawbone's position, the phrase 'up to' does not necessarily preclude the statement from providing a basis for a misrepresentation claim under California's consumer protection statutes." Order at 14-15. *See Herron v. Best Buy Co. Inc.*, 934 F. Supp. 2d 1161, 1171-73 (E.D. Cal. 2013) (noting that "multiple courts have found that 'up to' representations may materially mislead reasonable consumers" and collecting cases).

The Court expressed concern that Plaintiff "had not adequately alleged the manner in which the representation was false or misleading," particularly with respect to Plaintiff himself. 12/29/14 Order at 15. To correct that problem, Plaintiff explained:

> In the store prior to purchasing his Jawbone UP, Plaintiff carefully reviewed the product packaging and compared the representations Defendant made on the Jawbone UP labels with those of other fitness trackers, including the Nike FuelBand. In comparing the products, Plaintiff specifically noted that unlike the Nike Fuelband, the Jawbone UP had an advertised battery life of 10 days.
> …

From the first day, Plaintiff's Jawbone UP did not maintain a charge for the advertised 10 days following a complete charge.  In fact, the device maintained its charge for a dramatically shorter period of time, such as a few hours or a day.

…

Mr. Frenzel experienced identical problems with his second band.  Following a complete charge, the band again did not maintain a charge for 10 days.  Like his first band, his second band immediately suffered from a significantly shorter battery life, sometimes maintaining a charge for only a few hours.

FAC at ¶¶ 64, 66-67.

Defendant argues that Plaintiff relied on a representation that the product maintained a charge for 10 days rather than "up to 10 days."  Motion at 16-17.  Because the product packaging says "up to 10 days," Defendant argues that Plaintiff has not relied on the packaging.  *Id.* Defendant is grasping at straws.  Plaintiff clearly included images of the packaging with the statement "up to 10 days."  *See, e.g*., FAC at ¶¶38-43.  Based on that statement, Plaintiff was deceived into believing that the battery would last for 10 days.  Indeed, that statement clearly suggests that Jawbone UP can and will maintain a 10 day charge, or at the very least will maintain a charge for several days.  In other words, Plaintiff alleges, and any reasonable consumer would conclude, that a reasonable interpretation of the words "up to 10 days" indicates the product is capable of maintaining a 10 day charge.  In reality, Plaintiff's devices *never* maintained 10 day charge or anything close to a 10 day charge.  FAC at ¶ 66 ("From the first day, **Plaintiff's Jawbone UP did not maintain a charge for the advertised 10 days following a complete charge**.  In fact, the device maintained its charge for a dramatically shorter period of time, such as a few hours or a day."); *id.* at ¶ 67.

Further, at this stage of the litigation, Plaintiff adequately alleges that the power problems are tied to Defendant's Software and Service.  FAC at ¶ 43 ("Jawbone's Software directly affects the battery life of the Jawbone UP, and it is one of the root causes of the battery problems in the device.  To illustrate this point, Defendant recently released an update to the Jawbone UP Software for a related device (Jawbone UP24) that purportedly doubles the battery life of the product from 7 days to 14 days.  *See* Hari Chakravarthula, "UP24 Lasts 14 days on a Single Charge," Jawbone.com, *available at* https://jawbone.com/blog/up24-now-lasts-14-days-single-charge/ (last visited 1/26/2015).  Accordingly, the Jawbone UP Software/Firmware directly impacts the battery

1

2

life of the product).  Therefore, California law applied, and Defendant's false and misleading statements regarding battery life give rise to Plaintiff's claims.

3

4

b.    *Plaintiff Has Sufficiently Pled His Product Function Claim*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

Defendant argues that Plaintiff's "product function representation also doesn't support Plaintiff's claims," and that the Court rejected the "function" theory in its 12/29/2014 Order. Motion at 18-21.  Defendant is incorrect.  In response to the Court's concerns, Plaintiff reframed his complaint to more accurately reflect his claims.  He does not allege that the product just died or eventually failed; in fact, he alleged that the product cannot and does not function as advertised on the label as soon as it comes out of the box.  FAC at ¶¶ 44-53.  Instead of arising from alleged "quality" or the "reliability" of the product, Plaintiff alleges that a reasonable consumer who purchases the product would expect it to do what the box says it will do: track and record calorie intake, sleep patterns, and movement.  FAC at ¶¶ 2-89.  As Plaintiff's experiences demonstrate, the product does not "track" or "measure" a user's movement, sleep, or calories.  *Id.* at ¶¶ 22-53, 64-68.  Unlike Defendant's assertion that these allegations hinge on the product's "reliability," the allegations instead center on what the product packaging said it would do: "track" and "measure" the user's movement, sleep, and calorie intake.  No reasonable consumer would purchase a product that, for instance, is supposed to track and record every step with the expectation that it will, instead, track and record every third or fourth step taken.  The representations are materially false and misleading, and are therefore actionable.

