1

2

3

4

5

6                   UNITED STATES DISTRICT COURT

7                 NORTHERN DISTRICT OF CALIFORNIA

8

9    ROBERT FRENZEL,                      Case No. 14-cv-03587-WHO
                   Plaintiff,
10                                          **ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANT'S
11         v.                               MOTION TO DISMISS FIRST
                                            AMENDED COMPLAINT**
     ALIPHCOM,
12                                          Re: Dkt. No. 26
                   Defendant.
13

14

15                        **INTRODUCTION**

16         Plaintiff Robert Frenzel accuses defendant Aliphcom dba Jawbone ("Jawbone") of

17   fraudulently inducing him to purchase a Jawbone UP fitness tracker wristband through

18   misrepresentations regarding the device's battery life and general functionality.  He seeks to

19   represent a national class asserting claims under California's Consumer Legal Remedies Act,

20   Unfair Competition Law, and False Advertising Law, as well as claims for breaches of express

21   warranty and the implied warranty of merchantability.  In the December 29, 2014 order on

22   Jawbone's motion to dismiss Frenzel's original complaint ("Prior Order"), I dismissed each of

23   Frenzel's claims under a choice of law analysis and because the claims were inadequately alleged

24   for a variety of other reasons.  In his first amended complaint ("FAC"), Frenzel has cured some,

25   but not all, of the defects I identified.  Accordingly, Jawbone's motion to dismiss the FAC is

26   GRANTED IN PART and DENIED IN PART.

27

28

United States District Court
Northern District of California

**BACKGROUND**

## I.      FACTUAL BACKGROUND

### A.      The Jawbone UP

Jawbone is a California corporation headquartered in San Francisco, California.  FAC ¶ 8 (Dkt. No. 23).  It markets and sells the Jawbone UP, a "fitness tracker" or "lifestyle" wristband designed to track and measure a user's movements, calorie intake, and sleeping patterns.  *Id.* ¶ 35. To do these things, each Jawbone UP contains a battery, an accelerometer, and "MotionX Software."  *Id.* ¶ 36.  Frenzel describes the Jawbone UP as a system consisting of three basic components: (1) the wristband itself, (2) the software, and (3) the Jawbone mobile application ("app") and website.  *Id.* ¶ 2.  Each of these components is integral to the operation of a Jawbone UP.  *Id.*  The wristband holds the battery, accelerometer, and software; the software tracks and measures the user's activity; and the Jawbone app and website record and display the data gathered by the software so that the user can view it.  *Id.*

Jawbone has distributed three versions of the Jawbone UP: the first generation Jawbone UP, the second generation Jawbone UP, and the Jawbone UP24.  *Id.* ¶ 34.  While Frenzel previously alleged claims based on all three versions of the product, he now limits his claims to the second generation Jawbone UP, the version he purchased.  *Id.* ¶¶ 1 n.1, 34.  All references to "Jawbone UP" in this order are to the second generation Jawbone UP unless otherwise indicated.

### B.      Frenzel's Experience with the Jawbone UP

Frenzel is a Missouri citizen residing in Kansas City, Missouri.  FAC ¶ 7.  On November 12, 2012, he purchased a Jawbone UP from an Apple store in Kansas City.  *Id.* ¶ 64.  While in the store and before purchasing the device, he "carefully reviewed the product packaging and compared the representations [Jawbone] made . . . with those of other fitness trackers, including the Nike FuelBand."  *Id.*  He "specifically noted that unlike the Nike Fuelband, the Jawbone UP had an advertised battery life of 10 days."  *Id.*  He also specifically noted that the Jawbone UP would "track" and "measure" his movement, sleep patterns, and calorie intake.  *Id.*  Frenzel states that he "relied on these representations . . . on the product packaging when deciding to purchase the Jawbone UP instead of another fitness tracker."  *Id.*  Before purchasing his Jawbone UP,

United States District Court
Northern District of California

2

1    Frenzel also downloaded the Jawbone app "to see how the Jawbone Service and Software worked
2    and to determine if he wanted to purchase the device." *Id.* ¶ 65.[1]

3         Frenzel states that "[f]rom the first day, [his] Jawbone UP did not maintain a charge for the
4    advertised 10 days following a complete charge." *Id.* ¶ 66.  The device "maintained its charge for
5    a dramatically shorter period of time," such as for only "a few hours or a day." *Id.*  In addition, it
6    "did not accurately record his movement, sleep patterns, and calorie intake." *Id.*  Frenzel explains
7    that the device "failed to record significant periods of physical activity over the course of a day so
8    that he appeared inactive when he had actually been active.  That resulted in inaccurate readings of
9    both movement and calorie intake.  Further, the device frequently failed to record his sleep
10   patterns, making it appear he had not slept when, in fact, he had." *Id.*

11        Frenzel eventually contacted Jawbone to report these problems.  Less than one year had
12   passed since he purchased his device, and he was issued a replacement. *Id.* ¶ 66.[2]  He

---

[1] Attached to the FAC is a declaration by Frenzel describing his purchase of his Jawbone UP.
Frenzel Decl. ¶¶ 1-5 (FAC at p. 49-50).  The declaration's account of Frenzel's purchase is
substantially identical to the FAC's.  *See id.*

[2] Frenzel alleges that each Jawbone UP is accompanied by a one-year warranty that provides for a
replacement Jawbone UP, and that each replacement device issued under the one-year warranty
comes with its own three-month warranty.  FAC ¶ 34.  Jawbone submits a copy of its limited
warranty for judicial notice.  RJN Ex. 1 (Dkt. No. 27-1).  The limited warranty provides in
relevant part:

> AliphCom ("Jawbone") warrants to you, the original retail purchaser
> ("Consumer"), that this product ("Product") will under normal use
> operate substantially in accordance with the accompanying
> documentation for a period of one (1) year from date of original
> purchase.  Consumer's sole and exclusive remedy, and Jawbone's
> sole and exclusive responsibility under this warranty will be, at
> Jawbone's option, either to repair or replace the defective Product
> during the one (1) year limited warranty period so that it performs
> substantially in accordance with the accompanying documentation
> on the date of your initial purchase.  Any replacement may be, at the
> option of Jawbone, a new or remanufactured Product.