20

21

22

23

24

25

Accordingly, the cases cited by Defendant are inapposite.  Both *In re MyFord Touch Consumer Litig.*, 2014 WL 2451291 (N.D. Cal. May 30, 2014) and *Morgan v. Harmonix Music Sys., Inc.*, 2009 WL 2031765 (N.D. Cal. July 7, 2009) involve products that functioned as advertised but failed sometime after purchase.  There, because the products were not advertised to be free from defects, the respective courts dismissed the claims.  *In re MyFord Touch*, 2014 WL 2451291, *5; *Morgan*, 2009 WL 2031765, *3.  Here, the Jawbone UP did not perform as marketed

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT ALIPHCOM DBA JAWBONE'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:14-CV-03587 (WHO)

22

and advertised right out of the box.  That is different than saying "the product sometimes failed."

Motion at 20.[4]

### 3. Plaintiff Has Stated a Valid Claim for Breach of Express and Implied Warranties

Jawbone further argues that Plaintiff's warranty claims should be dismissed because "Plaintiff did not allege that Jawbone failed to replace or repair his Jawbone UP within the *warranty* period."  MTD at 21 (emphasis added).  Jawbone bases all of its warranty arguments on its "Limited Warranty" and the "three-month warranty on replacement bands."  *Id.* at 21-22.  Plaintiff's warranty claims, however, are not based on any breach of Jawbone's limited *contractual* warranties.  Plaintiff's claims are based on the "extracontractual" statements made by Jawbone on the packaging for the Jawbone UP.  FAC at ¶¶ 39-43 (battery life), ¶¶ 44-53 (activity tracking); *see also* ¶ 109 (breach of express warranty cause of action).  Those warranty claims are completely unrelated to Jawbone's limited contractual warranties.

Jawbone relies upon *Long v. Hewlett Packard Co.*, 2007 WL 2994812 (N.D. Cal. July 27, 2007) and quotes the portion of Judge Ware's decision in which he held that "a plaintiff cannot maintain a breach of warranty claim … for a product that is repaired within the warranty period and fails again months after the warranty has expired."  *Id.* at *4.  But that part of the *Long* decision relates to a claim for breach of a *contractual* warranty only.  Judge Ware held that Defendant HP had "fulfilled its warranty promises" and accordingly dismissed the claim for breach of the contractual warranty.  *Id.* at *5.  In this case, Plaintiff makes no allegations regarding Jawbone's limited contractual warranties and *Long* is therefore entirely inapplicable.[5]  Plaintiff has properly asserted his warranty claims.

---

[4]      Defendant's Software & Services Terms of Use explain that the Jawbone Software and Firmware affects the performance of the Jawbone UP.  *See* FAC, Ex. A ("Use of the Jawbone Service requires a personal computer, a Jawbone Device, Internet access and an installed and operating version of the Jawbone application software ("Jawbone Application").  Your ability to use the Jawbone Service may be affected by the performance of these items. …").  Further, Plaintiff explained at how the software and firmware causes the defects in function and battery life.  FAC at ¶ 43.

[5]      In *Long*, Judge Ware separately dismissed the plaintiffs' claims for "breach of express warranty of description," which are comparable to the claims asserted in this case.  Judge Ware found that HP had "validly disclaimed any express warranty created by virtue of its extracontractual statements identified by Plaintiffs."  *Id.* at *5-*6.  In its motion to dismiss, Jawbone makes no argument that it has disclaimed the express warranties set forth in Plaintiff's complaint.  Moreover, warranty disclaimers are strongly disfavored in the Ninth Circuit.  *Sierra*