*Id.* at 4.  It also states, "Jawbone DOES NOT WARRANT THAT THE PRODUCT IS ERROR
FREE OR THAT IT WILL FUNCTION WITHOUT INTERRUPTION."  *Id.* (capitalization in
original).

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   "experienced identical problems" with this second device. *Id.* ¶ 67.  "Like his first band, his

2   second band immediately suffered from a significantly shorter battery life, sometimes maintaining

3   a charge for only a few hours.  Further, as before, the band failed to accurately record his

4   movement, calorie intake, and sleep patterns from day one." *Id.*  When the replacement Jawbone

5   UP "stopped working," Frenzel again contacted Jawbone but was told that the three-month

6   warranty period on the replacement device had expired, and that his only recourse was to purchase

7   a new one. *Id.*[3]

8          Frenzel claims that two representations on the Jawbone UP box are false and misleading.

9   The first states, "Battery life up to 10 days." *Id.* ¶ 39.  The second states, "Measure your daily

10  activity details including steps, distance, speed, intensity, and calories burned.  Learn how active

11  you are throughout the day to help you reach your goals." *Id.* ¶ 44.[4]

12         **C.      Choice of Law Provisions**

13         Frenzel contends that all Jawbone UP purchasers are subject to California choice of law

14  provisions included in contracts they enter with Jawbone upon purchasing and setting up their

15  devices.  FAC ¶ 12.  He identifies two contracts with such provisions: (1) the terms of use for

16  Jawbone's website (the "Website Terms of Use") and (2) Jawbone's "Service and Software Terms

17  of Use." *Id.*

18                         **1.      Website Terms of Use**

19         Jawbone UP purchasers agree to the Website Terms of Use by visiting the Jawbone

20  website or when installing the Jawbone app.  FAC ¶ 21.  The Jawbone UP user manual directs

21  purchasers to visit the Jawbone website to install the Jawbone app. *Id.*  For the app to function,

22

23  [3] Jawbone's unopposed request for judicial notice of its limited warranty, Dkt. No. 27, is
    GRANTED.  *See Gross v. Symantec Corp.*, No. 12-cv-00154-CRB, 2012 WL 3116158, at *10
24  (N.D. Cal. July 31, 2012) ("Under the incorporation-by-reference doctrine, courts may consider
    relevant documents not physically attached to the plaintiff's pleading if (1) the contents are central
25  to the allegations and (2) no party questions the authenticity of the documents.").  The rest of
    Jawbone's requests for judicial notice concern materials that are not necessary to decide this
26  motion.  *See* Dkt. No. 27.  They are DENIED AS MOOT.

27  [4] The Jawbone UP box similarly advertises, "Measure daily activity and calories burned," and
    "Track your daily activity food and sleep."  FAC ¶ 44.  It also states: "Track how you sleep, move,
28  and eat.  Understand more about yourself to make smarter choices and feel your best." *Id.*

4

United States District Court
Northern District of California

1  purchasers must agree to the Website Terms of Use.  *Id.* ¶¶ 25-28.  Frenzel states that he agreed to

2  them while in the Apple store when he downloaded the Jawbone app.  *Id.* ¶ 65

3        The first paragraph of the Website Terms of Use states that Jawbone "grants you the right

4  to use this website . . . subject to the terms and conditions of use ('Terms of Use' or 'Agreement')

5  set forth below.  THE PURCHASE OF ANY PRODUCT OR SERVICE THROUGH THE SITE

6  IS GOVERNED BY THE TERMS OF SALE."  Website Terms of Use at 1 (FAC Ex. B, Dkt. No.

7  23-2).  The agreement's choice of law (and choice of venue) provision states as follows:

8        These Terms of Use and any action related thereto will be governed,
   controlled, interpreted, and defined by and under the laws of the
9        State of California, without giving effect to any principles that
   require the application of the law of a different jurisdiction.  By
10       using this site, you hereby expressly consent to the personal
   jurisdiction and venue in the state and federal courts for San
11       Francisco County, California, and you agree that any claim brought
   by you pursuant to these Terms of Use will be brought solely in
12       those courts and no other court.

13       *Id.*

14       Frenzel alleges that the Jawbone website is integral to the use of a Jawbone UP in that

15  "[w]henever a user logs information into the [Jawbone] app . . . , that information is updated in real

16  time on [the Jawbone] website."  *Id.* ¶ 32.  Thus, "[w]hether users know it or not, they use the

17  Jawbone website each and every time they log an activity on their app or plug their Jawbone UP

18  into their phone . . . to sync and record their data."  *Id.* ¶ 30.  In addition, both the app and the

19  website enable Jawbone UP users to view their "Account Data" and to input and edit their

20  "Registration Data."  *Id.* ¶ 29.  Frenzel claims that this "affects the function of the accelerometer

21  and the device's ability to record calorie intake and burn."  *Id.*  Frenzel states that the app and

22  website are also integral to the use of a Jawbone UP device in that they are the only means by

23  which a Jawbone UP user may check his or her device's remaining battery charge.  *Id.*

24                      **2.      Service and Software Terms of Use**

25       Jawbone UP users agree to the Service and Software Terms of Use when installing the

26  Jawbone app and setting up their device.  FAC ¶ 12.  Frenzel states that he agreed to it when he

27  downloaded the Jawbone app in the Apple store.  *Id.* ¶ 65.  The agreement's first sentence explains

28  that it is a "legal agreement between you and [Jawbone] concerning your use of the Jawbone

1    Service and Software (both as defined below) provided by Jawbone for updating and controlling

2    your Jawbone Device."  Software and Service Terms of Use at 1 (FAC Ex. A, Dkt. No. 23-1).