**C.      It Is Premature to Limit the Class Definition Prior to Class Certification**

Defendant argues that Plaintiffs' class definition is overbroad and should be stricken. Motion at 22-23.  The overwhelming majority of case law in California holds that it is inappropriate to determine class certification issues – such as the scope of class allegations or the breadth of the class definition – until a motion for class certification is brought. [6]  *See, e.g.*, *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 614-15 (N.D. Cal. 2007) ("[T]he granting of motions to dismiss class allegations before discovery has commenced *is rare* … because the shape and form of a class action evolves only through the process of discovery.") (internal quotations omitted) (emphasis added); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 2006 WL 3422198 (N.D. Cal. Nov. 28, 2006) (denying defendants' motion to amend the class definition per Rule 23(d)(4) and finding that "[i]t would be improper to allow Defendants to slip through the backdoor what is essentially an opposition to a motion for class certification before Plaintiffs have made such a motion and when discovery on the issue is still on-going").  Thus, it is far more appropriate to decide this issue at class certification rather than the pleading stage.

Defendant also raises concerns about the scope of the class definition in light of certain purchasers who may not have experienced defects in the product, were "not deceived by the labeling or advertising at issue," or may assert a claim after the warranty period expired.  Motion at 23.  First, Plaintiff need only establish his own reliance and classwide reliance is presumed.  FAC at ¶¶ 64-68; *Delarosa v. Boiron, Inc*, 275 F.R.D. 582, 586 (C.D. Cal. Aug. 24, 2011.  It is

---

*Diesel Injection Service, Inc. v. Burroughs Corp., Inc.*, 890 F.2d 108, 113-115 (9th Cir. 1989) ("when an express warranty is read together with a warranty disclaimer, *the express warranty is given effect over the disclaimer*") (emphasis added).

[6]      *See also Beal v. Lifetouch, Inc.*, 2011 WL 995884, at *7 (C.D. Cal. Mar. 15, 2011) (holding motion to strike class allegations premature at the pleading stage and refusing to strike such allegations because they are clearly relevant to the subject matter of the litigation); *Gooden v. Suntrust Mortg., Inc.*, 2012 WL 996513, at *8 (E.D. Cal. Mar. 23, 2012) (denying motion to strike nationwide class allegations at the pleading stage and holding instead that "class definitions will be considered during the certification process"); *In re Jamster Mktg. Litig.*, 2009 WL 1456632, at *7 (S.D. Cal. May 22, 2009) (denying motion to strike nationwide class allegations at the pleading stage because "[p]iece-meal resolution of issues related to the prerequisites for maintaining a class action do not serve the best interests of the court or parties"); *Baba v. Hewlett-Packard Co.*, 2010 WL 2486353, at *9 (N.D. Cal. June 16, 2010) (denying motion to strike class allegations as unmanageable at the pleading stage); *In re NVIDIA GPU Litig.*, 2009 WL 4020104, at *13 (N.D. Cal. Nov. 19, 2009) (denying motion to strike and holding that "[a] determination of the ascertainability and manageability of the putative class in light of the class allegations is best addressed at the class certification stage of the litigation").

premature to determine how many purchasers experienced defects (although Plaintiff asserts that all purchasers experience the battery and function problems).  Without discovery, it is unclear at this point who may assert a claim outside the warranty period, and whether Defendant offered partial or full refunds to purchasers, and whether those who received a replacement band received a defective product.  Following discovery, the class definition will be narrowed at class certification if the Court deems it appropriate.  At this time, Defendant's concerns are premature.

### III.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendant's motion to dismiss Plaintiff's FAC be denied in its entirety.  Should the Court find dismissal of any claims warranted, Plaintiff seeks leave to amend the FAC.  *See, e.g.*, *Keniston v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983) ("Ordinarily, leave to amend should be freely given in the absence of prejudice to the opposing party…  In the absence of such a reason, denial of leave to amend is an abuse of discretion and reversible.").

Dated:  April 24, 2015                    Respectfully submitted,

                                          **BURSOR & FISHER, P.A.**

                                          By:___*/s/ Julia A. Luster*_____
                                                   Julia A. Luster

                                          L. Timothy Fisher (State Bar No. 191626)
                                          Annick M. Persinger (State Bar No. 272996)
                                          Julia A. Luster (State Bar No. 295031)
                                          1990 North California Boulevard, Suite 940
                                          Walnut Creek, CA  94596
                                          Telephone: (925) 300-4455
                                          Facsimile:  (925) 407-2700
                                          E-Mail: ltfisher@bursor.com
                                                   apersinger@bursor.com
                                                   jluster@bursor.com

                                          *Attorneys for Plaintiff*