3            The agreement defines "Jawbone Service" as the "service . . . that enables you to update

4    and control your Jawbone Device."  *Id.* at 2.  The agreement then states that "[u]se of the Jawbone

5    Service requires a personal computer, a Jawbone Device, internet access, and an installed and

6    operating version of the Jawbone application software ('Jawbone Application')," and that "[y]our

7    ability to use the Jawbone Service may be affected by the performance of these items."  *Id.*

8            "Software" is defined as "[t]he software products made available through the Jawbone

9    Service."  *Id.*  The agreement also explains that "[t]wo types of Jawbone software are offered

10   through the Jawbone Service: (i) the Jawbone Application; and (ii) firmware for the Jawbone

11   Device ('Device Firmware')."  *Id.*  "The Jawbone Application and Device Firmware are

12   collectively referred to as 'Software.'"  *Id.*

13           The agreement's choice of law/venue provision states as follows:

14                   These Terms of Use and your use of the Jawbone Service are
                     governed by the laws of the State of California, without reference to
15                   its conflict of law rules.  Your use of the Jawbone Service may also
                     be subject to other local, state, national, or international laws.  You
16                   expressly agree that exclusive jurisdiction and venue for any claim
                     or dispute with Jawbone or relating in any way to your use of the
17                   Software resides in the state or federal courts of San Francisco
                     County, California.  You hereby irrevocably consent to the personal
18                   and exclusive jurisdiction and venue of these courts."

19                   *Id.* at 7-8.

20           Frenzel alleges that the Jawbone Software directly impacts the battery life of the Jawbone

21   UP and is "one of the root causes" of the battery problems in the device.  FAC ¶ 43.  To illustrate

22   this connection, Frenzel points to a September 8, 2014 posting on Jawbone's website reporting

23   that an update to the firmware for the Jawbone UP24 (a newer version of the Jawbone UP)

24   doubles the device's battery life, from seven to fourteen days.  *Id.* (citing Hari Chakravarthula,

25   "UP24 Now Lasts 14 Days on a Single Charge," available at https://jawbone.com/blog/up24-now-

26   lasts-14-days-single-charge).

27   **II.     PROCEDURAL BACKGROUND**

28           Frenzel filed this action on August 7, 2014.  Dkt. No. 1.  His original complaint asserted

United States District Court
Northern District of California

6

1    six causes of action against Jawbone: (1) violations of California's Consumer Legal Remedies Act

2    ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (2) violations of California's Unfair Competition Law

3    ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (3) violations of California's False Advertising

4    Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*; (4) breach of express warranty; (5) breach

5    of the implied warranty of merchantability; and (6) breach of the implied warranty of fitness for a

6    particular purpose. *Id.*

7             On December 29, 2014, I issued the Prior Order, granting Jawbone's motion to dismiss the

8    original complaint. Dkt. No. 22. I dismissed each cause of action with leave to amend but

9    dismissed Frenzel's request for injunctive relief without leave to amend. *Id.* at 27-28. I denied

10   Jawbone's motion to strike certain aspects of the proposed class definition, although without

11   prejudice to renewal of the motion upon the filing of an amended complaint. *Id.*

12            Frenzel filed the FAC on January 28, 2015. The FAC abandons the cause of action for

13   breach of the implied warranty of fitness for a particular purpose but otherwise includes the same

14   causes of action as the original complaint. As before, Frenzel states that he seeks to represent a

15   national class. FAC ¶ 72. However, Frenzel no longer seeks to represent purchasers of the first

16   generation Jawbone UP or the Jawbone UP24. *Id.* ¶¶ 1 n.1, 34. The proposed class definition is

17   now limited to all persons who purchased the second generation Jawbone UP, excluding those

18   who purchased it for resale. *Id.* ¶ 72. Frenzel seeks restitutionary, compensatory, and punitive

19   damages on behalf of himself and the class. FAC at p. 47 ("Prayer for Relief").[5]

20            Jawbone moved to dismiss on March 16, 2015. Dkt. No. 26. I heard argument from the

21   parties on May 27, 2015.

22

23

24

25

26   _____

27   [5] The FAC also includes a request for injunctive relief. FAC at p. 47. This request was dismissed
     without leave to amend in the Prior Order. Prior Order at 27. Frenzel explains in his opposition
     brief that the request appears in the FAC due to on oversight and that he no longer seeks injunctive

28   relief. Opp. at 2 n.1.

1

## LEGAL STANDARD

### I.   RULE 12(b)(6): MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). While "a complaint need not contain detailed factual allegations . . . it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "[C]onclusory allegations of law and unwarranted inferences are insufficient to avoid . . . dismissal" under this standard. *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). "[I]t is within [the court's] wheelhouse to reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

### II.   RULE 9(b): HEIGHTENED PLEADING STANDARD FOR FRAUD OR MISTAKE

Claims sounding in fraud or mistake are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that such claims "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994) (internal quotation marks and alterations omitted). The allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

### III.   RULE 12(f): MOTION TO STRIKE

Federal Rule of Civil Procedure 12(f) authorizes a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.

United States District Court
Northern District of California

1   Civ. P. 12(f).  The function of a motion to strike "is to avoid the expenditure of time and money

2   that must arise from litigating spurious issues by dispensing with those issues prior to trial."

3   *Sidney–Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  Motions to strike are

4   generally disfavored and "should not be granted unless the matter to be stricken clearly could have

5   no possible bearing on the subject of the litigation."  *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F.

6   Supp. 2d 1048, 1057 (N.D. Cal. 2004); *accord Adedapoidle-Tyehimba v. Crunch, LLC*, No. 13-cv-

7   00225-WHO, 2013 WL 4082137, at *5-7 (N.D. Cal. Aug. 9, 2013).

**DISCUSSION**

8

9   **I.      CHOICE OF LAW ANALYSIS**

10          In the Prior Order, I held that California's choice of law rules required the dismissal of

11   each of Frenzel's individual claims and prohibited him from representing a national class asserting

12   claims under the CLRA, UCL, and FAL.  Prior Order at 5-10.  I dismissed his individual claims

13   because he had not identified the state in which he purchased his Jawbone UP.  *Id.* at 8-9.  I

14   determined that he could not represent a national class asserting CLRA, UCL, and FAL claims

15   upon finding that, "given the . . . state of his pleadings, Jawbone ha[d] adequately demonstrated

16   that 'each class member's consumer protection claim[s] should be governed by the consumer

17   protection laws of the jurisdiction in which [his or her] transaction took place.'"  *Id.* at 9 (quoting

18   *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012)).

19          In the FAC, Frenzel clarifies that he purchased his Jawbone UP in Missouri but continues

20   to seek to assert California state law claims on behalf of a national class.[6]  *See* FAC ¶¶ 64, 72.

21   Jawbone contends that "there is nothing new in the FAC that could alter the Court's previous

22   conclusion that . . . choice of law principles prevent [Frenzel] from maintaining individual or class

23   claims under California law."  Mot. at 6-7.  Frenzel responds that the choice of law provisions in

24

25   ───────────────

    [6] Like the original complaint, the FAC does not specify under which state's law Frenzel seeks to
26   assert his warranty claims.  *See* FAC ¶¶ 106-121.  However, other allegations in the FAC indicate
    that Frenzel means to bring them under California law.  *See, e.g., id.* ¶ 20 ("California law applies
27   in this case.").  In addition, the two cases that Frenzel cites in his opposition brief in support of his
    warranty claims both apply California law.  *See* Opp. at 23, 23 n.4.  For these reasons, I construe
28   the FAC as seeking to assert warranty claims under California law.

United States District Court
Northern District of California

the Website and Service and Software Terms of Use make the application of California law proper here, and that even if the Terms of Use are inapplicable, California law is properly applied under the three-step governmental interest test. Opp. at 2-13.

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001); *accord Mazza*, 666 F.3d at 589. "California has two different analyses for selecting which law should be applied in an action." *Washington Mut. Bank, FA v. Superior Court*, 24 Cal.4th 906, 914 (2001). Where there is no advance agreement between the parties regarding applicable law, courts apply the three-step governmental interest test, "analyz[ing] the governmental interests of the various jurisdictions involved to select the appropriate law." *Id.* Where, as here, the parties have entered an agreement containing a choice of law provision, courts follow *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459 (1992).[7]

*Nedlloyd* instructs courts to "first examine the choice of law clause [to] ascertain whether the advocate of the clause has met its burden of establishing that the various claims of putative class members fall within its scope." *Washington*, 24 Cal.4th at 916. "[T]he scope of a choice of law clause . . . is a matter that ordinarily should be determined under the law designated therein." *Id.* at 916 n.3. In *Nedlloyd*, the California Supreme Court held that under California law, "a valid choice of law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates." 3 Cal.4th at 470. The court explained: "When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified

---

[7] California requires courts to conduct a "separate conflict of laws inquiry [for] each issue in the case." *Washington*, 24 Cal.4th at 920; *see also Estrella v. Freedom Fin. Network, LLC*, No. 09-cv-03156-SI, 2010 WL 2231790, at *4 (N.D. Cal. June 2, 2010) (noting that a court applying California's choice of law rules must "conduct a choice of law analysis for each claim or issue"). A court may thus "be required to utilize both [the governmental interest test and the *Nedlloyd* approach]" in a single case. *Washington*, 24 Cal.4th at 915.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    jurisdiction, the logical conclusion is that he or she intended that law to apply to all disputes

2    arising out of the transaction or relationship." *Id.* at 469 (emphasis omitted).

3         Once a court finds that a claim falls within the scope of a choice of law clause, it must then

4    consider whether the clause is enforceable. *Washington*, 24 Cal.4th at 916.  This involves a two-

5    part inquiry.  *Id.*  The court must first determine "whether the chosen state has a substantial

6    relationship to the parties or their transaction," or "whether there is any other reasonable basis for

7    the parties' choice of law."  *Id.* (internal quotation marks omitted).  Second, if either of these tests

8    is met, the choice of law clause is enforceable unless the court finds both (1) that "the chosen

9    state's law is contrary to a fundamental policy of California," and (2) that California "has a

10   materially greater interest than the chosen state in the determination of the particular issue."  *Id.* at

11   916-17.

12        With this framework in mind, I turn to the choice of law provisions at issue here.

13   **A.      Website Terms of Use**

14   The choice of law/venue provision in the Website Terms of Use states that

15         [t]hese Terms of Use and any action related thereto will be
     governed, controlled, interpreted, and defined by and under the laws
16   of the State of California, without giving effect to any principles that
     require the application of the law of a different jurisdiction. By
17   using this site, you hereby expressly consent to the personal
     jurisdiction and venue in the state and federal courts for San
18   Francisco County, California, and you agree that any claim brought
     by you pursuant to these Terms of Use will be brought solely in
19   those courts and no other court.

20   Website Terms of Use at 1.  In opposing Jawbone's motion to dismiss the original complaint,

21   Frenzel argued that the choice of law provision extended to his claims.  I rejected the argument on

22   the ground that it was unsupported by the actual allegations in the complaint, which made no

23   reference either to the provision or to the Website Terms of Use.  Prior Order at 9-10.

24        I also noted that even if Frenzel were to add appropriate allegations, the argument would

25   still likely fail because his claims did not to appear to relate to the Website Terms of Use.  *Id.*  I

26   cited two cases that had reached the same conclusion in similar circumstances.  *See In re Sony*

27   *Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 964-65 (S.D. Cal.

28   2012) (rejecting argument that plaintiffs' CLRA, UCL, and FAL claims were governed by the

1    choice of law provision in defendants' terms of service contract, where "[b]y its own terms, . . . the

2    provision dictates only that California law applies to the construction and interpretation of the

3    contract, and thus the provision does not apply to plaintiffs' noncontractual claims asserted under

4    California's consumer protection statutes"); *Nikolin v. Samsung Electronics Am., Inc.*, No. 10-cv-

5    01456, 2010 WL 4116997, at *4 n.3 (D.N.J. Oct. 18, 2010) ("By its express language, the Terms

6    of Use 'govern [the website visitor] while on this site,' and in a subsection titled 'Violation of

7    Terms of This Site,' they state that New Jersey law governs '[a]ny action related to these

8    Terms.'. . . Plaintiff has not alleged that either she or [defendant] violated the terms of

9    [defendant's] website, and [she] has not alleged that her claims arise under the website's terms.").

10    Frenzel dedicates a substantial portion of the FAC to allegations aimed at establishing a

11    connection between his claims and the Website Terms of Use. He states that Jawbone UP

12    purchasers must agree to the Website Terms of Use for their Jawbone app to function. *See* FAC ¶¶

13    25-28. Once the app is up and running, the app and website "simultaneously calculate and display

14    user data." *Id.* ¶ 31. "Whenever a user logs information into the app . . . , that information is

15    updated in real time on [the] website." *Id.* ¶ 32. "Whether users know it or not, they use the

16    Jawbone website each and every time they log an activity on their app or plug their Jawbone UP

17    into their phone . . . to sync and record their data." *Id.* ¶ 30. In addition, both the app and the

18    website enable Jawbone UP users to view their "Account Data" and to input and edit their

19    "Registration Data." *Id.* ¶ 29. Frenzel alleges that this "affects the function of the accelerometer

20    and the device's ability to record calorie intake and burn." *Id.*

21    Frenzel also states that the app and website are the only means by which Jawbone UP users

22    may check their device's remaining battery charge. *Id.* ¶ 29. He alleges that the app and website

23    display inaccurate information regarding remaining battery charge, as well as inaccurate

24    information regarding user activity. *Id.* ¶ 32. He claims that because the app and website display

25    this inaccurate information and are "integral to the accurate recording of the device," his claims

26    fall within the scope of the Website Terms of Use's choice of law provision. *Id.*

27    Jawbone contends that Frenzel's efforts to connect his claims to the Website Terms of Use

28    are misguided. It emphasizes that the choice of law provision, by its own terms, governs only

United States District Court
Northern District of California

12

"[t]hese Terms of Use and any action related thereto," not any action related in any way to the website.  Reply at 3.  Jawbone argues that Frenzel's position fails to "appreciate the distinction between claims arising from the website itself and claims arising from the terms of an agreement governing the website.  Even assuming that [Frenzel] has established the former, the choice of law provision only covers the latter."  *Id.* at 4.

Jawbone has the better of these arguments.  By its own terms, the Website Terms of Use's choice of law provision extends only to the terms of use themselves and to "any action related thereto."  Neither Frenzel's consumer protection claims nor his warranty claims are based on the Terms of Use themselves – e.g., he has not identified any misrepresentations or sued upon any express warranty statements contained in the Terms of Use.

Frenzel's efforts to portray his claims as being related to the Website Terms of Use are also unconvincing.  Although it appears that his claims have some tangential connection to the Jawbone website, their connection to the Website Terms of Use is beyond attenuated.  In *Nedlloyd*, the court found that a choice of law clause in a shareholders' agreement extended to claims for breach of fiduciary duty where the shareholders' agreement "creat[ed] the relationship between shareholder and corporation that g[ave] rise to [the plaintiff's] cause of action."  3 Cal.4th at 469.  The court explained that the defendant's "fiduciary duties, if any, arise from – and can exist only because of – of the shareholders' agreement."  *Id.*  That is not the situation here.  None of Frenzel's claims arise from the Website Terms of Use, and none exist only because of it.  Unlike *Nedlloyd*, this is not case where the claims at issue "emanat[e] from the agreement or the legal relationships it creates."  *Id.* at 470.  The choice of law provision from the Website Terms of Use does not apply here.

### B.   Service and Software Terms of Use

The choice of law/venue provision in the Service and Software Terms of Use states that

> [t]hese Terms of Use and your use of the Jawbone Service are governed by the laws of the State of California, without reference to its conflict of law rules.  Your use of the Jawbone Service may also be subject to other local, state, national, or international laws.  You expressly agree that exclusive jurisdiction and venue for any claim or dispute with Jawbone or relating in any way to your use of the Software resides in the state or federal courts of San Francisco

County, California.  You hereby irrevocably consent to the personal
and exclusive jurisdiction and venue of these courts."

Service and Software Terms of Use at 7-8.  Frenzel did not raise this provision in opposing the

previous motion to dismiss, and I did not discuss it in the Prior Order.

Frenzel states that the issue of whether his claims fit within the scope of the provision boils

down to a simple question: "[D]o [his] claims arise from his use of the Jawbone Service?"  Opp. at

4 (internal quotation marks omitted).  In support of his contention that they do, he alleges that the

Jawbone Software directly impacts the battery life of the Jawbone UP and is "one of the root

causes" of the device's battery problems.  FAC ¶ 43.  He also alleges that the Jawbone Service and

Jawbone Software are responsible for "inaccurately record[ing] user activity and report[ing]

inaccurate charge remaining for the battery."  *Id.* ¶ 32.

I agree with Jawbone that Frenzel's allegations regarding the connection between his

claims and the Jawbone Service are thin.  Nevertheless, I am persuaded that Frenzel's new reliance

on the choice of law provision in the Service and Software Terms of Use raises factual issues that

make the choice of law issue in this case better suited for resolution at class certification.  *Cf. Bias*

*v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 928 (N.D. Cal. 2013) (applying the *Nedlloyd* approach

but declining to decide choice of law issue at pleading phase where "the record with respect to

balancing the competing states' interests is not sufficiently developed").

The scope of the provision is significantly broader than the choice of law provision in the

Website Terms of Use.  Rather than applying only to the agreement itself and to "any action

related thereto," Website Terms of Use at 1, the choice of law provision in the Service and

Software Terms of Use extends to "your use of the Jawbone Service," Service and Software Terms

of Use at 7-8.  While the parties dispute the meaning of "Jawbone Service," there is no question

that the term covers a substantial portion of how consumers likely use their Jawbone UPs.  The

agreement broadly defines the term as the "service . . . that enables you to update and control your

Jawbone Device."  *Id.* at 2.  The agreement also states, unhelpfully, that "[u]se of the Jawbone

Service requires a personal computer, a Jawbone Device, internet access, and an installed and

operating version of the [Jawbone Application]," and that "[y]our ability to use the Jawbone

Service may be affected by the performance of these items."  *Id.*  Neither party has directed me to

14

United States District Court
Northern District of California

1    any portion of the agreement that provides additional clarity regarding the meaning of the term.

2    Determining that meaning, and which if any of the claims at issue here are sufficiently connected

3    to it to fall within the scope of the Service and Service Terms of Use's choice of law provision, is

4    better done after the parties have had an opportunity to conduct discovery and develop a factual

5    record.

6        Accordingly, I decline to hold, at this juncture, that California's choice of law rules

7    prohibit Frenzel from maintaining his claims against Jawbone, and the motion to dismiss on this

8    ground is DENIED.  Jawbone will have an opportunity to revisit the choice of law issue at class

9    certification.

10   **II.   FIRST, SECOND, AND THIRD CAUSES OF ACTION: VIOLATIONS OF THE
         CLRA, UCL, AND FAL**

11       In the Prior Order, I found that Frenzel's claims under the CLRA, UCL, and FAL failed to

12   satisfy Rule 9(b)'s heightened pleading standard.[8]  Prior Order at 11-18.  I explained that Frenzel

13   had not adequately alleged the existence of any actionable misrepresentation, and that he had "not

14   alleged with sufficient detail what representations he reviewed, when he first reviewed them, or

15   which ones he relied on in deciding to purchase his Jawbone UP."  Prior Order at 16.

16       Frenzel's amended consumer protection claims are based on two theories: (1) that Jawbone

17   misrepresented that Jawbone UP "retains its [battery] charge for 10 days when fully charged;" and

18   (2) that Jawbone misrepresented that the device "would accurately 'track' and 'measure' a user's

19   movement, sleep patterns, and calorie intake."  FAC ¶ 86; *see also, e.g., id.* ¶¶ 95, 98, 102, 105.

20   Frenzel alleges that Jawbone knew or should have known that the Jawbone UP device does not

21   maintain a battery charge for ten days when fully charged, and that the device does not accurately

22   record a user's movement, sleep patterns, or calorie intake.  *See, e.g.,* FAC ¶ 86.

23       Jawbone contends that both theories are defective under Rule 9(b).  I address each in turn.

24   **A.   Battery Life Theory**

25       As an initial matter, I note that Frenzel repeatedly mischaracterizes the alleged

26

27   _____

28   [8] Frenzel did not then and does not now dispute that his CLRA, UCL, and FAL claims sound in
     fraud and are governed by Rule 9(b).  *See, e.g.,* Opp. at 18.

misrepresentation underlying his battery life theory.  Frenzel claims that Jawbone misrepresented that the Jawbone UP "retains its charge for 10 days when fully charged."  FAC ¶ 86.  Similarly, he alleges that he selected the Jawbone UP over other fitness tracker wristbands based in part on Jawbone's representations that the device "had . . . a battery life of 10 days," and "would maintain a charge for 10 days."  *id.* ¶ 64; Frenzel Decl. ¶ 4.  The only representations that Frenzel alleges he relied on in making his purchase, however, were those on the device's box.  *See, e.g.,* FAC ¶ 64.  According to the FAC, the only statement regarding battery life on the device's box was not that the battery charge lasts 10 days, but that it lasts "up to" 10 days.[9]  *See id.* ¶ 39.  There is a significant difference between those two phrases, and Frenzel's apparent attempt to treat them as equivalent is not well taken.  To the extent his CLRA, UCL, and FAL claims are based on the allegation that Jawbone misrepresented that the Jawbone UP "retains its charge for 10 days when fully charged," *id.* ¶ 86, the claims are DISMISSED WITHOUT LEAVE TO AMEND.  Frenzel cannot maintain causes of action under these statutes based on a statement that he does not claim he relied on in making his purchase.  *See, e.g., Mazza*, 666 F.3d at 591 (in case involving claims under the CLRA, UCL, and FAL, noting that "California . . . requires named class plaintiffs to demonstrate reliance").

This leaves the question of whether the statement, "Battery life up to 10 days," can support Frenzel's consumer protection claims.  In the Prior Order, I dismissed his claims arising from this statement on the ground that he "ha[d] not adequately alleged the manner in which [the statement] was false or misleading."[10]  Prior Order at 15.  I explained that Frenzel had failed to allege with any degree of specificity: (1) whether either his original Jawbone UP or his replacement device ever maintained a charge for ten days; (2) how long after he acquired each device it began exhibiting power problems; (3) for how long each device would maintain a charge after it began

---

[9] In addition, Frenzel clarifies in his opposition brief that it was the statement, "Battery life up to 10 days," that "deceived [him] into believing the battery would last for 10 days."  Opp. at 21.

[10] Frenzel previously alleged that "[w]ithin a few months" of purchasing his original Jawbone UP, he "began experienc[ing] problems with [the device] when it stopped maintaining its charge," and that his replacement device "could not retain a charge" and "ultimately died."  Dkt. No. 1 at ¶¶ 41-42.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   exhibiting power problems; or (4) how much time passed between when his replacement device

2   began exhibiting power problems and when it stopped working.  *Id.* at 15-16.  I noted that

3   "Frenzel may not need to answer each of these questions to satisfy Rule 9(b) (and he may still fail

4   to satisfy Rule 9(b) despite answering all of them).  But Frenzel does need to provide sufficient

5   information regarding the manner in which Jawbone's statements were allegedly false or

6   misleading to give Jawbone notice of what it is charged with doing wrong."  *Id.* at 16 (citing

7   *Swartz*, 476 F.3d at 764).

8          Frenzel argues that the FAC cures these deficiencies.  He now alleges that "[f]rom the first

9   day, [his] Jawbone UP did not maintain a charge for [10 days] following a complete charge."

10   FAC ¶ 66.  The device "maintained its charge for a dramatically shorter period of time," such as

11   for only "a few hours or a day."  *Id.*  He further states that his replacement device exhibited

12   "identical problems" and "immediately suffered from a significantly shorter battery life,

13   sometimes maintaining a charge for only a few hours."  *Id.* ¶ 67.

14          I agree with Frenzel that these new allegations push his battery charge theory over the line

15   so that it survives a motion to dismiss.  As I noted in the Prior Order, "the phrase 'up to' does not

16   necessarily preclude [a] statement from providing the basis for a misrepresentation claim under

17   California's consumer protection statutes."  Prior Order at 14-15.  "[M]ultiple courts have found

18   that 'up to' representations may materially mislead reasonable consumers."  *Herron v. Best Buy*

19   *Co. Inc.*, 924 F. Supp. 2d 1161, 1172-73 (E.D. Cal. 2013) (citing cases).  In *Herron*, for example,

20   the court held that the plaintiff had stated a misrepresentation claim under the CLRA and UCL

21   where he purchased a laptop advertised as having a battery life of "up to 3.32 hours" and alleged

22   that he had "never once achieved even close to the represented 3.32 hours of battery life."  *Id.* at

23   1166-67, 1172-73.  In *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031 (N.D. Cal. 2010),

24   the court rejected the defendant internet provider's argument that statements regarding its

25   download speeds amounted to mere puffery under the CLRA, UCL, and FAL, where the plaintiffs

26   alleged that they had been unable to experience either the "typical" download speeds advertised by

27   the defendant, or the download speeds the defendant advertised its services as reaching "up to."

28   *Id.* at 1043-44.  And in *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351

17

1   (2003), the court reversed the grant of summary judgment for defendants on plaintiffs' CLRA,

2   UCL, and FAL claims arising from defendants' alleged misrepresentation that their program guide

3   system would display the schedule "up to 7 days in advance," where the record indicated that

4   plaintiffs could view the schedule only two to three days in advance. *Id.* at 1361-62. The court

5   rejected defendants' argument that their "up to" representation could only be reasonably

6   understood to mean that the system had the capacity to show the schedule seven days in advance.

7   *Id.* The court acknowledged that this was a "possible, if technical, interpretatio[n] of the

8   statemen[t], but we cannot say that there is no triable issue on whether [it was] untrue or

9   misleading . . . A perfectly true statement couched in such a manner that it is likely to mislead . . .

10   is actionable." *Id.* at 1361 (internal quotation marks omitted).

11          The new allegations in the FAC bring this case in line with decisions like *Herron*, *Walter*,

12   and *Echostar* and allow Frenzel to state a claim under the CLRA, UCL, and FAL. Jawbone does

13   not offer any authority to the contrary. Its only counterargument is to fault Frenzel for not

14   specifically alleging (1) how long after he acquired each device it began lasting only "a few hours

15   or a day;" (2) with what frequency each device lasted only a few hours; or (3) the longest period

16   each device ever lasted. Mot. at 18; Reply at 12. But Frenzel does allege how long after he

17   acquired each device it began lasting only a few hours or a day – i.e., "from the first day" for his

18   original Jawbone UP and "immediately" for his replacement device. FAC ¶¶ 66-67. I do not find

19   that additional specificity is required at this time. Nor do I find that Frenzel is required to allege

20   with greater detail how often his devices lasted only "a few hours or a day," or the longest period

21   they ever lasted.

22          Frenzel's battery life theory may proceed. Insofar as his CLRA, UCL, and FAL claims are

23   based on this theory, Jawbone's motion to dismiss those claims is DENIED.

24          **B.      Product Functionality Theory**

25          As with his battery life theory, Frenzel mischaracterizes the alleged misrepresentation

26   underlying his product functionality theory. He claims that Jawbone misrepresented that the

27   Jawbone UP "would accurately 'track' and 'measure' a user's movement, sleep patterns, and

28   calorie intake." FAC ¶ 86; *see also, e.g., id.* ¶¶ 95, 98, 102, 105. But, again, the only

representations Frenzel alleges he relied on in making his purchase were those on the Jawbone UP box, none of which use the word "accurately." Rather, according to the FAC, the only relevant statements on the box are:

> (1) "Measure your daily activity details including steps, distance, speed, intensity, and calories burned. Learn how active you are throughout the day to help you reach your goals."
>
> (2) "Measure daily activity and calories burned,"
>
> (3) "Track your daily activity food and sleep."
>
> (4) "Track how you sleep, move, and eat. Understand more about yourself to make smarter choices and feel your best."

*Id.* ¶ 44. As stated above, Frenzel cannot maintain causes of action under California's consumer protection statutes based on statements that he does not allege he relied on in making his purchase. To the extent that his CLRA, UCL, and FAL claims are based on the allegation that Jawbone misrepresented that the Jawbone UP "would accurately 'track' and 'measure' a user's movement, sleep patterns, and calorie intake," the claims are DISMISSED WITHOUT LEAVE TO AMEND.

In his opposition brief, Frenzel avoids basing his product functionality theory on any alleged statement involving the word "accurately." *See* Opp. at 22-23. He instead reframes the theory as a claim that "as soon as [a Jawbone UP] comes out of the box," it "cannot and does not function as advertised" in that it does not perform the promised tracking and measuring functions. *Id.*

This claim fails for two reasons. First, it is not supported by the allegations in the FAC. Frenzel repeatedly alleges that his devices failed to "accurately" track and measure, *see, e.g.,* FAC ¶ 86, but he does not allege that they never tracked and measured at all. For example, he alleges that his devices "failed to record significant periods of physical activity," not that they never recorded physical activity. *See id.* ¶¶ 66-67. Likewise, he states that his devices "frequently failed to record his sleep patterns," not that they never recorded his sleep patterns. *See id.* ¶¶ 66-67. These are allegations that the Jawbone UP does not track and measure very dependably, not that it completely fails to perform these functions.

The claim also fails because it is not meaningfully distinguishable from the product

United States District Court
Northern District of California

1   functionality theory I rejected in the Prior Order.  Frenzel previously alleged that various

2   statements on the Jawbone UP box regarding the product's functionality were misleading because

3   his device's power defect prevented it from working at all.  *See* Prior Order at 12-14; Dkt. No. 1

4   ¶¶ 15-17; Plaintiff's Opposition to Jawbone's Motion to Dismiss at 11-12 ("Plaintiff's claim is

5   simple: defendant stated that the device would do certain things that it . . . cannot do because it is

6   defective . . . Because of the power defect, the device cannot perform as described.").  I rejected

7   this theory on the ground that it "amount[ed] to the position that because [Frenzel's Jawbone UP]

8   eventually died, any statement by Jawbone regarding the device's functionality – regardless of

9   whether the statement claimed the device had a characteristic it does not have, or is of a standard

10  or quality of which it is not – was deceptive to a reasonable consumer."  Prior Order at 14 (internal

11  quotation marks and citations omitted).  I relied on several cases from this district holding that

12  general statements about a product's functionality – as opposed to statements regarding the

13  product's quality or reliability – do not become actionable on an affirmative misrepresentation

14  theory merely because the product fails to work perfectly.  *See In re MyFord Touch Consumer*

15  *Litig.*, 46 F. Supp. 3d 936, 954-55 (N.D. Cal. 2014); *Morgan v. Harmonix Music Sys., Inc.*, No.

16  08-cv-05211, 2009 WL 2031765, at *3 (N.D. Cal. July 7, 2009); *Long v. Hewlett-Packard Co.*,

17  No. 06-cv-02816 JW, 2007 WL 2994812, at *7 (N.D. Cal. July 27, 2007); *see also Berenblat v.*

18  *Apple, Inc.*, No. 08-cv-04969-JF, 2009 WL 2591366, at *6 (N.D. Cal. Aug. 21, 2009) (dismissing

19  CLRA claims based on laptop's allegedly defective memory slot where "[t]he complaint does not

20  allege that [defendant] made any specific representation with respect to the durability of the

21  memory slot;" noting that "[s]imilar claims under the CLRA have been rejected because otherwise

22  [a] statement describing any feature would be actionable when either the feature – or product as a

23  whole – eventually failed").

24          These cases continue to apply here, and I continue to find them persuasive.  Jawbone's

25  motion to dismiss Frenzel's CLRA, UCL, and FAL claims arising from the product functionality

26  theory is GRANTED.  Because I am persuaded that further amendment of those claims would be

27  futile, they are DISMISSED WITHOUT LEAVE TO AMEND.

28

**III.   FOURTH AND FIFTH CAUSES OF ACTION: WARRANTY CLAIMS**

Frenzel's fourth and fifth causes of action are for breach of express warranty and breach of the implied warranty of merchantability.  FAC ¶¶ 106-121.  I previously dismissed these causes of action on the ground that, even assuming that any such warranties existed, Frenzel had not alleged that Jawbone failed to comply with them.  Prior Order at 21-26.  I held that the warranty periods and available remedies for any express warranty or implied warranty of merchantability were constrained by the terms of Jawbone's limited warranty.  *Id.*  That limited warranty prescribes a one-year warranty period for Frenzel's original Jawbone UP and a three-month warranty period for his replacement device.  *See, e.g.,* FAC ¶ 34.  It also states that a consumer's "sole and exclusive remedy" is the "repair or replace[ment]" of the defective product.  RJN Ex. A at 4 (Dkt. No. 27-1).  Thus, because Frenzel had not alleged that Jawbone failed to repair or replace either of his devices within the applicable warranty period, he could not maintain claims for either breach of express warranty or breach of the implied warranty of merchantability.  Prior Order at 21-26.

Jawbone contends that the warranty claims in the FAC must be dismissed for the same reason.  Mot. at 21-22; Reply at 14.  I agree.  As in the original complaint, Frenzel does not allege in the FAC that Jawbone failed to repair or replace either of his devices during the applicable warranty periods.  Rather, he alleges that Jawbone replaced his original Jawbone UP because he contacted customer support within the one-year warranty period, and that Jawbone then refused to replace his replacement Jawbone UP because he contacted customer support after the three-month warranty period that governed that device.  FAC ¶ 67.  The only material difference between the original complaint and the FAC with respect to Frenzel's warranty claims is that Frenzel now clearly states that he did not contact Jawbone regarding his replacement device until after the expiration of the three-month warranty period.  *See* Dkt. No. 1 ¶¶ 40-41; FAC ¶67.  That difference does not justify a different outcome here.  Jawbone's motion to dismiss the fourth and fifth causes of action, for breach of express warranty and breach of the implied warranty of merchantability, is GRANTED.

I will allow leave to amend.  Although Frenzel does not specifically allege in the FAC when he attempted to return his replacement Jawbone UP, it appears possible that this occurred

United States District Court
Northern District of California

1  after the expiration of the three-month warranty period that governed his replacement device but

2  before the expiration of the one-year warranty period that governed his initial device.  In this

3  scenario, it seems possible that Frenzel could state a claim under a warranty theory against

4  Jawbone.

5  **IV.  MOTION TO STRIKE**

6  Frenzel seeks to represent a national class defined as all persons who purchased the second

7  generation Jawbone UP, excluding those who purchased it for resale.  FAC ¶ 72.  Frenzel has

8  already substantially narrowed his proposed class definition by removing from it purchasers of the

9  first generation Jawbone UP and the Jawbone UP24.  I agree with Frenzel that further

10  modification of the proposed class definition is inappropriate at this time.  *See In re Wal-Mart*

11  *Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007) ("[T]he granting of

12  motions to dismiss class allegations before discovery has commenced is rare . . . because the shape

13  and form of a class action evolves only through the process of discovery.") (internal quotation

14  marks omitted); *see also Long v. Graco Children's Products Inc.*, No. 13-cv-01257-JD, 2014 WL

15  7204652, at *4 (N.D. Cal. Dec. 17, 2014) ("Many courts have recognized that the sufficiency of

16  class allegations are better addressed through a class certification motion, after the parties have

17  had an opportunity to conduct some discovery.") (internal quotation marks and alterations

18  omitted).  The motion to strike is DENIED.

19  **CONCLUSION**

20  For the foregoing reasons, Jawbone's motion to dismiss the FAC is GRANTED IN PART

21  and DENIED IN PART.  Frenzel shall file a second amended complaint, if any, by July 27, 2015.

22  **IT IS SO ORDERED**.

23  Dated: July 7, 2015

24  _____

25  WILLIAM H. ORRICK
   United States District Judge

26

27

28

United States District Court
Northern District of California